UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI

TERRANCE J. FEASTER,

    Plaintiff,

VS.

ANNETTE CHAMBERS-SMITH, et al.,

    Defendants.

Case No. 1:22-cv-313

District Judge Michael R. Barrett
Magistrate Judge Karen L. Litkovitz

# MOTION TO COMPEL DISCOVERY

Plaintiff, Terrance J Feaster, acting in Pro Se moves this Court for Reconsideration in the foregoing "Motion to Compel" requiring Defendants to release, turnover, and or allow the plaintiff to review Direct Evidence that is relevant, viable, and favorable to the plaintiff in the instant case pursuant to "Fed. R. Civ. P. 26 (B)(iv), 34 and 37(a)(2). The relevant Evidence being Camera, DVR, and Audio is Exculpatory, Material, and discoverable to the Plaintiff. In accordance to "Federal Rules of Evidence 401 and 402. Plaintiff has made numerous "Good Faith" attempts to "meet and Confer" to no avail. See; "Memorandum "/Exhibits attached.

MEMORANDUM IN SUPPORT

I.     Introduction of Case and Facts, Plaintiff Terrance J. Feaster, Currently Incarcerated at the Southern Ohio Correctional Facility (S.O.C.F.) Brought a 42 USCS 1983 Civil Action against Defendants, in an Amended Complaint on 6/24/2022 (Doc. #3) for various civil rights violations.

II.  LAW AND ARGUMENT

On 2/29/2024 An order by Magistrate Judge Karen L. Litkovitz denying (Doc. #70) Plaintiff's Motion to Compel Discovery was entered.

In this Subsequent Motion For Reconsideration To Compel Discovery by Plaintiff pursuant to Fed. R. Civ. P. 26, 34, 37 (a)(2) as well as S.D. Ohio Civ. R. 37.1 Plaintiff expresses in accordance with the Aforementioned Order and cited authorities, He has "In a good faith attempt" Continuously requested Resolution and an opportunity to meet and confer on the basis of discovery to no avail via (Exhibit A Letter to defendants, Attorney Andrew T. Gatti and attached "Settlement Proposal" dated 12/1/2023). Which acts as the ultimate request for resolve and conference. With no response plaintiff then initiated discovery pursuant to Fed. R. Civ. P. 26 and 34 by way of "Plaintiff's First Requests For Production Of Documents" (see id. at PAGEID 600,

referencing Doc. 69-1). The plaintiff avers in order to not spoil any defense the defendants may have, he has in this instant motion attached exhibits more precise to his argument, those documents being disclosed but not fully in accordance with plaintiff's "First Request For Production Of Documents" and in no way being malicious or deliberately causing ill intentions to the discovery process in this matter and all authorities cited herein. Plaintiff prays the court takes this into consideration.

Moreover, Plaintiff insists that pursuant to Fed. Rules Evid R 401 and 402 and upon the test of this court and the relevancy/admissability of the evidence in question of both recorded camera DVD and DVR #666-21 which the plaintiff considers Direct and Relevant/admissable evidence in accordance to the Fed. Rules Evid. cited and discoverable at this juncture in the proceedings pursuant to Fed. R. Civ. P. 26, 34, and 37(a)(2), when requested, the defendants fail to turnover or allow review of exculpatory evidence, the court in it's discretion shall intervene as not to cause undue delay, financial hardship, or prejudice to the movant. Plaintiff puports that any reasonable person

Could infer this evidence to be the "meat and potatoes" of the case at bar and material to the Courts Facts and Findings. In The matter of time and resources spent on litigation, Plaintiff provides relevant exhibits to assist the court and "trier of fact", listed and labled further; 1). [Exhibit B. Correspondences between parties, [see; Plaintiff's letter to defendant's addressed to O.A.G.O. Atty A. Gatti - request For meet/confer or other matter in said Case, 1st letter from A. Gatti dated 1/19/24, Plaintiff's letter dated 1/24/24, and 2nd letter + list of documents with statement allowing review of said video and audio dated 1/30/24 and 2nd letter from plaintiff to A. Gatti / defendants requesting review of video and Audio dated 3/3/24 emphasis added). 2). (Exhibit C-1 Use of force report by: Witness /Camera Operator Austin Watts "AGO Bates stamped 000297" - Falsified Report - " [Witness Watts is not a defendant in this action] emphasis added), (Exhibit C-2 Supervisor's Use of Force / U.O.F. Summary Report Conducted by: Defendant Robert Setty "See, AGO Bates stamped 000283 - 000284 " "Falsified Report" [emphasis added]). (Exhibit C-3 "PLANNED" U.O.F. Checklist Authorized by: Defendant Phillip Frazie [see, ✱ = DVD/DVR Availability note: N/A] Bates Stamped

4

000281-000282. 3). (Exhibit D-1 Ohio Department of Rehabilitation and Correction Policies/Procedures O.D.R.C. Which govern U.O.F. and "SUPERSEDES" O.A.C. 5120-9-01 and 5120-9-02 [see, 63-UOF-01] emphasis added). (Exhibit D-2 [ODRC Policy 63-UOF-02 and "SUPERSEDES" ORC 5120.01; AR 5120-9-01, AR 5120-9-02] emphasis added) (Exhibit D-3 [ODRC Policy 63-UOF-03 and "SUPERSEDES" OAC, AR 5120-9-01, AR 5120-9-02 emphasis added). (Exhibit D-4 [OAC Ann., AR 5120-9-01, AR 5120-9-02] emphasis added)

4). (Exhibit E-1 [OAC Ann. 5120-9-29 which governs the authority of the S.O.C.F. R. Erdos - "warden's" designee Linnea Mahlman as the Officer of the office of The Inspector Of Institutional Services] Note: R. Erdos and designee I.I.S. L. Mahlman are not defendants in this action.) ((quotations omitted)) (Exhibit E-2 [OAC Ann. 5120-9-31 govern the Inmate Grievance Procedure] emphasis added) 5). (Exhibit F [Declaration of Cameron S. Parry] ((emphasis added)).

Further, Plaintiff expresses the provided exhibits attached are indicative of the correct, adequate, and procedural process in which the defendants and ODRC are usually conducted and due to the

5

repetitive failures and violations of the defendants viable, relevant, and admissable evidence was not saved or destroyed wantonly, maliciously, and deliberately in a collaborative effort to hide exculpatory evidence material to the facts in the case at bar.

III. Finally, Exhibit F, the declaratory statement of Cameron S. Parry [#729-326] who can attest to the injuries and conditions incurred in this matter, as well as plaintiff's Due Process right will be substantially violated if this evidence does not materialize causing plaintiff undue delay and prejudice due to the actions of the defendants.

WHEREFORE, Plaintiff request for the foregoing reasons the court Grant this "Motion For Reconsideration and compel Discoverable material" as it relates to camera DVD, DVR, and Audio.

Respectfully Submitted.

Terrance J. Feaster, Pro Se
#551840
P.O. Box 45699
Lucasville, OH 45699

6

CERTIFICATE FOR SERVICE

I certify that a copy of the foregoing " Motion For Reconsideration to Compel Discovery" was sent via U.S. Mail to the Ohio Attorney Generals office, Andrew T. Gatti, Corrections litigation Unit, at 30 E. Broad ST., 23rd Floor, Columbus, ohio 43215 on this 12th day of March, 2024.

Terrance J. Feaster, Pro Se'

#557840

(s.o.c.f.) P.O. Box 45699

Lucasville, Ohio 45699

Exhibit A

O.A.G.O.                                    December 1st, 2023
Andrew T. Gatti (Atty.)
Corrections litigation Unit
30 E. Broad ST., 23rd Fl.
Columbus, OH 43215

RE: FEASTER V. CHAMBERS-SMITH, et al., 1:22-CV-313

Dear Mr. Gatti,

Enclosed please find Plaintiff, Terrance J. Feaster's
"Settlement Agreement Proposal" In a "good faith"
attempt at resolving issues/disputes in the instant
case and to satisfy each party and S.D. Ohio Civ. R.
37.1. "CALENDER ORDER" entered on 11/28/23 and Discovery
deadline is set for 5/17/2024. THEREFORE, Defendant's
Counter offer/rejection deadline shall be set for
12/16/2023 as not to cause delay in discovery as the
"Plaintiff's Requests For Production of Documents" will
follow the foregoing Proposal. (Defendants Copy)

Sincerely,

Terrance J. Feaster #551840    Pro Se'
P.O. Box 45699
Lucasville, OH 45699

"SETTLEMENT AGREEMENT PROPOSAL"

In The Case FEASTER V CHAMBERS - SMITH, et al., 1:22-CV-313, Plaintiff Terrance J. Feaster, Pro Se Currently incarcerated at the Southern Ohio Correctional Facility, P.O. Box 45699, Lucasville, Ohio 45699. (Versus) Defendant's B. Crank, P. Frazie, W. Jewell, C. Justice, J. Kinner, S. Salyers, C. Sammons, R. Setty, J. Stevenson, and T. Wellman. Who are represented by the Ohio Attorney Generals Office by and through Counsel Andrew T. Gatti with Offices located at 30 E. Broad ST., 23rd Fl., Columbus, Ohio 43215 enter into this Settlement Agreement for resolve and parties mutually agree as follows:

I Background Of Case

a) Plaintiff in this Action filed a 42 U.S.C. 1983 Civil Suit against defendants named herein on 6/2/22 and soon after Amended Complaint entered on 6/24/22 Now the leading Complaint. On 12/7/22 Plaintiff entered Notice of attached exhibits into evidence and on 12/19/22 Order and R&R was filed and entered by the court per Magistrate Judge Karen L. Litkovitz, Dismissing claims against defendants, with exception to Plaintiff's First Amendment Retaliation claim against Defendant B. Crank and Eigth Amendment claims of Excessive Force and Unnecessary and Wanton Infliction of Pain against Defendants

Pg. 2 of 5

P. Frazie, W. Jewell, C. Justice, J. Kinner, S. Salyers, R. Setty, J. Stevenson, T. Wellman as well as deliberate indifference to a Serious Medical/Inadequate Medical treatment Claims against Defendant C. Sammons.

On 5/25/2023 Plaintiff moved For Defendants to Reply or answer Amended Complaint and Subsequently Defendants on 6/13/2023 Filed In response "Motion to Dismiss" and on 9/7/2023 Order and R&R denying Defendants "Motion to Dismiss" was entered per Magistrate Judge Karen L. Litkovitz. No objections or Answer was entered or filed by Defendants prompting orders by district Judge Michael R. Barrett to direct Clerk to enter default and request Plaintiff to Move For "Default Judgement" against 3 out of 10 Defendants See 10/24/2023 (Doc. 56) and 10/26/2023 (Doc. 58) Plaintiff's "Default Motion".

On 11/8/2023 Defendants "response in opposition" filed and on 11/15/2023 Plaintiff in "Good Faith" Filed a Second "Motion For Answer" (Doc. 62)

On 11/16/2023 Defendents "Answered" Vehemently denying Plaintiff's Averments (Doc. 64)

Subsequently Plaintiff filed "Request For Discovery Dispute Conference" (Doc 65)

"CALENDER ORDER" Entered on 11/28/2023 For Discovery deadline Set for 5/17/2024 and Dispositive Motion deadline Set for 6/17/2024. (Doc. 66)

Pg. 3 of 5

b. Plaintiff Asserts that because of the Defendants Conduct and Actions Stemming from incidents in accordance to 11/27/21 and 12/3/21 of Retaliation and a Subsequent brutal beating, Plaintiff was Subjected to and incurred under extreme deplorable conditions severe injuries and was further denied Mental Health/Medical treatment explained Further, by defendants named herein. (under Fabricated Reports)

II Description of Injuries Incurred

a. Plaintiff was first sprayed with 3 burst of O.C. Spray then attacked by a 5 man SRT Tactical team who Intentionally and Sadistically assaulted the plaintiff by maliciously punching, attempting to break fingers, twisting his leg, and purposely slamming his head against the concrete floor all while he was cuffed and shackled leaving him naked with swelling to the head, face, and fingers. Cuts to his legs and wrist, cuts and gashes to his scalp, and Abrasions to his right side of his face which led to a black eye and swelling.

b. Plaintiff had previously been diagnosed with (P.V.C) Cardio vascular issues consistent with a heart murmur and O.C./Chemical Agent caused pain and suffering, Plaintiff Suffers from headaches, Anxiety, has bruises and permanent Scars from the ordeal and certainly Plaintiff suffered

Pg. 4 of 5

emotional distress which was clearly inflicted by defendants,
Plaintiff further lost all trust in ODRC's Mental Health,
Medical, Disciplinary Process, and Overall Operations due
to the Plain and clear Fabrication and False Conduct
Reports/botched Investigation affirmed in this matter.

III. RELIEF PER. AMENDED COMPLAINT

a) Compensation and Punitive relief for a total Sum of
$1,000,000.00, transfer, cost, and interest or whatever other
relief the court may grant.

b) Plaintiff Agrees to settle as follows; For a total Sum of
$300,000.00 an immediate deduction of his level 4 to 3
and transfer to T.C.I. or C.C.A. with expungement of
institutional Record and Restrictions.
Upon payment and completion of Agreement Plaintiff must
file Motion to Dismiss this case with prejudice against all
Defendants, So far as the Agreeing parties further comply
with all authorities and policies and In so far as this
agreement becomes final judgement, aligns with the S.D.
of Ohio court Rules and Provisions Prescribed under the
P.L.R.A.

c) This Agreement is subject to change or counter offer per
Agreeing parties and or representing counsel, Further

Pg. 5 of 5

upon consent of all parties and the court assigned in this matter does this Agreement or any further agreement become binding by way of order and Final Judgement of the Court.

I Plaintiff, Terrance J. Feaster, hereby certify and declare by penalty of perjury and Prescribed under the laws of the United States that the Foregoing "Settlement Agreement Proposal" is a true and correct Document, Executed at Lucasville, OH 45699 on this 1st day of December, 2023. by _____

Terrance J. Feaster, Pro se'



**DAVE YOST**
OHIO ATTORNEY GENERAL

Criminal Justice Section
Office 614-644-7233
Fax 855-665-2568

Exhibit B

January 19, 2024

Terrance Feaster, #A551-840
Southern Ohio Correctional Facility
P.O. Box 45699
Lucasville, Ohio 45699

Re:  *Feaster v. Chambers-Smith, et al.*
       Case No.  1:22-CV-313

Dear Mr. Feaster:

Due to the size and complexity of your discovery requests, we are still compiling the information. We anticipate completing your requests on or about February 9, 2024. We apologize in advance for any inconvenience.

Sincerely,

DAVE YOST
Ohio Attorney General

*Andrew T. Gatti*

ANDREW T. GATTI
Assistant Attorney General
Criminal Justice Section

ATG

Exhibit B

**Ohio Attorney Genarals Office**          January 24th, 2024

Andrew T. Gatti (Atty.)

Corrections litigation Unit

30 E. Broad ST., 23rd Fl.

Columbus, Oh 43215


**RE:** FEASTER V. CHAMBERS-SMITH, et al., 1:22-cv-313


Dear Mr. Gatti,


Enclosed Please find Defendants copy of Plaintiffs **"Motion To Compel"** filed in the instant case and at any time Plaintiff is willing to meet and confer on discovery or further discussions on matters pertaining to the case at bar.



Sincerely,

Terrance J. Feaster, Pro Se'

#551840

P.O Box 45699

Lucasville, OH 45699



**DAVE YOST**

OHIO ATTORNEY GENERAL

Criminal Justice Section
Office 614-644-7233
Fax 855-665-2568

Exhibit B

January 30, 2024

Terrance Feaster, #A551-840
Southern Ohio Correctional Facility
P.O. Box 45699
Lucasville, Ohio 45699

Re: *Feaster v. Chambers-Smith, et al.*
Case No. 1:22-CV-313

Dear Mr. Feaster:

Enclosed are the Defendants' responses to your request for Production of Documents, and the responsive documents Bates Stamped 000001 – 000350. SOCF personnel will be sent videos you requested and marked Bates Stamped 000351 – 000353 and the RIB audio for Case No. SOCF-21-003966, Bates Stamped 000354. Along with the video and audio files a Statement to be completed and signed each time you view a video or listen to the audio.

Thank you and please let me know if you have any questions.

Sincerely,

DAVE YOST
Ohio Attorney General

*Andrew T. Gatti*

ANDREW T. GATTI
Assistant Attorney General
Criminal Justice Section

ATG

Enclosures

Copy

Exhibit B

Ohio Attorney General's Office          March 3rd, 2024
Andrew T. Gatti (Atty)
Corrections Litigation Unit
30 E. Broad St. 23rd Fl.
Columbus, OH 43215


RE: FEASTER V. CHAMBERS-SMITH, et al., 1:22-CV-313


Dear Mr. Gatti,


I would first object to all evidence disclosed
by the defendants and it's authenticity in
this matter, and because the S.O.C.F. is lacking
a legal aid at this time which seems to be of
no conjecture or coincidence. I plan to file a
more accurate and verified objections to those
disclosures made via my "First Production of Documents
Requests."
Further I have on numerous occassions requested
to meet and confer with you, via conference or
otherwise concerning Discovery matters since
December 1st, 2023 without so much as a response.
I am requesting to review Audio and video files
requested in the "First Production of Documents
Request" as time has since elapsed according
to your letter dated January 30th, 2024.

Further, Pursuant to "Fed. R. Civ. P. 11" I would express that a "Motion For Sanctions" shall be forthcoming as long as the defendants continue violations in accordance with my civil rights and denial of viable and exculpatory evidence protected under the "P.L.R.A." Those being grievances compiled since September 2023 - March 2024 which show puported repetitive acts by agents within the S.O.C.F. which is indicative of the very same conduct that initiated the case at bar and those associated. Moreover, I invoke and cite "Prof. Cond. Rules 3.1, 3.2, 3.3, 3.4, and 3.4" As well as "Prof. Cond. Rules 4.1, 4.3, 8.4" as these are applicable to the Misconduct and blatant, deliberate, and intentional willful breach of the rules cited above when as an attorney given your oath to abide by these rules, deny me credible evidence relevant to this instant case, provides me the right to file grievances with the "Ohio Disciplinary Counsel" and report your Misconduct pursuant to "Prof. Cond. Rules 8.1 and 8.3".

Finally, I formally request that any and all Misconduct by you as representing counsel in the case at bar immediately cease and

pg. 3 of 3

now that it is plain and evident that you are aware and possibly colluding with the S.O.C.F. in their actions of misconduct that lies outside the scope of their duties and responsibilities, you are bound by not only these "Ohio Rules of Professional Conduct" but those prescribed under "Federal Rules For Judicial-Conduct and Judicial-Disability Proceedings" and therefore, Must release and Report to the court all findings of misconduct Conducted by the S.O.C.F. or suffer any reprimand of those Tribunals actionable.

(Declaration Attached)

Sincerely,

Terrance J. Feaster, Pro Se'
#551840
S.O.C.F.
P.O. Box 45699
Lucasville, OH 45699

copy

March 3rd, 2024

## "DECLARATION"

I, Plaintiff, Terrance J. Feaster, acting in Pro Se' hereby declare:

The foregoing letter, objections to defendant's evidentiary disclosures, and statements made therein are true and correct by penalty of perjury under the laws of the United States of America verified this 3rd day of March 2024 at Lucasville, OH 45699.

Terrance J. Feaster

Exhibit C-1

# Use Of Force Report

| Name (Last, First, MI) | | Title | Date | OAKS ID |
|---|---|---|---|---|
| Watts, Austen B | | C/O | Dec 3, 2021 | Redacted |
| Incident Date | Incident Time | Incident Location | | |
| Dec 3, 2021 | 3:10 PM | J2-Cell 41 | | |
| Inmate(s) Involved: | | | | |
| I/M Feaster 551-840 | | | | |

Type of Force:

☐ Reactive          ☐ Planned/TAC Force          ☒ Witness

Explain in detail what you observed during this Use of Force Incident:

At the above date and approximate time listed, I (C/O Watts) was utilized as the camera operator for a five man extraction team for I/ M Feaster(551-840) who was refusing to move from his cell to his new designated cell per afternoon move sheet. At the above time, myself, LT. Setty and CIT Conley approached I/M Feasters cell where CIT Conley started to utilize IPC skills with multiple direct orders to be hand restrained and exit the cell, due to the inmate having total disregard for all directives, LT Setty deployed o/c into the cell towards the inmates facial region in order to gain compliance before utilizing the five man extraction team for the planned use of force that was issued by the shift captain. I/M Feaster still was disregarding all direct orders after o/c was deployed. After the five man team was assembled, once again myself and LT Setty with the addition of the five man team went down and approached the cell front of I/M Feaster's cell where the final order was given by LT Setty, I/M Feaster refused to comply with the final order. At this point, the cell door was open per LT Setty request, then the five man extraction team made entry into the cell where I/M Feaster was still highly aggressive, combative with the five man team and physically resisting and combating the team members. After the inmate was properly restrained with hand and leg restraints the five man team moved I/M Feaster to the strip out cage in J2 where the inmate talked with medical, mental health, was strip searched, clothed and then placed back in hand and leg restraints then moved to J2-01 where the restraints were removed off the inmate and then the five man team exited the cell. No other force was used or witnessed. EOR.

| Signature: | | Date: |
|---|---|---|
| | *austen watts* | 12/3/2021 |

Action Taken:

| Signature of Managing Officer: | Date: |
|---|---|
| | |

Distribution: ALL COPIES TO MANAGING OFFICER who will distribute appropriately.

DRC-2181 E (03/2019)                                                                                   Page 1 of 1

# Use Of Force Report

| Name (Last, First, MI) Stidham, Aaron, L | | Title C/O | Date Dec 3, 2021 | OAKS ID Redacted |
|---|---|---|---|---|
| Incident Date Dec 3, 2021 | Incident Time 3:15 PM | Incident Location J2-41 | | |
| Inmate(s) Involved: Feaster 551-840 | | | | |

Type of Force:

☐ Reactive     ☐ Planned/TAC Force     ☒ Witness

Explain in detail what you observed during this Use of Force Incident:

On the above date and time, While I was working in J2 South I/M Feaster 551-840 was supposed to be moved from J2-41 to J2-1 but was refusing to comply. I witnessed Lt Setty and C.I.T Negotiator Conley approach the cell front to get I/M Feaster to comply without any Use Of Force. I/M Feaster was refusing direct orders and threatening to harm himself. Due to the negotiations failing Lt Setty made multiple attempts to deploy O/C into the cell. The I/M refused to comply, and Lt Setty told me to stay and watch I/M Feaster while he retrieved the extraction team. After the team arrived, I/M Feaster was given final directives to comply but refused. The team entered the cell and I could hear direct orders were being given telling I/M to stop resisting. It sounded as if there was a struggle in the cell and I heard more direct orders being given. After a short time the I/M was brought out and placed into the J2 strip cage. The I/M was checked by mental health and the nurse, then was placed into J2 cell 1 without any further incidents.

| Signature: Aaron L. Stidham | *Aaron Stidham* | Date: 12/3/2021 |
|---|---|---|

Action Taken:

| Signature of Managing Officer: | Date: |
|---|---|

Distribution: ALL COPIES TO MANAGING OFFICER who will distribute appropriately.

DRC-2181 E (03/2019)                                                                 Page 1 of 1

AGO Response to Discovery Request
000298

*Exhibit C-2*

# Supervisor's Use of Force Summary Report

*(To be completed by shift supervisor before distribution to Deputy Warden of Operations)*

| Date of Force: Dec 3, 2021 | Time of Force: 3:10 PM | AM / PM |
|---|---|---|

| Location of Incident: J2-41 | | |
|---|---|---|

Inmate(s) on Whom Force was Used:

| | Name | Number | Injured in Incident |
|---|---|---|---|
| 1. | Feaster (no stg code found) | A-551840 | ☐ YES  ☒ NO |

Staff Member(s) who Used Force:

| | | Injured in Incident |
|---|---|---|
| 1. | Lieutenant Robert Setty | ☐ YES  ☒ NO |
| 2. | Correction Officer Joshua Kinner | ☐ YES  ☒ NO |
| 3. | Correction Officer Justin Stevenson | ☐ YES  ☒ NO |
| 4. | Correction Officer Carl Justice | ☐ YES  ☒ NO |
| 5. | Correction Officer William Jewell | ☐ YES  ☒ NO |
| 6. | Correction Officer Travis Wellman | ☐ YES  ☒ NO |

Staff and Inmate Witnesses to Force Used:

| | Name | Staff Title | Number |
|---|---|---|---|
| 1. | Landon Conley | Correction Officer | |
| 2. | Aaron Stidham | Correction Officer | |
| 3. | Austin Watts | Correction Officer | |

Supervisor's Summary of Incident:

★ • Videotape (if a planned Use of Force?)   ☒ YES  ☐ NO

★ • Security footage available and preserved?   ☒ YES  ☐ NO

★ • Copies attached?   ☐ YES  ☒ NO   DVR #666-21
                                         label/description

• OC used?   ☒ YES  ☐ NO   If yes, time of decontamination: 3:30 PM

Summary:
Per reports submitted and DVR #666-21: IM Feaster 551840 was placed on the institutional moves sheet to go to J2-01. Lt. Robert Setty notified Ms Salyers about the situation. Ms Salyers went to J2 and spoke with IM Feaster and afterwards she advised the Captain's office that IM Feaster would not be put on watch. Due to this a 5 man SRT was authorized by Captain Frazie, to extract and move IM Feaster 551840 from J2-41 to J2-01 due to the pending refusal to move. Lt. Setty contacted medical and was advised that OC was authorized to be utilized if necessary. At this time Lt. Setty went to J2, with medical nurse Corey Sammons on standby in J corridor, a negotiator (Officer L.Conley) and a camera operator (Officer A Watts) to attempt to negotiate with IM Feaster and gain compliance from him to move. IM Feaster would not comply with negotiations and instead began yelling he was suicidal and was going to hurt himself. IM Feaster then began acting like he was biting his arm. Lt. Setty reported he did not think he was actually biting it but he and Officer Conley did issue orders to him to stop self harming and those orders along with Lt. Setty brandishing his OC canister appeared to stop his behavior. At this time Lt Setty reports issuing more direct orders to IM Feaster to move to J2-01 or force would be utilized on him. Lt. Setty then opened the hatch for IM Feaster to cuff up and issued direct orders to him to cuff. IM Feaster then used his suicide blanket to cover the entrance. Lt Setty and Officer Conley issued more orders and IM Feaster continued to not comply. At that time Lt Setty utilized OC to the facial area of IM Feaster through the crack of the cell door to attempt to gain compliance. Due to not being able to get a full exposure

DRC2611 E (Rev. 11/18)                                                                 Page 1 of 2

to IM Feaster's facial area because IM Feaster began using his suicide blanket to go back and forth blocking both the crack and the food hatch. Lt Setty made multiple attempts through the food hatch and the crack and did manage to deploy OC to the facial area of IM Feaster to the point that he felt he was fully exposed. IM Feaster continued to disobey directives and refuse to move. As a precaution Lt Setty instructed range Officer Aaron Stidham to watch IM Feaster until the SRT returned. At 330 pm Lt Setty returned with the SRT. Officer Josh Kinner was assigned to shield, Officer Justin Stevenson assigned to upper left, Officer Carl Justice assigned to lower right, Officer William Jewell assigned to lower left and Officer Travis Wellman assigned to lower right. After introductions of the SRT , medical (RN Corey Sammons), and mental health (RN Roxanne Crum) the SRT went to J2 41 to extract IM Feaster. At the cell front Lt Setty gave IM Feaster a final order to be handcuffed and move to J2-01. IM Feaster would not comply and instead started yelling at the SRT something to the effect of "lets go" "come on in". At this time Lt Setty ordered the SRT to enter the cell. The SRT entered and IM Feaster began attempting to push into the shield and prevent them from entering. The SRT did force their way into the cell and push IM Feaster back and begin taking control and securing IM Feaster on the cell floor. SRT issued orders to IM Feaster to lay on his stomach and put his hands behind him. IM Feaster would not comply and the SRT struggled with him attempting to gain control. The SRT did manage to secure IM Feaster on the cell floor. Officer Stevenson reported applying handcuffs and Officer Justice applied leg irons. Once IM Feaster was secured and restraints applied he was assisted to standing and escorted to the J2 strip cage. Once in the strip cage IM Feaster was checked by medical and spoken to by Mental health Nurse Crum. He stated he was suicidal and MHA Salyers who was in the area at that time came to the strip cage and addressed IM Feaster. Ms Salyers again advised IM Feaster was not being placed on watch. IM Feaster was then strip searched and dressed in segregation clothing. IM Feaster was compliant throughout this process. Once finished IM Feaster was placed back in restraints and escorted to J2-01. SRT members did maintain control throughout all escorting in case IM Feaster resisted but he was compliant with being escorted from J2-41 to the strip cage and then to J2-01. Once in J2-01 IM Feaster was escorted into the cell and ordered to lie face down on the bunk. The SRT removed the restraints and backed out of the cell. This concluded the extraction of IM Feaster. No other force was reported during this incident. All staff involved in using force and inmate Feaster were checked by medical. No injuries reported per MERs. All SRT equipment was inventoried accounted for and sanitized.

**As the Shift Supervisor, I have reviewed all of the documents, including all attachments, for accuracy, completeness and consistency prior to submitting them to the Chief of Security.**

| Prepared By (Shift Supervisors Name): | Title: | Date: |
|---|---|---|
| Robert Setty | Lieutenant | Dec 3, 2021 |

**Note to Shift Supervisors:** When submitting this packet to the Deputy Warden of Operations, you must include the following:

1. Incident Report from each staff member listed above (DRC1000).
2. Statements from each inmate on whom force was used and statements from inmate witnesses.
3. Medical Examination results of any staff or inmates involved in the use of force (DRC5251).
4. Any readily available video of the incident or photos of the scene, evidence or injuries.
5. Any other relevant documentation (example: Conduct Report - DRC4018).

| Chief of Security Signature | Date |
|---|---|
| The - Major Newkell | Dec. 6, 2021 |

AGO Response to Discovery Request
000284

*Exhibit C-3*

## USE OF FORCE CHECKLIST

**Date of Incident:** 12-03-2021          **Time of Incident:** 3:10 PM

**Inmate's Name:** Feaster          **Inmate's Number:** 551840

**Housing Assignment:** J2-01          **Incident Location:** J2-41

### THE FOLLOWING INFORMATION IS ENCLOSED:

| | |
|---|---|
| Use of Force Checklist | 1 |
| Planned Use of Force Checklist | 1 |
| Supervisor's Use of Force Summary (DRC 2611) | 1 |
| Use of Force Report (DRC2181) | 9 |
| Inmate(s) Voluntary Statement (DRC2737) | 1 |
| Medical Evaluation Form Inmate(s) (DRC5251) | 1 |
| Medical Evaluation Form Staff (s) (DRC5251) | 6 |
| Report of Change of Confinement (DRC4019) | electronic |
| Conduct Report(s) (DOTSPortal Print DRC4018) | 2 |
| Assault on Staff Report (DRC 2460, 2461, 2462 | NA |
| Authorization for Suicide Watch (DRC 5200/5202) | NA |
| Immobilizing Restraints Report (DRC2533) | 0 |
| Crisis Precaution and/or Immobilizing Restraint Log (DRC2534) | 0 |
| Crisis/Hostage Situations Intervention Report (DRC2699) | 1 |
| Photos (documenting injuries-if applicable) | 0 |
| ✗ DVD - Planned Use of Force | NA |
| ✗ OSHP Notification | NA |
| Special Incident Required (Yes/No) | No |
| ✗ DVR Available, provide # | DVR-#666-21 |

RECEIVED

DEC - 6 2021

DEPUTY WARDEN
OF OPERATIONS

| DEPUTY WARDEN OF OPERATIONS' USE ONLY | |
|---|---|
| ☐ Deputy Warden – Spec. Serv. | ☑ Committee Referral |
| ☐ M.H. Admin. | ☐ No Further Action |
| ☐ Investigator | |
| ☐ QIC | Signature: |
| ☒ HNT | |
| ☐ Safety | *Gntth Davis* |
| ☐ Other | Review Date: |
| R/MH: *B/n* | *12-6-21* |

*eh-no*

*Capt. R.L. Jnaze*
Shift Commander's Signature
Southern Ohio Correctional Facility

*12.3-2021*
Date

Revised: 9/04/2019

AGO Response to Discovery Request
000281

# PLANNED USE OF FORCE CHECK LIST

Supervisor's Name: _Robert Setty_

Today's Date: _12·3·2021_          Time: _3·10 pm_

Camera Operator: _A. WATS_

Shift Commander Authorizing Planned UOF: _Captain P. FRAZIE_

Inmate Name: _FEASTER_

Inmate Number: _551 848_

Cell Location: _J 2·41_

Crisis Negotiator/CIT: _C/o_

OC was cleared by Medical Nurse: _RN SAMMONS AT 2:35 pm_

Medical: _RN SAMMONS_

Mental Health: _RN CRUM / MH adm. Salyers_

Reason For: <u>Extraction</u> / 5-Way Restraint / Release:

_Im Feaster is refusing to move to J2-1_

### 5 MAN SRT

<u>SRT Member Name and Assignment:</u>

#1 Shield - _J. Kinner_

#2 Upper Right - _J STEVENSON_

#3 Upper Left - _C JUSTICE_

#4 Lower Right - _W Jewell_

#5 Lower Left - _T Wellman_

5-Way Restraints: ☐ Will / ☒ Will Not, be utilized. If so; Cell Location:          Time:

Supervisor's Signature: _Lt Robt Setty_

AGO Response to Discovery Request
000282

Exhibit D-1

| | | | |
|---|---|---|---|
| | **SUBJECT:**<br>**Behavioral Intervention/Use of Force** | PAGE ___1___ OF ___13___. | |
| | | **NUMBER: 63-UOF-01** | |
| **Ohio** Department of<br>Rehabilitation & Correction | **RULE/CODE REFERENCE:**<br>OAC 5120-9-01, 5120-9-02 | **SUPERSEDES:**<br>63-UOF-01 dated 11/02/2020 | |
| | **RELATED ACA STANDARDS:**<br>5-ACI-3A-32M, 3A-33M, 3A-35M, 1D-12,<br>1D-13, 1D-19, 3A-31, 3C-08, 6A-29 | **EFFECTIVE DATE:**<br>**March 1, 2022** | |
| | | **APPROVED:**<br>*O.C. Smith* | |

## I. AUTHORITY

Ohio Revised Code 5120.01 authorizes the Director of the Department of Rehabilitation and Correction, as the executive head of the department, to direct the total operations and management of the department by establishing procedures as set forth in this policy.

## II. PURPOSE

The purpose of this policy is to provide guidance to institutional staff who face situations where behavioral intervention is needed, and force might be used when responding to incarcerated individual resistance, and to provide guidance to staff who investigate incidents when force is used.

## III. APPLICABILITY

This policy applies to all persons employed by the Ohio Department of Rehabilitation and Correction (ODRC) and to contractors providing a service to the ODRC who work inside a correctional institution and interact with incarcerated individuals.

## IV. DEFINITIONS

The definitions for the below listed terms can be found at the top of the policies page on the ODRC Intranet at the following:

Definitions Link
- **Behavioral Intervention**
- **Body Worn Camera (BWC)**
- **Contact Officer**
- **Cover Officer**
- **Crisis Intervention Team (CIT)**
- **Deadly Force**
- **Excessive Force**
- **Force**
- **High Interest Use of Force Incident**
- **Immobilizing Security Restraints**

| SUBJECT: **Behavioral Intervention/Use of Force** | PAGE___2___ OF _13_ . |
| --- | --- |

- **Intervene**
- **Less-than-Deadly Force**
- **Physical Harm to Persons**
- **Planned Use of Force**
- **Prone Restraint**
- **Reactive Force**
- **Reasonable Force**
- **Risk**
- **Serious Physical Harm to Persons**
- **Substantial Risk**
- **Tapping-In**
- **Transitional Hold**

## V.  POLICY

It is the policy of the ODRC for staff to evaluate and assess all situations involving incarcerated individuals to determine the most appropriate way in which to respond or intervene, as to first seek a way to gain compliance prior to using physical force. Should it become necessary to apply physical force, the ODRC supports using the amount of force reasonably necessary to control the incarcerated individual(s), and only if doing so cannot otherwise be avoided. It is expected that staff shall utilize interpersonal communication skills and effective behavioral intervention techniques to properly de-escalate situations when possible and safe to do so. After responding to a situation, staff are expected to de-escalate force as the active incident de-escalates.

## VI.  PROCEDURES

### A.  De-escalation and Behavioral Intervention

1.  Duty to de-escalate – All staff are required to use interpersonal communication (IPC) skills and behavioral intervention techniques to de-escalate a situation whenever it is safe and possible to do so. Such techniques may include using a calm tone of voice, affirming an understanding of the individual's statements, asking questions about the individuals' issues or concerns offering options to resolve the issue, concern, or problem.

    a.  Staff should attempt to communicate and verbally interact with the incarcerated individual to avoid using force.

        i.  Staff are not expected to deescalate a situation after having been attacked/assaulted by an incarcerated individual. In the event of such an occurrence, the staff member shall protect him/herself and others in accordance with reactive force training, while calling for assistance if possible.

        ii.  Staff are not expected to de-escalate a situation if doing so places them or others at risk of harm or physical injury.

DRC 1362

| SUBJECT: **Behavioral Intervention/Use of Force** | PAGE 3 OF 13 . |
| --- | --- |

  b. Staff should be mindful to create physical space between themselves and a hostile incarcerated individual, who does not pose a danger to himself, herself or others allowing for time and distance to be factors in managing an individual's behavior, staff can continue to effectively communicate while carrying out a further assessment of the situation.

  c. When initial IPC efforts do not improve the situation, and there is time and availability, staff should consider bringing crisis responders, crisis intervention team (CIT) members, hostage negotiators, behavioral health providers, or any other appropriate staff member(s) to assist in resolving the situation. If deployed, crisis responders, CIT members, and hostage negotiators shall be used in accordance with ODRC Policy 310-SEC-17, Hostage Negotiation and Crisis Intervention.

  d. Staff shall warn the incarcerated individual that planned force may have to be used to resolve the situation, when it is safe and possible to do so; and

  e. Staff shall allow the incarcerated individual a final opportunity to comply with the order, once the necessary staff are assembled, prior to the commencement of planned force.

2. Duty to Intervene - ODRC staff must recognize the dynamic nature of the correctional environment, to include assisting other colleagues in the management of incarcerated individuals. It is critical that staff understand and be able to control their own emotions while interacting with a hostile incarcerated individual or an individual in crisis. Having staff designate both a contact officer and cover officer will help organize the manner in which communication is conducted, while better managing the incident.

  a. All ODRC employees must recognize and act upon the affirmative obligation to intervene, including tapping-in, to prevent or stop another employee from engaging in an act that would violate an incarcerated individual's constitutional rights, including using excessive force.

  b. All ODRC employees have an affirmative duty to intervene in a situation when they see unsafe, unlawful, or improper tactics being used by another employee or contractor.

  c. An ODRC employee shall call for assistance if it is safe and possible to do so, before beginning a behavioral intervention with an incarcerated individual.

  d. It is expected the employee being relieved will relinquish their control/position.

**B.** **Staff Created Jeopardy**

1. ODRC staff are expected to maintain and display respect and professionalism to one another, and the incarcerated individuals for whom they are employed to manage safely and humanely.

| SUBJECT: **Behavioral Intervention/Use of Force** | PAGE __4__ OF __13__ . |
|---|---|

2. To minimize the need for the use of force, an employee should never verbally or physically provoke or abuse an incarcerated individual.

3. An employee must use care to avoid creating situations where an incarcerated individual may attempt to assault the employee or others.

4. If an employee is found to have provoked or incited an incarcerated individual to engage in a violent act(s) or has created a use of force situation by virtue of violating ODRC policy, they may be found to have violated Standards of Employee Conduct or applicable civil and criminal laws.

**C. Threat Assessment**

An employee may use force in those situations described in Ohio Administrative Code (OAC) 5120-9-01, Use of Force. However, each employee is responsible for using only the amount of force reasonably necessary under the totality of circumstance(s). Before using force, however, an employee shall reasonably and realistically attempt to de-escalate the situation, whenever it is safe and possible to do so. If de-escalation techniques do not resolve the situation, then force may be used, as described in this policy. Situations requiring the use of force can develop quickly and thus change the level of response that is appropriate. Circumstances presented by the incarcerated individual involved in the use of force situation must be considered. Other factors should also be considered before deciding how much and what kind of force, if any, is to be used in any specific situation. Some of these factors include, but are not limited to:

1. Surrounding - An awareness of your surroundings when using force, which may endanger others, such as chemical agents or firearms, to minimize the threat to other people.

2. Innocents - Any person in the immediate vicinity that would or could be adversely affected by the amount and type of force used.

3. Safety and effectiveness - As employees of the ODRC, we have a duty to protect, staff, third persons, and incarcerated individuals, but there is no requirement to needlessly sacrifice one's own personal safety in doing so.

   a. An employee must balance their ability to be effective against the risk to personal safety. However, employees are always expected to respond in the event of an attack on another employee who needs assistance.

   b. Whenever safe and possible to do so, an employee shall summon assistance and wait for assistance to arrive before becoming involved in a use of force. In the event of an attack on another employee who needs assistance, an employee shall not wait for assistance to arrive before becoming involved. While waiting for assistance to arrive, an employee should attempt to de-escalate the situation.

DRC 1362

    c. Whenever it is necessary to use force, it is ideal to have enough staff to safely control the situation as the presence of additional staff will likely reduce or eliminate the need to use force. The staff person who is confronted with a situation must consider the availability and nearness of other staff, and whether the situation can wait for additional staff before responding.

    d. If an employee cannot effectively intervene in a situation, the employee is expected to continue to be observant of as many circumstances of the situation as possible to be reported later.

    e. The ability to utilize planned force should always be considered when assessing the need to use force. Planned force is a preferred tactic unless the necessary delay in responding will jeopardize the security of the institution or the safety of any person.

4. The risk of harm presented by the incarcerated individual - The employee must evaluate the circumstances and surroundings, and determine the level of threat to self, others, and the security of the institution. The employee should consider five (5) factors. All these factors must be weighed together in determining the appropriate response:

    a. The harm being threatened must be immediate and likely if force is not used. Physical harm must be a likely consequence of the threat if carried out,

    b. The incarcerated individual must have the opportunity and ability to carry out the threat,

    c. The staff member must reasonably perceive themselves or another to be in jeopardy,

    d. The employee must evaluate what force is necessary to effectively control the situation and the availability of alternatives. A greater potential of harm justifies a greater level of force, and

    e. The use of force is necessary to control or subdue an incarcerated individual who refuses to obey prison rules, regulations, or orders.

5. Enforcement of rules and regulations - If no other means of obtaining compliance has been effective, a planned use of force may be used, when necessary, to control or subdue an incarcerated individual who refuses to obey prison rules, regulations, or orders. In most circumstances, reactive force used to achieve compliance with prison rules, regulations, or orders, is not justified and a planned use of force instead must be utilized.

✖6. Staff should attempt to use only force reasonably necessary.

7. Force or physical harm to person shall not be used as a punishment.

8. The use of a transitional hold may be permitted only when all the following conditions are met:

    a. Transitional hold may be applied only by staff with current training on the safe use of this procedure, including how to recognize and respond to signs of distress in the individual,

     b. Transitional hold may be applied only in a manner that does not compromise breathing, including the compromise that occurs with the use of: (1) pressure or weight bearing on the back; (2) soft devices such as pillows under an individual's face or upper body; or (3) the placing of an individual's or staff's arm under the individual's head, face, or upper body,

     c. Transitional hold may be applied only for the reasonable amount of time necessary to safely bring the person or situation under control and to ensure the safety of the individuals involved, and

     d. Transitional hold may be applied only with consistent and frequent monitoring during and after the intervention (use of force) with every intent to assure that the person is safe and suffers no harm.

     e. Upon completion of the transitional hold, staff shall place the incarcerated individual in a recovery position.

     f. If there is sufficient available staff during the situation, then an employee shall monitor the physical and mental condition of the incarcerated individual.

**D.   Less-Than-Deadly Force**

There are six (6) general circumstances in which a staff member may use force against an incarcerated individual.

1.   Self-defense from physical attack or threat of physical harm,
2.   Defense of another from physical attack or threat of physical attack,
3.   When reasonably necessary to control or subdue an incarcerated individual who refuses to obey rules, regulations, or orders,
4.   When necessary to stop an incarcerated individual from destroying property or engaging in a riot or other disturbance,
5.   Prevention of an escape or apprehension of an escapee,
6.   Controlling or subduing an incarcerated individual in order to stop or prevent self-inflicted harm.

**E.   Deadly Force**

Deadly force is authorized in the following situations unless other alternatives to deadly force could reasonably accomplish the law enforcement purpose:

1.   To protect self or others from an immediate threat of death or serious physical harm threatened by an incarcerated individual or anyone else.

2.   To prevent or halt the commission of an escape or to apprehend an escapee. Once an escape is no longer in progress (i.e., once the escapee is no longer in the immediate environs of the institution/facility and hot pursuit has ceased) deadly force may be used only if there is an immediate threat of death or serious physical harm to self or others, or if authorized by the incident specific use of deadly force policy statement and instructions.

| SUBJECT: **Behavioral Intervention/Use of Force** | PAGE___7___ OF _13_ . |
|---|---|

3.  To prevent loss of control of the institution, or a significant part, or to regain such control.

**F.  Escapes**

1.  Escape Prevention

2.  Prior to using firearms, staff must attempt to use alternative methods to stop the escape, such as verbal commands, increasing staff presence, OC spray or other less lethal munitions.

3.  An employee who determines an escape is in progress and determines that using less than deadly force would not be sufficient to prevent the escape, shall, if possible, issue a verbal warning prior to using a firearm to halt or prevent the escape. If possible, the employee shall notify other staff of the escape attempt prior to shooting the subject. This may be done by staff-down alarm or other alarm system if available. Verbal contact with other perimeter security staff prior to use of deadly force is desirable when this is practical. The incarcerated individual does not have to be on the first (or interior) perimeter fence before the employee issues the verbal warning.

4.  Firearms may be used to halt or prevent an escape from a correctional institution or other confined setting only if less force would not reasonably be sufficient to halt or prevent the escape. Prior to using firearms, staff must reasonably believe that an incarcerated individual has the capability to escape.

    a.  When the incarcerated individual begins to climb, cut through, or otherwise penetrate the exterior perimeter fence, and the employee has reasonably determined lesser force will not be sufficient, the employee is authorized to shoot the subject. No warning shot shall be fired.

    b.  For example, the incarcerated individual may be carrying items that could be used to escape such as, but not limited to, a ladder, grappling hook, rope, broom handles, or sticks, suggesting intent to escape.

    c.  Every employee on a perimeter post shall regularly survey the surrounding terrain to determine in advance whether firearms can be safely discharged in any direction.

    d.  Firearms may be used, when necessary, to halt or prevent an escape from a security level one camp, prison work detail, bedside visit, funeral visit, community service release detail, or transport outside the institution. Any incarcerated individual who is attempting to escape is to be presumed dangerous. This applies regardless of their security level. Prior to using firearms, staff must reasonably believe that an incarcerated individual has the capability and intention to escape. Staff must consider the risk to innocent persons in the community within the line of fire. The employee shall issue a verbal warning prior to shooting the subject. No warning shot shall be fired. In a community service release, OPI, or work program detail setting, staff shall secure any remaining incarcerated individuals and notify community law enforcement and the institution administration as soon as possible.

DRC 1362

| SUBJECT: **Behavioral Intervention/Use of Force** | PAGE __8__ OF __13__ . |
| --- | --- |

  e. The institution shall discuss the manner of pursuit, detection, and recapture of an escapee with the appropriate community law enforcement agency. Whenever possible, this planning discussion should take place prior to any incident. General escape procedures shall be followed per the institution specific escape post order.

5. Circumstances to Consider

Staff must consider the totality of circumstances when deciding whether to use deadly force. Deadly force may only be used when the incarcerated individual is at the point that further delay in acting will result in a loss of control or custody of the individual and other means of regaining control or custody will not be effective. Whenever safe and possible to do so, staff shall consider:

  a. Whether other staff is equipped and available to assist in apprehending the incarcerated individual without the need for deadly force, or whether no one else is available to assist,

  b. Whether the use of deadly force will present a risk of harm to innocent parties,

  c. Whether the incarcerated individual has been injured or impaired in some manner that will slow or prevent the individual's flight,

  d. The individual's proximity to concealment, a community, or some external assistance.

  e. Whether the incarcerated individual is likely to be overtaken by staff while still in view, and

  f. Whether immediate action is necessary, based on the information known, to halt or prevent escape or loss of custody.

All personnel involved in the pursuit of an escapee shall be given incident specific instructions as to the circumstances under which the use of deadly force is authorized to apprehend the escapee(s). Subject to the given incident specific use of force policy and instructions, when an escapee is no longer on institution property or no longer in the immediate environs of the institution, personnel involved in the pursuit of the escapee are authorized to use deadly force as a last resort to prevent an immediate threat of death or serious physical harm to self or others. Prior to using deadly force, personnel shall positively identify the escapee. For additional information regarding escape pursuit and apprehension, see the institution specific escape post order.

**G. Disturbances**

When one or more incarcerated individuals threaten, by words or actions, to take control of any portion of the institution, the area put at risk must be considered. An incarcerated individual takeover of certain areas of an institution should be considered more critical than others. An incarcerated individual who barricades themselves alone in a closet presents a different threat than an incarcerated individual who is attempting to take over the control center. The greater the potential threat, the greater the justification in both considering, and perhaps ultimately using, deadly force to either maintain, or take back, staff control of the facility. Some of the most critical areas would include:

| SUBJECT: **Behavioral Intervention/Use of Force** | PAGE___9___ OF _13_ . |
|---|---|

1. Any place where an incarcerated individual(s) could obtain equipment, supplies, or contraband that would either prolong or increase the level of the disturbance, or cause injury to others. This would include the maintenance shops for tools, the ability to mass manufacture weapons, and/or facilitate escape from a fenced perimeter. This would also include areas such as the pharmacy and medical services areas for drugs and drug paraphernalia.

2. Areas where large groups of incarcerated individuals could gather that would provide an increased potential for either recruitment or mass actions by the incarcerated individual instigators. This would include the dining room and recreation areas.

3. Areas that provide essential services to the institution. Incarcerated individuals who damage or take control of these areas could prolong the disturbance, hinder staff efforts to retake control, or cause such damage to the facility that significant portions or the entire facility could potentially be rendered uninhabitable until lengthy and expensive repairs could be made.

**H. Pregnant and Post-Partum Individuals**

Staff shall avoid application of this policy to a pregnant or post-partum (up to six weeks following delivery) female incarcerated individual to the best of their ability, using it only as a last resort to prevent substantial bodily harm to the individual or others, substantial property damage, or creation of a substantial security risk. Application of this policy is not advised for a pregnant or post-partum female incarcerated individual.

1. Leg, ankle, and/or waist restraints cannot be used on a pregnant or post-partum individual at any time.

2. If extreme circumstances are present that require physically immobilizing restraints to be utilized on a pregnant or post-partum female incarcerated individual, it shall require authorization by a physician. It cannot be authorized by a shift commander.

3. The institution's medical director must be contacted as soon as it is safe and possible to do so after force has been applied or restraints have been used on a pregnant or post-partum female incarcerated individual.

4. The managing officer shall be notified immediately if there is a likelihood that a pregnant or post-partum female incarcerated individual will need to have physically immobilizing restraints applied or if physical restraints are applied in a situation where it is not safe and reasonable to contact the managing officer prior to their use

5. The appropriate regional director shall be notified any time that physically immobilizing restraints are used on a pregnant or post-partum female incarcerated individual.

**I. Medical Assistance**

1. When it is safe and possible to do so following the use of force, medical attention shall be provided even when the incarcerated individual does not appear to be injured. The incarcerated individual shall be evaluated by a qualified medical professional. A record

DRC 1362

| SUBJECT: **Behavioral Intervention/Use of Force** | PAGE __10__ OF __13__ . |
| --- | --- |

shall be made of the evaluation on the Medical Exam Report (DRC5251). The shift commander shall ensure that photographs are taken of any injuries. If the incarcerated individual refuses to submit to an evaluation, the nurse shall visually observe the individual for obvious injuries and document both the refusal and the review on the Medical Exam Report (DRC5251). If the incarcerated individual refuses the medical evaluation, the refusal shall be digitally and audio recorded.

2.  Immediately following a use of force, medical staff shall examine employees physically involved in the use of force to determine whether the employee is injured and the extent of any injury. Any employee in need of medical care shall be referred to community medical services as appropriate.

3.  For the incarcerated individuals involved in a use of force at the Ohio State University Medical Center (OSUMC), the Franklin Medical Center (FMC) security supervisor on duty at OSUMC shall confirm that the OSUMC medical staff has examined the incarcerated individual(s) involved. The security supervisor shall document completion of this exam by OSUMC medical staff on an Incident Report (DRC1000/1001).

4.  FMC staff assigned to the OSUMC who are injured during a use of force at OSUMC shall be sent to the OSUMC emergency department for evaluation by OSUMC medical staff. FMC staff denying any injury shall document this fact in the Incident Report (DRC1000/1001) they complete regarding the use of force.

**J.  Use of Body Worn Cameras (BWCs)**

1.  Staff wearing a BWC shall activate it, whenever safe and possible to do so, at the point any behavioral intervention techniques are employed with an incarcerated individual. This shall include activating the BWC when an incarcerated individual escalates a situation and/or confronts staff or other incarcerated individuals and intervention is necessary to address the behavior. Use of the BWC shall follow ODRC Policy 10-SAF-22, Body Worn Camera.

2.  Staff shall continue to record the entire behavioral intervention and/or use of force incident after activation of the BWC, in its entirety, to include medical treatment of the incarcerated individual as described in subsections VI.M.3 and VI.M.4 of this policy.

**K.  Reporting the Behavioral Intervention/Use of Force after the Incident**

1.  Each employee and/or contractor who is physically involved in or witnesses a use of force incident shall verbally notify their supervisor of the basic details of the incident before leaving the institution at the end of their shift or workday. The supervisor shall complete an Incident Report (DRC1000) summarizing the basic details of the incident before leaving the institution.

2.  After verbal notification has been completed, employees must complete and submit a Use of Force Report (DRC2181/1001), to include the basic details of any behavioral intervention, de-escalation or intervention efforts occurring before or during the UOF incident, within seventy-two (72) hours of the incident.

DRC 1362

L. **Site Supervisor Responsibilities**

1.  Whenever a site supervisor is called to assist staff, they shall activate their BWC before arriving on scene.

2.  Upon arriving on scene, the site supervisor shall conduct a threat assessment ensuring the location is secure and staff are effectively addressing the situation in accordance with this policy and required de-escalation techniques.

3.  The site supervisor shall ensure behavioral intervention techniques are used in accordance with this policy and, when warranted, that any use of force is applied appropriately.

4.  The site supervisor shall ensure that the escort of an incarcerated individual is safe and the proper escort techniques are used. If a supervisor is available, then the escort shall be directly supervised. Reasonable efforts shall be made by the supervisor to ensure any staff involved in the use of force are not involved in the subsequent escort of the incarcerated individual.

5.  The supervisor shall obtain written statements in accordance with OAC 5120-9-02. If the incarcerated individual initially refuses to make a statement in the immediate aftermath of a use of force incident, a second opportunity should be given once an opportunity for decompression or calming down has been achieved.

M. **Electronically and Photographically Recording the Use of Force**

1.  If employees do not activate their BWC during a use of force incident, they must notify their supervisor immediately.

2.  Staff without a BWC are encouraged to video record any use of force whenever possible, as well as any de-escalation efforts.

3.  Video recording shall capture the escort of an incarcerated individual to and from the medical area, following a use of force incident. While the individual is in the medical area, recording should continue outside the medical exam and should avoid capturing images or audio of the medical exam. Medical staff may request recording of a medical exam if the incarcerated individual is combative or engaging in threatening behavior.

4.  If the incarcerated individual refuses the medical evaluation, the refusal shall be digitally and audio recorded.

5.  Whenever possible, photographs, security footage, audio recordings, and/or other video(s) of the incident shall be preserved and incorporated into the permanent record of the use of force incident. This applies to both planned and reactive uses of force.

6.  The institution shall ensure that an adequate number of staff members have been trained on the use of any hand-held video, photographic, and/or BWC equipment that will be used to visually record force incidents. The chief of security shall ensure shift supervisors

| SUBJECT: **Behavioral Intervention/Use of Force** | PAGE __12__ OF __13__ . |
|---|---|

are made aware of the names of those who have been trained to use the equipment. One or more designated members shall also be assigned the responsibility of regularly inspecting the video and photographic equipment to ensure it is always available, all components are in proper working order, adequate supplies of tape, film and/or other necessary supplies are on hand, and those batteries are always charged to the maximum.

7.   During the incident, it is important to keep in mind the visual field being recorded. Force incidents are dynamic events that never occur in ideal locations or in an ideal fashion for the BWC/electronic record to be able to capture exactly what everyone is doing at all times with an unwavering picture. However, great attention shall be paid by operators of the BWC/electronic recording device to place themselves in the best location possible to visually record the incident, without interfering with the force incident itself.

A questionable video record of a force incident may often raise more questions than it answers. Examples:

a.   The camera appears to swerve for no apparent reason away from the actual force being applied.
b.   The camera is apparently unduly wavering on the visual field being captured.
c.   A narrow focus is unnecessarily used to only record a small part of the incident.
d.   The video record contains significant amounts of time when the camera is not focused on anything involving the force incident.
e.   There appear to be gaps in the chronological events of the incident when the camera was turned off or placed in the "paused" mode.

8.   A video, photographic, or other visual record shall immediately be made of any staff member(s) or incarcerated individual(s) that claimed injury as a result of the incident, as required by ODRC Policy 310-SEC-29, Cell Extractions. Consideration shall be given to doing this even if the force incident was not planned and the video recording device and camera were not already being used. Further, in some instances, it is equally important to also record the absence of any injury following a force incident. The shift supervisor shall consider the seriousness of injuries, the seriousness of the disruption caused by the incident, the likelihood of litigation, and whether the injury is capable of being photographed. The shift supervisor shall include in their report the factors considered in deciding whether to make a visual record. Injuries often look worse several hours after an incident. Taking a second set of photographs shall be considered if this occurs. In addition, all staff injuries shall be reported in accordance with ODRC Policy 10-SAF-15, Employee Accident Reporting and Analysis.

9.   In any partial visual record taken, such as photographs only of hands, legs, etc., it is important to place somewhere in that visual display a written indication as to who that individual is. Among other ways, this can be accomplished by placing an appropriately sized sign listing the staff member or incarcerated individual's name and number in the visual field being photographed or recorded.

DRC 1362

| SUBJECT: **Behavioral Intervention/Use of Force** | PAGE___13___ OF _13_ . |
|---|---|

**Referenced ODRC Policies:**

| 10-SAF-15 | Employee Accident Reporting and Analysis |
|---|---|
| 10-SAF-22 | Body Worn Cameras |
| 310-SEC-17 | Hostage Negotiation and Crisis Intervention |
| 310-SEC-29 | Cell Extractions |

**Referenced Forms:**

| Incident Report | DRC1000 |
|---|---|
| Incident Report Supplement | DRC1001 |
| UOF Report | DRC2181 |
| Medical Exam Report | DRC5251 |

Exhibit D-2

**Ohio** Department of
Rehabilitation & Correction

| SUBJECT:<br>**Use of Force Report** | PAGE ___1___ OF ___6___ |
|---|---|
| | NUMBER: **63-UOF-02** |
| RULE/CODE REFERENCE:<br>ORC 5120.01; AR 5120-9-01,<br>AR 5120-9-02, 5120-9-03 | SUPERSEDES:<br>63-UOF-02 dated 06/10/2019 |
| RELATED ACA STANDARDS:<br>5-ACI-3A-31(4202), 3A-35M (4206M) | EFFECTIVE DATE:<br>**November 2, 2020** |
| | APPROVED:<br>*A.C. Smith* |

## I. AUTHORITY

Ohio Revised Code 5120.01 authorizes the Director of the Department of Rehabilitation and Correction, as the executive head of the department, to direct the total operations and management of the department by establishing procedures as set forth in this policy.

## II. PURPOSE

The purpose of this policy is to provide guidance and to establish a standardized process for the purpose of documenting, investigating, and distributing information related to the use of force on incarcerated individuals.

## III. APPLICABILITY

This policy applies to all persons employed by the Ohio Department of Rehabilitation and Correction (ODRC) and to contractors providing a service to the ODRC who work in a correctional institution and/or otherwise interact with incarcerated individuals.

## IV. DEFINITIONS

All definitions set forth in ODRC Policy 63-UOF-01, Use of Force, shall be applicable in this policy.

## V. POLICY

It is the policy of the Ohio Department of Rehabilitation and Correction (ODRC) that all incidents of use of force be properly reported, reviewed, and referred for investigation when appropriate.

## VI. PROCEDURES

### A. Reporting the Use of Force after the Incident

Each employee and/or contractor who is physically involved in or witnesses a use of force incident is required to make verbal notification of basic details to a supervisor before leaving the institution at the end of their shift or workday. After verbal notification has been completed, employees must complete a Use of Force Report (DRC 2181/1001) within seventy-two (72)

| SUBJECT: **Use of Force Report** | PAGE___2___ OF ___6___ . |

hours of the incident. Supervisors should encourage employees to write their reports prior to viewing any video related to the incident. Once properly advised of this recommendation, staff members should be permitted to view available video footage.

1.      If any employee chooses to defer the completion of a Use of Force Report (DRC2181), the shift supervisor will be responsible for ensuring that all involved parties provide verbal notification of the basic details. The shift supervisor shall include the information contained in any/all verbal reports in the "summary" section of the Supervisor's Use of Force Summary Report (DRC2611).

2.      The shift supervisor will document whether any staff member chooses to view available video footage prior to the completion of a Use of Force Report (DRC2181). This documentation should be reflected in the "summary" section of the Supervisor's Use of Force Summary Report (DRC2611).

3.      The shift supervisor shall ensure an Incident Report (DRC1000) is completed and the incoming shift supervisor is so advised when an incarcerated individual is left in restraints at the end of the supervisor's shift.

4.      In the event the incarcerated individual is placed in restrictive housing and suspected of committing a criminal offense, the managing officer/designee or highest ranking official on site shall consult with the Ohio State Highway Patrol prior to interviewing the incarcerated individual to coordinate the administrative investigation with any criminal investigation.

5.      It is the responsibility of each employee or contractor to be as observant as possible of a use of force situation and to carefully, comprehensively, and accurately report in accordance with section VI.A of this policy. Employees shall document their own personal, first-hand perceptions. Employees shall describe their own actions and those of other staff members if the writer witnessed them. Employees shall take care to report specific details as completely as possible. Opinions and judgments should not be included in the written report. If the employee(s) received information from others, these statements and their source shall also be documented. Employees shall never discuss or attempt to obtain agreement on the details of the incident with other employees when completing Use of Force Reports (DRC2181/1001).

6.      Once completed, Use of Force Reports (DRC2181/1001) and Incident Reports (DRC1000) are to be immediately delivered to the appropriate shift supervisor so the packet can be prepared in accordance with Administrative Rule 5120-9-02, Use of Force Reports and Investigations. The shift supervisor shall have the responsibility to review these reports and shall direct the employee/contractor to supplement the report as necessary in order to ensure its completeness and accuracy. The shift supervisor is expected to review, critique, and assess reports for completeness, accuracy, and inconsistencies. It is the responsibility of the employee/contractor to complete any requested supplement immediately.

DRC 1362

7. The shift supervisor shall also be responsible for retrieving, capturing, and/or securing any other immediately relevant documentary evidence such as log book entries, shift rosters, cell assignments, photos of the scene or injuries, and video recordings of the incident (including security cameras), provided doing so does not compromise any current criminal investigation. The shift supervisor is responsible for making written notification to the chief of security regarding the general details of the use of force incident, including the expected completion date of the Supervisor's Use of Force Summary Report (DRC2611).

8. Once all the Use of Force Reports (DRC2181/1001) have been received and reviewed, the shift supervisor must complete a Supervisor's Use of Force Summary Report, (DRC2611), and ensure all relevant paperwork is obtained before leaving the institution. This includes:

   a. Use of Force Reports (DRC2181/1001);
   b. Inmate Use of Force Statement (DRC2737) from each incarcerated individual physically involved in the use of force;
   c. Witness statements, whether staff or incarcerated individual (unless confidential);
   d. Medical exam reports (DRC5251 or electronic equivalent) on all staff and incarcerated individuals physically involved in the use of force; and
   e. Any other related documents, photographs, video (to include handheld and/or security camera footage), diagrams or information used to describe the incident.

9. The use of force reports, incident reports, relevant medical reports, and/or other relevant documentation shall be attached to the Supervisor's Use of Force Summary Report (DRC2611). The shift supervisor shall deliver the entire documentation packet to the chief of security.

**B.  Chief of Security Review**

The chief of security/designee shall be responsible for conducting a quality assurance review of the entire use of force packet for accuracy, consistency, completeness, and proper preservation of all relevant documents, photographs, videos required in section VI.A.6 of this policy. Once the quality assurance review is completed, the chief of security/designee shall endorse the Supervisor's Use of Force Summary Report (DRC2611) and forward the entire packet to the responsible deputy warden for review.

**C.  Deputy Warden Review**

The appropriate deputy warden shall decide, after any necessary interviews or consultations, whether a use of force packet contains the sufficient information necessary to evaluate the incident. The deputy warden shall complete a Deputy Warden Review of Use of Force (DRC4181) to document the review and decision. Once all information has been assembled and the deputy warden has evaluated it, the packet must then be sent to the managing officer. In the case of a high interest use of force incident, the deputy warden's review shall be expedited.

| SUBJECT: **Use of Force Report** | PAGE __4__ OF __6__ . |
|---|---|

**D.** **Use of Force Records**

The responsible deputy warden, after the managing officer's review has been completed, shall ensure that records of all use of force incidents are maintained in their office. These records shall include the number of use of forces, date of incident, incarcerated individual name(s), number(s), race and injury; mental health caseload status, SPMI, OC usage, reason force was used, video availability, planned or reactive, cell extraction, location, time, day of the week, staff equipment type, employee(s) involved name and OAKS ID, position/title, employee(s) and injuries; further action needed, date sent to investigator, use of force investigator, was the use of force appropriate under the circumstances, justified/unjustified, corrective action taken, and date completed. This information shall be routed to the responsible regional security administrator prior to the 10th calendar day of each month.

**E.** **Managing Officer's Review**

1. If there is no substantial factual dispute, the managing officer may accept the reports and information submitted by the deputy warden as provided in Administrative Rule 5120-9-02, Use of Force Reports and Investigations. The managing officer may always choose to send the matter to a use of force investigation as a matter of discretion. In any event, the managing officer must document his/her decision on the "Managing Officer's" section of the Deputy Warden's Review of Use of Force (DRC4181).

2. The managing officer is required to refer the use of force incident for further inquiry by a use of force investigator or the chief inspector if any of the following apply:

   a. The factual circumstances are not described sufficiently in the record to enable an evaluation of the propriety of the amount of force utilized;
   b. The incident involved serious physical harm to any person;
   c. The incident constituted a significant disruption to the normal operation of the institution;
   d. Weapons, PR-24 strikes, or less-lethal munitions were used during the incident whether by staff or by incarcerated individuals (excluding the pepper-ball system); or
   e. Whenever the involved incarcerated individual claim abuse or excessive force and the medical exam report reflects injuries consistent with the claim.

3. The following circumstances are examples of use of force incidents that do not have to be referred to a use of force investigation or the Office of the Chief Inspector for investigation:

   a. Incidents where the incarcerated individual(s) involved is/are taken to the ground to be controlled and the reports, statements, and available video documentation are consistent;
   b. Incidents where the incarcerated individual is placed into four or five point restraints without incident and the reports, statements, and available video documentation are consistent;
   c. Incidents where video documentation is available that corroborates the reports and statements; this includes planned uses of force that involve the deployment of a pepper-ball system.

| SUBJECT: **Use of Force Report** | PAGE___5___ OF ___6___ . |
|---|---|

d. Incidents involving three (3) or more offenders, where there are no significant injuries to staff or incarcerated individuals related to the use of force and there is video corroboration of the response and/or use of force that corresponds with the written reports, the managing officer shall have discretion as to whether the incident requires a use of force investigation. If the incident is not referred for a use of force investigation, the regional director must be notified of the rationale for the decision and the managing officer shall facilitate an after-action review of the incident; all of which shall be submitted to the regional director for review.

F.  **Incarcerated Individual Complaints of Use of Force Where No Use of Force Report Has Been Made**

1.  A use of force by a staff member, as defined in Administrative Rule 5120-9-01, Use of Force, without the subsequent completion of a Use of Force Report (DRC2181/1001) is contrary to department policy and Administrative Rule 5120-9-03, Inmate Complaints of Use of Force Where No Use of Force Report Was Made.

2.  The institution inspector shall investigate incarcerated individual complaints of use of force by employees where no Use of Force Report (DRC2181/1001) was filed.

3.  In the event of a complaint by an incarcerated individual of use of force where no Use of Force Report (DRC2181/1001) was filed, the following procedure shall occur.

    a.  Any incarcerated individual complaint of use of force, whether oral or written, received by any employee, shall be immediately forwarded to the institution inspector. If the complaint is oral, the employee receiving the complaint shall document it in an Incident Report (DRC1000/1001) and forward the original report to the managing officer and a copy to the institution inspector.

    b.  Regardless of the way a complaint of use of force is received, the staff member receiving the report shall ensure the incarcerated individual is evaluated by a qualified medical professional. A record shall be made of the evaluation on the Medical Exam Report (DRC5251 or electronic equivalent). A shift supervisor shall ensure comprehensive photographs are taken of any and all injuries or lack thereof.

    c.  Upon receipt of a complaint of a use of force, the institution inspector shall interview the incarcerated individual, the employee allegedly involved, and any other witnesses the institution inspector deems necessary to determine if a use of force occurred. The institution inspector shall attempt to obtain any and all security video if available.

    d.  If the institution inspector determines a use of force did occur, they shall require the appropriate use of force reports be filed, as stated in section VI.A.6 of this policy.

    e.  The institution inspector shall prepare a report for the managing officer which shall include their findings, a summary of the evidence upon which the findings were based, and any and all relevant documentation.

DRC 1362

| SUBJECT: **Use of Force Report** | PAGE __6__ OF __6__ . |

    f.   The managing officer shall then assign the use of force investigation to a use of force investigation. Administrative Rule 5120-9-02, Use of Force Reports and Investigations, and ODRC Policy 63-UOF-03, Use of Force Investigation, shall be followed.

**Referenced ODRC Policies:**

63-UOF-01    Use of Force
63-UOF-03    Use of Force Investigation

**Related Department Forms:**

| Incident Report | DRC1000 |
| Incident Report Supplement | DRC1001 |
| Use of Force Report | DRC2181 |
| Supervisor's Use of Force Summary Report | DRC2611 |
| Inmate Use of Force Statement | DRC2737 |
| Deputy Warden Review of Use of Force | DRC4181 |
| Medical Exam Reports | DRC5251 |

DRC 1362

*Exhibit D·3*

**Ohio** | **Department of Rehabilitation & Correction**

| SUBJECT:<br>**Use of Force Investigation** | PAGE ___1___ OF __6__ . |
| | NUMBER: **63-UOF-03** |
| RULE/CODE REFERENCE:<br>AR 5120-9-01, 5120-9-02 | SUPERSEDES:<br>63-UOF-03 dated 11/25/16 |
| RELATED ACA STANDARDS: | EFFECTIVE DATE:<br>**September 3, 2019** |
| | APPROVED:<br>*A. C. Smith* |

## I. AUTHORITY

Ohio Revised Code 5120.01 authorizes the Director of the Department of Rehabilitation and Correction, as the executive head of the department, to direct the total operations and management of the department by establishing procedures as set forth in this policy.

## II. PURPOSE

The purpose of this policy is to establish a standardized process for the purpose of documenting, investigating, and distributing information related to the use of force on inmates.

## III. APPLICABILITY

This policy applies to all persons employed by the Ohio Department of Rehabilitation and Correction (ODRC) and to independent contractors providing a service to the ODRC who interact with inmates and may be involved in the reporting of and investigation of use of force incidents (excluding employees of the Adult Parole Authority (APA) who are required to follow ODRC policy 104-TAW-02, APA Use of Force.

## IV. DEFINITIONS

All definitions set forth in ODRC policy 63-UOF-01, Use of Force, shall be applicable in this policy.

## V. POLICY

It is the policy of the Ohio Department of Rehabilitation and Correction (ODRC) to monitor and ensure that responses to resistance and uses of force are appropriate and consistent with applicable administrative rules and ODRC policies by documenting and investigating such incidents where appropriate.

| SUBJECT: **Use of Force Investigation** | PAGE___2___ OF __6__ . |
|---|---|

## VI.   PROCEDURES

### A.   Composition

The managing officer shall appoint one exempt employee (unless additional exempt employees are deemed necessary by the managing officer) to serve as the Use of Force Investigator utilizing the Deputy Warden Review of Use of Force (DRC4181). When necessary the use of force investigator shall consult a physical skills instructor for clarification of techniques. Members of the rules infraction board (RIB) or the hearing officer who conducted or will be likely to conduct hearings against the inmate arising from the same incident in which force was used shall not be assigned as the use of force investigator.

### B.   Training

No employee shall be assigned as the use of force investigator unless he/she has successfully completed the appropriate departmental training.

### C.   Documents

A completed use of force report packet shall include:

1.   Use of Force Reports (DRC2181);
2.   Inmate Use of Force Statement (DRC2737) from each inmate physically involved in the use of force;
3.   A Supervisor's Use of Force Summary Report (DRC2611);
4.   Witness statements, whether staff or inmate (unless confidential);
5.   Medical Exam Reports (DRC5251) on all staff and inmates physically involved in the use of force;
6.   A Use of Force Investigation Summary Report (DRC2641), if applicable;
7.   Any other related documents, photographs, diagrams, video, or information used to describe the incident.

### D.   Non-institutional Use of Force Investigator

Pursuant to Administrative Rule 5120-9-02 (K), Use of Force Reports and Investigations, the chief inspector may initiate an investigation of a use of force upon his/her own initiative or at the request of the Director, assistant director, deputy director of prisons, regional directors, or the managing officer of the institution in which the incident took place. In such cases, the chief inspector may coordinate or assign a use of force investigator utilizing other ODRC staff as necessary and appropriate.

### E.   Function

1.   The use of force investigator shall make every reasonable effort to interview each employee and inmate physically involved in the use of force incident and any other witness (staff or inmate) considered relevant.

| SUBJECT: Use of Force Investigation | PAGE __3__ OF __6__ |
| --- | --- |

2. Exceptions to this requirement include if the inmate has been released from ODRC supervision or the employee no longer works for the ODRC. If any employee or inmate involved is no longer located at the institution where the incident occurred and it is not feasible for the use of force investigator to conduct an interview at that employee's or inmate's current location, the use of force investigator may conduct the interview via speakerphone or teleconference. All interviews shall be taken as soon as possible after the incident is reported.

## F.    Use of Force Investigator Responsibilities

1. The use of force investigator shall impartially review the incident using all available reports, statements, photographs, video, testimony, technical support, etc., pertinent to the matter. The use of force investigator shall have the authority to call any employee to give statements, accounts, and information regarding any matter under review.

2. All employees are under an affirmative duty to fully cooperate with any use of force investigation if called upon to do so as stipulated in the ODRC Standards of Employee Conduct. The employee witness may invoke protections against self-incrimination to prevent the statements from later use in court. However, that does not excuse the employee from testifying before the use of force investigator.

3. Any employee(s) called before the use of force investigator shall be permitted to have a representative accompany him/her during the interview in accordance with applicable Collective Bargaining Agreements.

4. The investigation report is the official record of the use of force investigator.

5. The use of force investigator shall determine whether the employee was justified in using force and whether the force used was appropriate and/or excessive. The use of force investigator shall identify any policy or procedure violations related to the use of force and shall explain how the violation impacted the use of force incident. The use of force investigator shall formulate any recommendations concerning the matter for inclusion in investigation report.

## G.    Standards and Issues

It must be recognized that situations requiring the use of force can develop quickly and thus change the level of response that is appropriate. Circumstances presented by the inmate involved in the use of force situation and surrounding circumstances must be considered. To determine if the force used by an employee was appropriate and reasonably necessary under the circumstances, the use of force investigator shall consider:

1. The actual force applied, and the formal techniques applied, if any;
2. The need for the force;
3. The relationship between the force and the necessity for using force;
4. The extent of any injuries received by physically involved parties;
5. The behavior(s) and background of the inmate against whom the force was used;
6. The actions by third parties who were present;

DRC 1362

SUBJECT: **Use of Force Investigation**   PAGE __4__ OF __6__ .

7. The inmate's ability to cause harm;
8. The inmate's opportunity to cause harm;
9. The threat of harm perceived by the employee(s);
10. The feasibility or availability of alternative courses of action;
11. The behavior of the employee during and immediately preceding the incident;
12. The severity of the security concern resulting in force to be utilized;
13. The governmental interest requiring the employee(s) to act.

**H. Record of Testimony**

Additional documentation may include:

1. A transcription of an interview - In the event such a transcription is made, the subject of the interview shall read the transcript for accuracy and sign it.

2. Written statements - Inmates and/or employees may be required to write out their version of the incident or the use of force investigator may write down the testimony as it is being given. In either case, the witness shall verify that the written statement is accurate by providing their signature to the statement.

**I. Report**

After all testimonies have been taken, the use of force investigator shall determine what the facts of the use of force incident are and shall draw a conclusion as to whether the employee used a reasonable response and whether excessive force was applied under the circumstances. Administrative Rule 5120-9-01, Use of Force, shall be the standard for determining whether the response was reasonable. The use of force investigator's written report shall summarize the Use of Force Investigation Summary Report (DRC2641) and shall also include:

1. A brief statement of the facts as found by the use of force investigator;
2. A conclusion as to the necessity for the response and if the force used was appropriate;
3. A conclusion as to whether excessive force was employed and its conclusions regarding any allegation of abuse;
4. The reasons supporting these conclusions;
5. Any other recommendations formulated by the use of force investigator; and
6. The signature of the use of force investigator.

**J. Deadlines and Action**

Regardless of any formal deadlines, it is always important to complete the investigation as soon as possible after an incident so that memories are fresh and needed records are readily retrievable. The use of force investigator shall complete all interviews within twenty business days after the use of force investigator has received the case. The use of force investigator shall submit the written report to the managing officer within thirty business days after being assigned. Only the managing officer may authorize exceptions to this deadline; however, the deadline may not be extended beyond an additional thirty business days.

| SUBJECT: **Use of Force Investigation** | PAGE  5  OF  6 . |
|---|---|

K.  **Submitting the Report and Record**

The use of force investigator shall forward the use of force report and record, including all attachments and the Use of Force Investigation Summary Report (DRC2641), to the managing officer, or to the chief inspector when the investigation has been conducted and/or coordinated by the Office of the Chief Inspector. The managing officer or chief inspector shall then distribute the report as appropriate. The record shall include:

1.  All relevant Use of Force Report/Supplement (DRC2181);
2.  Inmate Use of Force Statement (DRC2737) from each inmate physically involved in the use of force;
3.  The Use of Force Investigation Summary Report (DRC2641);
4.  The results of the Medical Exam Report (DRC5251) for all inmates and/or staff members physically involved in the incident; and
5.  All relevant supplemental information (i.e., pictures, videos and other descriptive information).

L.  **Review**

1.  The managing officer shall review the entire record within seven calendar days of receipt from the use of force investigator. The managing officer may accept the report, or he/she may send it back to the use of force investigator for additional investigation if necessary or reassign the investigation to a new use of force investigator. Any additional interviews must be conducted in accordance with section VI.H of this policy.

2.  Once the managing officer is satisfied that the incident has been completely investigated, he/she may either accept or reject the investigative findings and conclusions, in whole or in part. In either case, if it is determined the employee involved was not justified in their level of response, or that excessive force was used, the managing officer or other appropriate appointing authority shall discipline the employee subject to applicable civil service laws and regulations or union contracts and ODRC Standards of Employee Conduct.

3.  The managing officer may refer the use of force incident to the Ohio State Highway Patrol (OSHP) for criminal prosecution. If the managing officer refers a use of force incident to OSHP, the managing officer shall notify ODRC Legal Services within 24 hours of the referral.

4.  The use of force investigation and subsequent report shall also serve as the administrative investigation into conduct which may be in violation of ODRC policies, procedures, and/or rules. The Use of Force Investigation Summary Report (DRC2641) may be used to support employee disciplinary action.

5.  Investigations of incidents that are suspected to be criminal in nature shall not be initiated by the ODRC's officials unless the OSHP is aware of the nature of the incident and has granted the ODRC consent to conduct an administrative investigation.

| SUBJECT: **Use of Force Investigation** | PAGE___6___ OF __6__ . |
|---|---|

M.   **Office of Prisons**

    1.   If an inmate is transported for medical care as a result of a use of force incident, the managing officer shall notify the regional director as soon as possible.

    2.   If upon final review, the managing officer determines that the use of force incident merits further review due to the nature or level of force used, or due to the seriousness of injury to the inmate(s), or staff, the managing officer shall notify the regional director as soon as possible and provide all documentation associated with the use of force, as well as any photographs and/or video associated with the use of force, to the regional director and security administrator within a reasonable time.

N.   **File**

A copy of the entire record shall be kept in the managing officer's/designee's office. A copy of the Use of Force Investigation Summary Report (DRC2641) and the report prepared by the use of force investigator, minus any attachments, shall be placed in the inmate's unit file and in the designated employee file.

**Related Department Forms:**

| | |
|---|---|
| Use of Force Report | DRC2181 |
| Supervisor's Use of Force Summary Report | DRC2611 |
| Investigation Summary Report | DRC2641 |
| Inmate Use of Force Statement | DRC2737 |
| Deputy Warden Review of Use of Force | DRC4181 |
| Medical Exam Report | DRC5251 |

Exhibit D-4

# OAC Ann. 5120-9-01

### Copy Citation

This document is current through updates effective October 14, 2023.

- **OHIO ADMINISTRATIVE CODE**
- **5120 Department of Rehabilitation and Corrections - Administration and Director**
- **Chapter 5120-9 Use of Force; Institutional Rules**

## 5120-9-01. Use of force.

(A) As the legal custodians of a large number of potentially dangerous inmates, prison officials and employees are confronted with situations in which it may be necessary to use force to control inmates or respond to resistance. This rule identifies the circumstances when force may be used lawfully.
(B) As used in this rule and rules 5120-9-02 and 5120-9-03 of the Administrative Code:
(1) "Force" means the exertion or application of a physical compulsion or constraint.
(a) The mere application and use of restraints (such as handcuffs, waist or leg restraints) in connection with accepted procedures such as the transport, escort or movement of an inmate shall not in itself be considered a reportable use of force.
(b) The use of one's hands with minimal force such as may be necessary or incidental to the application of restraints, or to restrain, guide, support, or direct, etc., an inmate during procedures such as the transport, escort or movement of an inmate shall not in itself be considered a reportable use of force.
(c) If force, greater than minimal force, is needed to overcome the physical resistance of an inmate in order to apply restraints or otherwise gain control of the inmate, it shall be considered a reportable use of force.
(2) "Less-than-deadly force" means any force which could not reasonably be expected to result in the death of the person against whom it is directed.
(3) "Excessive force" means an application of force which, either by the type of force employed, or the extent to which such force is employed, exceeds that force which reasonably appears to be necessary under all the circumstances surrounding the incident.
(4) "Deadly force" means any force that carries a substantial risk that it will proximately result in the death of any person. Examples of deadly force include, but are not limited to, the following:
(a) Discharging a firearm in the immediate vicinity of or directed toward another person;
(b) Striking another person on the head with an instrument;
(c) Applying force or weight to the throat or neck of another.
(5) "Physical harm to persons" means any injury or other physiological impairment regardless of its gravity or duration.
(6) "Serious physical harm to persons" means any of the following:
(a) Any physical harm which carries a substantial risk of death;
(b) Any physical harm which involves some permanent incapacity, whether partial or total, or which involves some temporary, substantial incapacity;
(c) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment which occurred as a result of a physical injury;
(d) Any physical harm which involves some permanent disfigurement or which involves some temporary, serious disfigurement;
(e) Any physical harm which involves acute pain of such duration as to result in substantial suffering, or which involves any degree of prolonged or intractable pain.
(7) "Risk" means a significant possibility, as contrasted with a remote possibility, that a certain result may occur or that certain circumstances may exist.
(8) "Substantial risk" means a strong possibility, as contrasted with a remote or insignificant possibility, that a certain result may occur or that certain circumstances may exist.
(9) "Immobilizing security restraints" means any appliance which secures the inmate in such a way that the inmate is prevented from rising, using toilet facilities, or eating. "Immobilizing security

restraint" shall include, but is not limited to, what is known as "four-way" or "five-point" restraints. This does not include the use of handcuffs, leg irons or belly chain in the transport or movement of the inmate.

(C) Guidelines regarding the use of force. Force shall be used in accordance with the following guidelines.

(1) Amount of force. Staff members considering the use of force shall evaluate the need to use force based on the circumstances as known and perceived at the time it is considered.

(a) Staff may use force only to the extent deemed necessary to control the situation; staff shall increase or decrease the level of force as resistance increases or decreases.

(b) Staff should attempt to use only the amount of force reasonably necessary under the circumstances to control the situation and shall attempt to minimize physical injury.

(c) Force or physical harm to persons shall not be used as punishment.

(2) Less-than-deadly force. There are six general circumstances in which a staff member may use force against an inmate or third person. A staff member may use less-than-deadly force against an inmate in the following circumstances:

(a) Self-defense from physical attack or threat of physical harm;

(b) Defense of another from physical attack or threat of physical attack;

(c) When necessary to control or subdue an inmate who refuses to obey prison rules, regulations or orders;

(d) When necessary to stop an inmate from destroying property or engaging in a riot or other disturbance;

(e) Prevention of an escape or apprehension of an escapee; or

(f) Controlling or subduing an inmate in order to stop or prevent self-inflicted harm.

(3) Deadly force. Deadly force may only be used when the staff member reasonably believes that such force is necessary to accomplish any of the following:

(a) To protect self or another from death or serious physical harm being caused or threatened by an inmate or another person;

(b) To prevent or halt the commission of an escape, or to apprehend an escapee, or;

(c) To prevent loss of control of the institution, or a significant part, or in order to regain such control.

(4) Whenever possible, an appropriate oral warning shall be given prior to the use of deadly force. In no event shall a warning shot from a firearm be appropriate.

(5) Medical attention for any individual injured during a use of force incident will be provided as soon as practical after the incident.

(6) Force to achieve compliance: Any use of force in which staff can prepare for the use of force. Staff shall call for assistance before using such force. When safe and reasonable to do so, such force should be directed by the shift supervisor or other ranking official and should be videotaped.

(7) Reactive force- A use of force that is an immediate response to an immediate threat of harm to oneself or another; and the individual can safely and effectively respond to the threat.

OAC Ann. 5120-9-02

Copy Citation

This document is current through updates effective October 14, 2023.

OHIO ADMINISTRATIVE CODE 5120 Department of Rehabilitation and Corrections - Administration and DirectorChapter 5120-9 Use of Force; Institutional Rules

**5120-9-02. Use of force report and investigations.**

(A) Following any reported use of force, the shift supervisor shall ensure that the following reports have been completed:

(1) Each staff member who used force or who witnessed any part of the use of force shall complete an incident report which accurately and completely describes what he or she observed, what led up to the incident and what was done to resolve the matter, and what force was used by the staff member. The report form shall list the inmates on whom force was used, the staff members who used force and any staff, inmate or other witnesses known. The report shall be completed prior to the end of the shift, unless the staff member, for good cause, is unable to do so.

• (2) The shift supervisor shall obtain a written statement from each inmate against whom force was used describing the inmate's version of the event, and identifying any witnesses to the event. This statement shall be taken as soon as possible after the incident. The shift supervisor shall determine what additional witness statements are needed and, in making this determination, shall take into consideration both the nature of the incident and any injuries received. The inmate may refuse to make such a statement, but shall make his refusal in writing and shall acknowledge that he knowingly waived his opportunity to make a statement.

• (3) In the event that the inmate is placed in restrictive housing and suspected of committing a criminal offense, the warden, warden's designee, or highest ranking official on site shall consult with the Ohio state highway patrol prior to interviewing the inmate to coordinate the administrative investigation with any criminal investigation.

◦ (4) Medical staff shall examine all individuals upon whom force was used, and any individual who used force on an inmate. Medical staff shall prepare a written assessment of each individual examined. Whenever a person is injured and needs medical care a shift supervisor shall collect and report the names of staff and inmate witnesses. If the shift supervisor was directly involved in the force incident, statements shall be obtained by another supervisor not directly involved in the incident.

• (5) The shift supervisor shall consider making a videotape or photographic record of any individual, whether staff or inmate, who was or claims to have been injured during the incident. In deciding to make such a record, the shift supervisor shall consider:

(a) The extent of the injuries;

(b) The nature of the incident, even if the individual is uninjured; and

(c) Whether the injury is visible or capable of being photographed.

(6) The record of injuries may be made at the time of the medical assessment if doing so will not interfere with or delay the delivery of necessary medical care. Such record must not include any medical information apart from a description or depiction of the injury.

✗ (B) The shift supervisor shall prepare a packet containing each of the documents listed in this rule together with any other witness statements or information considered relevant. The shift supervisor should save any available recordings, including all security cameras and any hand-held recordings that capture the incident and post-incident escorts. The shift supervisor shall prepare a report on the

appropriate form to attach to the relevant documents referenced in paragraph (A) of this rule. The shift supervisor shall deliver this packet to the chief of security, and/or other designee who will review the packet for accuracy, consistency and completeness. The completed packet will then be delivered to the designated deputy warden as soon as all reports are completed .

(C) The designated deputy warden shall review the use of force packet prepared by the shift supervisor. The designated deputy warden may order or collect additional statements or other information as needed. The deputy warden shall determine the following:

(1) Are the factual circumstances described sufficiently in the record to enable an evaluation of the amount of force used;

(2) Are the factual circumstances of the situation in dispute;

(3) Was the type and amount of force appropriate for the circumstances as the deputy warden of operations believes them to have occurred;

(4) Was the type and amount of force reasonable under the circumstances as the responding staff perceived them; and

(5) Were applicable administrative rules, departmental policies, institution policies and post orders followed.

(D) The designated deputy warden shall send his or her determinations as described above to the warden for review or further action. The warden may:

(1) Accept the findings of the deputy warden;

(2) Direct that the deputy warden or other appropriate staff conduct further inquiry into the situation;

(3) Refer the matter to a use of force investigation; or,

(4) Refer the matter to the chief inspector, pursuant to paragraph (K) of this rule, for investigation.

(E) The warden may refer any use of force to a use of force investigation at any time. The warden is required to refer the use of force for further inquiry if any of the following apply:

(1) The factual circumstances are not described sufficiently in the record to enable an evaluation of the propriety of the amount of force utilized;

(2) The incident involved serious physical harm to any person;

(3) The incident constituted a significant disruption to the normal operation of the institution; or

(4) Weapons, PR-24, strikes, or less-lethal munitions were used during the incident, whether by staff or by inmates.

(F) The use of force investigator shall be assigned by the warden or designee. The use of force investigator shall conduct a review of the use of force incident and the matters surrounding the incident. The investigator shall not be any person involved with the incident under investigation, nor such person's direct supervisor, nor any person who reviewed some other aspect of the incident, such as the

hearing officer or a member of the rules infraction board. The person appointed to investigate a use of force incident must complete training for that position.

(G) The use of force investigator shall review all materials in the use of force packet and any findings previously made. The investigator shall also interview each inmate and staff member directly involved, and any other relevant witnesses. These interviews shall be completed within twenty working days of the date the matter was referred to the investigator. Any extensions must be approved by the warden. The investigator shall review any other relevant evidence.

(H) The investigator shall prepare a report which contains findings of fact and conclusions as to whether the level and degree of force used was appropriate for the circumstances. The investigator shall submit to the warden a report, a summary of the statements received, the use of force packet, and any other information received by the investigator within thirty working days after being assigned. The warden must approve any request for an extension of the deadline for the report.

(I) The warden shall review the record and report presented by the investigator. If the warden believes that further investigation or clarification is necessary the warden may return the matter to the assigned investigator, another investigator, or the chief inspector for additional investigation or review. When the warden is satisfied that the matter has been thoroughly investigated, the warden shall take such actions as he or she deems appropriate.

(J) The warden shall supplement the report with any relevant information about other actions taken as a consequence of the conclusions of the report. The complete investigative record shall be stored in a secure area designated by the warden. A copy of the cover sheet and report prepared by the investigator, minus any attachments, shall be placed in the offender's unit file and in the designated employee file.

(K) The chief inspector may initiate an investigation of a use of force incident either upon his or her own initiative or upon the request of the director, assistant director, regional director, or the warden of the institution in which the incident took place. In such cases the chief inspector may utilize other departmental staff to assist with the investigation or hearing as may be necessary or appropriate, notwithstanding other provisions of this rule to the contrary.

(L) A use of force investigation report generated under this rule shall also serve as the administrative investigation into conduct which may be in violation of departmental policies, procedures, and/or rules. The use of force investigation may be used to support employee disciplinary action.

*Exhibit E-1*

# OAC Ann. 5120-9-29

Copy Citation

This document is current through updates effective November 6, 2023.

- **OHIO ADMINISTRATIVE CODE**
- **5120 Department of Rehabilitation and Corrections - Administration and Director**
- **Chapter 5120-9 Use of Force; Institutional Rules**

## 5120-9-29. The office of the inspector of institutional services.

The warden of each institution shall appoint an individual to serve as the inspector of institutional services. As appropriate, the warden may also appoint an assistant inspector of institutional services. Screening, interviewing, and selecting individuals for both positions requires the participation of the chief inspector or designee. The inspector of institutional services shall report directly to the warden, with functional supervision being maintained by the chief inspector or his/her designee. The chief inspector or designee shall be involved in the performance evaluation of the inspector of institutional services. The inspector of institutional services shall have sufficient authority, clerical support, and access to all records and areas of the institution in order to carry out the duties of the office.
The inspector of institutional services shall:
**(A)** Facilitate all aspects of the inmate grievance procedure, as established by rule 5120-9-31 of the Administrative Code;
**(B)** Investigate and respond to grievances filed by inmates;
**(C)** Monitor the application of institutional and departmental rules and policies affecting conditions of incarceration; and report to the warden any noncompliance including recommendations for corrective action;
**(D)** Conduct regular inspections of institutional services and serve as a liaison between the inmate population and institutional personnel;
**(E)** Review and provide input on new or revised institutional policies, procedures and post orders;
**(F)** Provide training on the inmate grievance procedure and other relevant topics;
**(G)** Perform other duties as assigned by the warden or chief inspector which do not create a conflict with paragraph (A) or (B) of this rule;
**(H)** Submit all reports, documents, or other forms of accountability of their work to the chief inspector and/or warden as directed.

*Exhibit E-2*

# OAC Ann. 5120-9-31

Copy Citation

This document is current through updates effective November 6, 2023.

- **OHIO ADMINISTRATIVE CODE**
- **5120 Department of Rehabilitation and Corrections - Administration and Director**
- **Chapter 5120-9 Use of Force; Institutional Rules**

## 5120-9-31. The inmate grievance procedure.

**(A)** The department of rehabilitation and correction (DRC) shall provide inmates with access to an inmate grievance procedure. This procedure is designed to address inmate complaints related to any aspect of institutional life that directly and personally affects the grievant. This may include complaints regarding the application of policies, procedures, conditions of confinement, or the actions of institutional staff.

**(B)** The inmate grievance procedure will not serve as an additional or substitute appeal process for hearing officer decisions, rules infraction board decisions or those issues or actions which already include a separate appeal mechanism beyond the institution level or those issues or actions where a separate administrative rule specifically indicates there is no appeal or where a final decision has been rendered by operation support center staff or a managing officer. Other matters that are not grievable include complaints related to legislative actions, the Ohio Revised Code, Administrative Code, ODRC policies, and decisions of the adult parole authority, judicial proceedings and sentencing or complaints whose subject matter is exclusively within the jurisdiction of the courts or other agencies. Complaints which present allegations which fall, in part, within the scope of paragraph (A) of this rule and in part within this paragraph will be considered to the extent they are not excluded under this paragraph.

**(C)** A written explanation of and instructions for the use of the inmate grievance procedure shall be readily available to both staff and inmates. Newly hired staff, and newly incarcerated inmates at reception shall receive a written and oral description of the procedure. Inmates shall also receive information regarding the inmate grievance procedures during orientation at their parent institution. Appropriate provisions shall be made as necessary for inmates not fluent in English, persons with disabilities and those with low literacy levels. All materials used to provide information and training on the inmate grievance procedure to staff and inmates shall be prepared or approved by the office of the chief inspector.

**(D)** Inmates may utilize the inmate grievance procedure regardless of any disciplinary status, or other administrative or legislative decision to which the inmate may be subject. Appropriate provisions shall be made to ensure access to the inmate grievance procedure by inmates not fluent in English, persons with disabilities, and those with low literacy levels. Each institution shall ensure a secure method exists for inmates to send kites, informal complaints, grievances, and other institutional correspondence to staff.

**(E)** Limited restrictions may be imposed, only with the approval of the chief inspector, based upon an inmate's abuse or misuse of the inmate grievance procedure. Such a restriction shall be for a stated period of time not to exceed ninety days and subject to extension by the chief inspector if the inmate has not substantially complied with the restriction requirements. Provisions shall be made to ensure that the inmate can pursue issues that could present a substantial risk of physical injury, such as medical concerns, through the inmate grievance procedure. Any inmate subject to a restriction shall be notified in writing. Such notice shall include a clear explanation of the nature of the restriction, and the length of time of the restriction, (conditional upon their compliance). The notice shall also include an explanation of how they may pursue issues that could present a substantial risk of harm while on restriction.

**(F)** An inmate may be subject to disciplinary action for intentionally providing false information, or disrespectful, threatening or otherwise inappropriate comments made in an informal complaint, grievance, grievance appeal or grievance against the warden or inspector of institutional services. Only the chief inspector or designee and/or inspector of institutional services, with the approval of the

chief inspector or designee, may initiate disciplinary action based upon the contents of an informal complaint, grievance, grievance appeal or grievance against the warden or inspector of institutional services. Failure of the inmate to substantiate his or her grievance allegations shall not, by itself, be used as grounds to initiate disciplinary action.

(G) Retaliation or the threat of retaliation for the use of the inmate grievance procedure is strictly prohibited. Any alleged or threatened retaliation may be pursued through the inmate grievance procedure. Appropriate disciplinary action shall be taken against any employee found to be in violation of this rule.

(H) Grievance records are considered confidential and shall be maintained in a secure manner. No grievance records shall be placed in any inmate file which is available to the adult parole authority, except when the record is the basis of disciplinary action initiated by the inspector and authorized by the chief inspector.

(I) Only the procedure designated by the chief inspector may be used to file informal complaints, grievances, grievance appeals, or grievances against the warden or inspector of institutional services. Such process shall be reasonably available to inmates regardless of their disciplinary status or classification. Inmates shall not be required to advise a staff member, other than the inspector of institutional services, of the reason the procedure is being initiated.

(J) The inmate grievance procedure shall be comprised of three consecutive steps fully described in this paragraph. This procedure is designed to address inmate complaints related to any aspect of institutional life that directly and personally affects the grievant, including complaints regarding the application of DRC policies, procedures, conditions of confinement or the actions of institutional staff. Whenever feasible, inmate complaints should be resolved at the lowest step possible. Informal complaints must contain specific information; dates, times, places, the event giving rise to the complaint and, if applicable, the name or names of personnel involved and the name or names of any witnesses. Specificity of the complaint provides institutional staff the opportunity to investigate the complaint and to take corrective action to address a valid complaint. In the event an inmate does not know the identity of the personnel involved, a "John/Jane Doe" complaint may be filed. However, the complaint shall be specific as to dates, times, places, physical descriptions of any unidentified personnel and the actions of said personnel giving rise to the complaint.

(1) The filing of an informal complaint - step one:

Within fourteen calendar days of the date of the event giving rise to the complaint, the inmate shall file an informal complaint to the direct supervisor of the staff member, or department most directly responsible for the particular subject matter of the complaint. Staff shall respond in writing within seven calendar days of receipt of the informal complaint. If the inmate has not received a written response from the staff member within seven calendar days, the inspector may grant an additional four calendar days for response. The inspector of institutional services shall take prompt action to ensure that a written response is provided to the informal complaint within required timelines and if a response is not provided within required timelines, the informal complaint step is automatically waived and the inmate may proceed to step two. Informal complaint responses shall reflect an understanding of the inmate's complaint, be responsive to the issue, cite any relevant departmental or institutional rules or policies and specify the action taken, if any. The inspector of institutional services shall monitor staff compliance with the informal complaint process. Any pattern of non-compliance by staff shall be reported to the warden for appropriate action. The filing of an informal complaint may be waived if it is determined by the inspector of institutional services that there is a substantial risk of physical injury to the grievant, the complaint is filed pursuant to rule 5120-9-03 or 5120-9-04 of the Administrative Code, paragraph (H) of this rule, or for other good cause. In instances where the inmate has failed to meet the requirements of paragraph (J) of this rule, notification will be provided by the inspector stating the reason(s) why use of the grievance procedure is not appropriate.

(2) The filing of the notification of grievance - step two:

If the inmate is dissatisfied with the informal complaint response, or the informal complaint process has been waived, the inmate may file a notification of grievance with the inspector of institutional services. All inmate grievances must be filed by the inmate no later than fourteen calendar days from the date of the informal complaint response or waiver of the informal complaint step. The inspector of institutional services may also waive the timeframe for the filing of the notification of grievance, for good cause. The inspector of institutional services shall provide a written response to the grievance within fourteen calendar days of receipt. The written response shall summarize the inmate's complaint, describe what steps were taken to investigate the complaint and the inspector of institutional service's findings and decision. The inspector of institutional services may extend the time in which to respond by no more than fourteen days with notice to the inmate. If a disposition has not

been rendered after a total of twenty-eight days from the receipt of the grievance, the complaint will be deemed unresolved and the inmate may proceed to step three of the process. Expedited responses shall be made to those grievances that, as determined by the inspector of institutional services, present a substantial risk of physical injury to the grievant or for other good cause.

(3) The filing of an appeal of the disposition of grievance - step three:

If the inmate is dissatisfied with the disposition of grievance, the inmate may file an appeal with the office of the chief inspector. Only issues presented in an informal complaint or grievance may be raised in a grievance appeal. Grievance appeals shall contain a clear, concise statement explaining the basis for the appeal. The appeal must then be filed to the office of the chief inspector within fourteen calendar days of the date of the disposition of grievance. For good cause the chief inspector or designee(s) may waive such time limits. The chief inspector or designee(s) shall provide a written response within thirty calendar days of receipt of the appeal. The chief inspector or designee(s) may extend the time in which to respond for good cause, with notice to the inmate. The decision of the chief inspector or designee is final. Grievance appeals concerning medical diagnosis or a specific course of treatment shall be investigated and responded to by a health care professional.

(K) Appropriate remedies for valid grievances shall be provided. Potential remedies may include, but are not limited to: changes to institutional policies or procedures, the implementation of new policies or procedures, and/or corrective action specific to the inmate's complaint (for example, a correction to the inmate's account, locating lost property, etc.) If the resolution of a grievance or portion thereof, requires the authorization of the warden the inspector of institutional services shall submit the findings and recommendations concerning the grievance to the warden for the warden's approval, modification or disapproval. The warden shall respond in writing to the inspector of institutional services within fourteen calendar days. The inspector of institutional services shall provide to the office of the chief inspector the report to the warden, that includes the warden's decision.

(L) Grievances against the warden or inspector of institutional services ("direct grievances") must be filed directly to the office of the chief inspector within thirty calendar days of the event giving rise to the complaint. Direct grievances must show that the warden or inspector of institutional services was personally and knowingly involved in a violation of law, rule or policy, or personally and knowingly approved or condoned such a violation.

The chief inspector or designee(s) shall respond in writing within thirty calendar days of receipt of the direct grievance. The chief inspector or designee(s) may extend the time in which to respond for good cause, with notice to the inmate. The decision of the chief inspector or designee is final.

Exhibit F

Declaratory Statement

I Cameron. S. Parry, Hereby declare:

Between the months or November 2021 and January of 2022, I was working and assigned as a J-2 Porter at S.O.C.F and witnessed Terrance Feaster locked in the Stronghold Cell J2-01, his door was locked the entire Stay, he was feed through a food Slot and would often times ask me to flush his toilet which only flushed from outside because C/o's wouldn't we had no cleaning materials and I couldn't access them or Feaster, Feasters door Stayed Closed while the rest of the Stronger Side doors would open from breakfast until lunch, I noticed that Feaster had been up by SRT's and his eye on his right Side was Swollen and black he had Cacked up blood and Cuts on his head and his fingers were Swollen from what I could See from his window or Shoot. I had also been housed in L-6-B9, when C/o Crank Searched his Cell when he wrote a Fabricated report on what was Found in his Cell and had him placed in Seg. I also had to Call Feaster's Family after Seeing his injuries and the way he was being treated While in J-2 Cell 01

I, Cameron Parry #729-326, Certify and
declare by penalty of perjury under the
laws of the united States the the foregoing
is true and Correct. Executed at, Lucasville
OH. October 30th. 2023


Signature: Cameron Parry          date: 10/30/2023

TERRANCE J. FEASTER # 551840
SOCF
P.O. BOX 45699
LUCASVILLE, OHIO 45699



Southern Ohio Correctional Facility
Outgoing Inmate Mail

US POSTAGE
ZIP 45648  $
02.4W
0000388647 M

OFFICE OF THE CLERK
RICHARD W. NAGEL
U.S. DISTRICT COURT
S.D. OF OHIO
100 EAST FIFTH ST., RM. 103
CINCINNATI, OHIO 45202