Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI

TERRANCE J. FEASTER,
    Plaintiff,

                      Case No. 1:22-cv-313

VS.
                      District Judge Michael R. Barrett
                      Magistrate Judge Karen L. Litkovitz

ANNETTE CHAMBERS-SMITH, et al.,
    Defendants.

PLAINTIFF'S DISCLOSURE OF DISCOVERY AND
INTENTION TO USE IN CHIEF AT TRIAL

    Plaintiff, Terrance J. Feaster, acting in Pro Se moves to Disclose viable and relevant Information discoverable to defendants, as well as an attached witness list of non-parties with evidentiary material and testimony subject to Subpoena with his Intentions to use in chief at trial in the case at bar. Pursuant to Fed. R. Civ. P. 26 and Fed. R. Civ. P. 34.

                      Respectfully Submitted.

                      Terrance J. Feaster Pro. Se'

Plaintiff hereby discloses the following discoverable Information, witness list, and documents Material in this matter. As well as Things Tangible to be used in chief at Trial.

1.) Ohio Administrative Code, Administrative Rules 5120-9-01,(02), and (03). As well as ODRC Policies 63-UOF-01, 02, and 03 Authorities governing Use of Force.

2.) O.A.C., A.R. 5120-9-04 Appropriate Supervision and ODRC Policy 31-SEM-02 Standards of Employee Conduct, and Policy 64-DCM-01 Protection from harm.

3.) ODRC Policies 67-MNH-09 Suicide Prevention, 68-MED-01 Medical Services.

4.) O.A.C., AR 5120-9-08, (08.1 RESCINDED) Disciplinary Procedures for the Rules Infraction Board (R.I.B) and ODRC Policy 56-DSC-02.

5.) O.A.C., A.R. 5120-9-09 and (10) Superseded by ODRC Policies 55-SPC-02 and 53-CLS-04. (Restrictive/ERH Housing)

6.) ODRC Policy 09-INV-01 Surveillance.

7.) O.A.C., A.R.'s 5120-9-29 and (31) The office of the Inspector of institutional Services and inmate Grievance Procedure.

As well as those authorities related and applicable not mentioned at this time.

6.) Recent: Kites/Grievances e-filed with Institution Inspector of S.O.C.F. Parker that are material and relevant to this case in a show of repetitive acts. See: Kite ref# 379096961, ref#341575481, ref# 380484811, and ref # 381161357. As well as Grievances #socf0003269, #socf0003027, #socf0003494, and #socf0003543. When requested per AR 5120-9-29 and 5120-9-31 on November 7th, 2023 via I.I.S. Parker, Plaintiff received no response. (See: Kite #384332761)

## "DECLARATION"

I Plaintiff, Terrance J. Feaster, hereby certify and declare by penalty of perjury under and Prescribed within the laws of the United States that the Foregoing "Production of Documents Requests" is a true and correct document, executed at Lucasville, Ohio on the 17th day of December, 2023 by: ~~Terrance J. Feaster~~

Terrance J. Feaster, Pro-Se'

CERTIFICATE OF SERVICE

I certify that a copy of the foregoing "Plaintiff's First Request For Production Of Documents" was sent via U.S. Mail to Ohio Attorney General's Office, Andrew Cautti, Corrections Litigation Unit, at 30 E. Broad St., 23rd Fl. Columbus, Ohio 43215 on this 17th day of December, 2023

Terrance J. Frasier, Pro Se'
# 551840
P.O. Box 45699
Lucasville, OH 45699

| SUBJECT: **Suicide Prevention** | PAGE ___1___ OF ___10___ |
| | NUMBER: **67-MNH-09** |
| ORC/OAC REFERENCE: ORC 5120.01 | SUPERSEDES: 67-MNH-09 dated 07/01/2021 |
| RELATED ACA STANDARDS: 5-ACI-4A-11, 5E-09, 6A-35M, 6C-10, 5-ACI-6E-01 | EFFECTIVE DATE: **April 24, 2023** |
| *Exhibit D* | APPROVED: *a.c.Smith* |

**Ohio** | **Department of Rehabilitation & Correction**

## I. AUTHORITY

Ohio Revised Code 5120.01 authorizes the Director of the Department of Rehabilitation and Correction, as the executive head of the department, to direct the total operations and management of the department by establishing procedures as set forth in this policy.

## II. PURPOSE

The purpose of this policy is to establish procedures for the identification and management of potentially suicidal incarcerated persons.

## III. APPLICABILITY

This policy applies to all persons employed by the Ohio Department of Rehabilitation and Correction (ODRC), all contractors providing direct mental health and medical services to incarcerated persons, and all persons incarcerated in institutions operated by the ODRC.

## IV. DEFINITIONS

The definitions for the below listed terms can be found at the top of the policies page on the ODRC Intranet at the following:

**Definitions Link**
- **Close Watch**
- **Constant Watch**
- **Cut-down Devices**
- **Credentialed Mental Health Professional (CMHP)**
- **Electronic Health Record (EHR)**
- **Independently Licensed Mental Health Professionals (ILMHP)**
- **Limited Privilege Housing (LPH)**
- **Mental Health Administrator/Mental Health Manager (MHA/MHM)**
- **Mental Health Professionals (MHP)**
- **Mental Health Special Observation Status (MHSOS)**
- **Quality Improvement Coordinator (QIC)**
- **Regional Behavior Health Administrator (RBHA)**

SUBJECT: **Suicide Prevention (67-MNH-09)** | PAGE__2__OF __10_

- **Restrictive Housing (RH)**
- **Safe Cells**
- **Serious Self-Injurious Behavior**
- **Suicide Attempt**
- **Suicide Prevention and Review Team (SPART)**
- **Suicide Prevention Coordinator**
- **Transitional Program Unit (TPU)**
- **Wellness Plan**

**V.    POLICY**

It is the policy of the ODRC to maintain a program for managing crises and suicide prevention that addresses each of the following components: training, identification, referral, evaluation, treatment, housing and monitoring, communication, intervention, notification, review, and debriefing.

**VI.    PROCEDURES**

A.    Training requirements shall be completed in accordance with OHS Protocol I-14, Mental Health Training Requirements.

B.    Incarcerated Person Education

1.    A suicide awareness video shall be offered to all incarcerated persons during orientation at reception and parent institutions within seven (7) calendar days of arrival. This shall be documented on the Incarcerated Person Orientation Checklist (DRC4141) in accordance with ODRC Policy 52-RCP-01, Reception Admission Procedures.

2.    The suicide awareness video shall be shown monthly in all housing units.

3.    For those removed from the routine reception process and transferred into alternative housing (e.g., death row, residential treatment, protective custody, etc.), the Suicide Awareness Video shall be shown on the day of transfer into the alternative housing.

C.    Screening and Referral

1.    The EHR NSG Initial Mental Health Screening (DRC5170) shall be utilized to screen incarcerated persons for suicide potential upon arrival at reception or upon arrival at the transferred institutions in accordance with ODRC Policy 67-MNH-02, Mental Health Screening and Mental Health Classification.

a.    Any incarcerated person received on a current suicide precaution from the county jail shall be maintained on constant watch until assessed by an ILMHP/CMHP. The receiving institution shall immediately notify the Shift Commanders Office and follow their local procedures for placing the incarcerated person in a safe cell and initiating all appropriate paperwork until assessed by an ILMHP/CMHP.

b.    If the incarcerated person was on watch in the county jail in the previous six (6) months but did not arrive at reception on a suicide precaution, behavioral health staff shall ensure the incarcerated person is evaluated as soon as possible, but no later than the next business day, to determine if there is a current risk.

| SUBJECT: **Suicide Prevention (67-MNH-09)** | PAGE___3_ OF _10_. |
|---|---|

2. The EHR MH Detailed Mental Health Screening (DRC5163) shall be used to identify static and dynamic suicide risk factors and to identify immediate need for follow-up.

    a. The MHP conducting the EHR MH Detailed Mental Health Screening (DRC5163) shall review available collateral information.

    b. Records shall be requested if the incarcerated person reports receiving mental health services in the community, including suicide watch placement in the county jail.

    c. The MHP shall also verify whether the person was on the mental health caseload or was on suicide precautions during any prior ODRC confinement and request records.

3. Any employee who receives information from the community of an incarcerated person's suicide risk is responsible for assuring the safety of the person. If behavioral health staff is immediately available, they can consult about the disposition. If no behavioral health staff is available, the incarcerated person shall be placed on constant watch.

4. If an incarcerated person is notified of a serious change in their health condition or other significant life event (e.g., death of family member, new sentence, or adverse parole decision, etc.), any staff who becomes aware of this significant information shall make a referral to Behavioral Health on the same day that the person is notified and in accordance with ODRC Policy 67-MNH-02, Mental Health Screening and Mental Health Classification. Behavioral health staff shall assess the person the day the referral is received. The shift supervisor or MHP shall initiate a constant watch by utilizing the EHR MH Authorization for Crisis Precaution (DRC5200).

D.    Restricted Housing Units

1. When an incarcerated person enters Restrictive Housing status, the shift supervisor shall ensure immediate notification to Medical and Behavioral Health staff. EHR Special Management Housing Admission Screening (DRC5404) shall be completed in the electronic health record and appropriate notifications made in accordance with ODRC Policy 67-MNH-31, Mental Health Procedures for Transitional Program Units (TPU) and Death Row Housing Units.

2. During the completion of the Restrictive Housing Admission Screening (DRC5404), Medical and Behavioral Health staff shall determine need for:

    a. Placement on watch precautions, or
    b. Housing recommendation (i.e., double bunked, placed near correctional officer podium, etc.), and/or
    c. Referrals to service areas

3. Behavioral health staff shall conduct weekly rounds in accordance with ODRC Policy 67-MNH-31, Mental Health Procedures for TPU and Death Row Housing Units.

4. Persons in Restrictive Housing shall be double bunked as able based on security level/concerns, clinical appropriateness, and/or census of unit.

E.    Assessment and Treatment

1. The totality of the situation shall be examined and taken into consideration when making assessments and determining watch precaution placement to include:

    a. Voiced intentions regarding death by suicide,

| SUBJECT: **Suicide Prevention (67-MNH-09)** | PAGE___4_ OF __10_ |
|---|---|

     b. Dangerous or high-risk behaviors regardless of voiced intent to die by suicide,

     c. Environmental factors such as safety concerns,

     d. Health concerns,

     e. Re-entry concerns,

     f. Available community information,

     g. Historical information,

     h. The protective and risk factors shall be examined for relative importance in arrival at a clinical determination.

2. Incarcerated persons shall be maintained on a crisis precaution and stepped down to lower levels of monitoring or crisis precautions based on clinical presentation, assessment, and assessed need.

3. Persons shall be maintained on a watch precaution for as long as clinically indicated.

4. The ILMHP/CMHP, within twenty-four (24) hours of watch placement, shall complete a risk assessment utilizing the EHR MH Initial Crisis Assessment (DRC5201), regardless of whether the incarcerated person participates.

    a. The ILMHP/CMHP shall utilize historical information, observation and information gathered at assessment to complete the EHR MH Initial Crisis Assessment (DRC5201).

    b. Incarcerated persons on crisis precaution who are uncooperative with the risk assessment, (e.g., verbally non-responsive or engaging in behaviors that interfere with completing an adequate risk assessment), shall remain on crisis precautions until they participate at a level that allows for a comprehensive risk assessment to be completed.

    c. A subsequent EHR MH Initial Crisis Assessment (DRC5201) is not required if a person who is placed on constant watch is reduced to MHSOS or close watch and is then elevated again to constant watch. This is considered a one watch episode.

    d. Incarcerated persons who start on MHSOS status and then progress up to constant or close watch shall have an EHR MH Initial Crisis Assessment (DRC5201) completed within twenty-four (24) hours.

5. Incarcerated persons on crisis precaution, constant or close suicide watch require daily evaluation by an ILMHP/CMHP. The EHR MH Crisis Precaution Disposition and Property (DRC5202) shall be completed daily by the ILMHP/CMHP conducting the crisis assessment to apprise the correctional staff of the level of watch, property permitted, out of cell activity and engagement with peer supports.

6. Assessments shall be completed on an EHR MH Soap Note (DRC5287) reflecting clinical interventions that address the current watch placement.

7. Behavioral health shall provide clinical interventions, access to treatment, and access to programming as clinically appropriate for persons on watch precaution status.

8. ILMHP/CMHP shall determine and document property allowances on the EHR MH Crisis Precaution Disposition and Property (DRC5202 daily for persons on constant and close watch status.

    a. The MHA/MHM shall be immediately notified of any authorized property being removed from the safe cell for misuse/self-harm.

    b. The RBHA shall be immediately notified of atypical property restrictions or cell placement such as, but not limited to:

SUBJECT: **Suicide Prevention (67-MNH-09)** PAGE\_\_\_5\_ OF \_\_10\_

i. Medical Operations and/or Security authorizing a dry cell for any person on watch precaution status,

ii. Suicide garments are removed due to misuse/self-harm.

c. A multi-disciplinary treatment team meeting to include the RBHA shall be facilitated if a typical placement and/or property exist for greater than twenty-four (24) hours.

F. Termination of Watch and Post Watch Follow-Up

1. At the termination of crisis watch, the ILMHP/CMHP shall document on the EHR MH Crisis Precaution Disposition and Property (DRC5202) and the EHR MH Crisis Precaution Discontinuation Note the mental health follow-up contact required to address identified clinical concerns such as suicide risk, environmental issues, or increased clinical need.

2. For incarcerated persons who are not on the mental health caseload who are placed on a crisis precaution (Constant, Close or MHSOS) a EHR Wellness Plan (DRC5061) shall be created at the time of their release from the crisis precaution.

3. For incarcerated persons who are on the mental health caseload, their EHR Wellness Plan (DRC5061) shall be reviewed prior to release from watch and updated as clinically necessary.

4. Standard Watch Follow-Up - In every instance in which a crisis watch was initiated or continued due to a risk of death by suicide or serious physical injury as assessed by an ILMHP/CMHP, the person regardless of caseload placement shall be seen by an MHP on the following schedule: the first calendar day following release from watch, the third calendar day following release from watch and within seven (7) calendar days after release from watch. These timeframes include holidays and weekends.

a. Incarcerated persons on the mental health caseload at the time of watch initiation or admitted to the caseload following the crisis episode, shall have a treatment team meeting within seven (7) calendar days of the watch discontinuation to update planned interventions and the frequency of follow-up for continued care.

i. When clinically indicated, the EHR MH Treatment Plan (DRC5197) shall be updated to include the concern of management of suicidality, incorporating information from the most recent EHR MH Initial Crisis Assessment (DRC5201) and EHR Wellness Plan.

ii. When treatment team is attended by the incarcerated person within the first seven (7) calendar days post-watch release, that meeting can take the place of the third follow-up appointment.

b. Non-caseload persons who have made a serious suicide attempt shall be assessed by an ILMHP/CMHP to determine any need for ongoing mental health services. This assessment may result in the person being added to the mental health caseload. Non-caseload persons shall have the mental health evaluation process initiated at the 7-day follow-up to determine clinical need for caseload placement or short-term treatment.

i. Non-standard Watch Follow-Up – In every instance of placement on a crisis precaution, the ILMHP/CMHP shall consider and document their rationale for follow-up clinical contacts following removal from crisis precaution. For those persons who do not require the standard watch follow-up, alternative follow-up shall be considered to address ongoing clinical needs, identified risk factors,

SUBJECT: **Suicide Prevention (67-MNH-09)** | PAGE___6___OF ___10___

provide short term support, provide assistance, to monitor symptoms, to engage in mental health treatment and more. The frequency of the follow-up is determined by ILMHP/CMHP and shall reflect the identified the clinical issues.

G.  Housing and Monitoring

1.  Any incarcerated person placed on constant or close watch shall be housed in an approved safe cell.

    a.  The safe cell shall be inspected for safety immediately before the person's placement, and at least once daily, according to ODRC Policy 310-SEC-01, Incarcerated Person and Physical Plant Searches. The incarcerated person shall be strip searched prior to being placed in the cell. The completion of the cell and strip search shall be documented on the Crisis Precautions and/or Immobilizing Restraints Log (DRC2534).

    b.  A Behavioral Health Operations approved gown and blanket shall be provided at the conclusion of the strip search and prior to being placed in the safe cell to preserve the person's dignity. The ILMHP/CMHP may modify what property the person can keep, utilizing the EHR MH Crisis Precaution and Disposition Property (DRC5202).

    c.  Due to the primary medical mission at FMC, there may be incarcerated persons who are unable to be safely maintained in a safe cell while on watch status. In these instances, the FMC health planning administrator designee, security chief/designee and MHM/designee shall confer to decide on the best placement for each incarcerated person. Other watch related policy requirements will be maintained.

    d.  Each facility shall have a local plan outlining plan for utilizing non-suicide safe approved cells in the event that all of their safe cells are occupied. This plan shall be submitted and approved by the RBHA. Refer to OHS Protocol I-8 Safe Cell Specifications & Inspection Criteria for safe cell approval and utilization.

        i.  The MHA/MHM shall immediately notify the RBHA in the event that this plan is activated.

2.  Specifications for Safe Cells and the SPART inspection criteria are in OHS Protocol I-8: Safe Cell Specifications and Inspection Criteria.

3.  Custody staff are responsible to ensure the incarcerated person has access to a shower, as clinically supported, at least five (5) times per week, while maintaining appropriate level of supervision for the type of watch, with respect to human dignity.

    a.  Depending on the layout of the shower area, this may mean the correction officer observes the person's head or feet to ensure they have not self-injured.

    b.  When the physical plant of the shower area prevents clear visual supervision by staff, clean water and soap shall be provided in a way that allows the incarcerated person to wash and dry for personal hygiene.

4.  If an incarcerated person needs to perform bodily functions or shower, this shall be done under observation of the same gender correctional staff and logged on the Crisis Precaution and/or Immobilizing Restraints Log (DRC2534). All necessary toileting items shall be provided when requested by the incarcerated person regardless of the need to change supervising custody.

5.  Persons on crisis precaution shall have cell searches completed by security staff prior to watch placement, when a person is removed from the safe cell for assessment or hygiene

| SUBJECT: **Suicide Prevention (67-MNH-09)** | PAGE___7___OF___10___. |

activities, and/or when it is suspected the person has contraband.

6. If typical utensils pose a safety risk, the incarcerated person shall be given approved paper utensil. Refer to OHS Protocol D-5, Diet Formulary Protocol.

H. Suicide Precaution Levels

1. Constant Watch

   a. Constant watch is used for any crisis in which the highest level of control, containment and monitoring is indicated. This may include an incarcerated person who is actively suicidal, threatening or engaging in self-injury, who poses a high risk for suicide or as an initial precaution prior to an evaluation by an ILMHP/CMHP.

   b. The person placed on constant watch shall be housed in a safe cell.

   c. A designated correction officer must observe the incarcerated person at this level on a continuous, uninterrupted basis, with documentation of observation at staggered intervals not to exceed fifteen (15) minutes using the Crisis Precautions and/or Immobilizing Restraints Log (DRC2534).

      i. An exception shall occur during assessments with behavioral health staff who will maintain continuous observation. The correction officer shall document on the Crisis Precautions and/or Immobilizing Restraints Log (DRC2534) that the incarcerated person is with behavioral health staff.

      ii. If the safe cells utilized for constant watch at a given institution are physically located next to one another, with an unobstructed view of both incarcerated persons and both entire cells, one (1) officer may be assigned to observe two (2) persons at this level of observation.

      iii. The designated correction officer assigned to conduct constant watch shall be provided periodic rotation from the assignment during their shift.

      iv. While on constant watch, contact with other incarcerated persons not assigned to peer support activities shall be kept at a minimum.

      v. Security staff shall be responsible for observing interactions in safe cell areas to include porter activities, tray pass, laundry, etc. In those rare occasions when contact occurs, the security staff monitoring the watch must observe all interactions, check food trays, etc. for conveyance of contraband.

      vi. Only an ILMHP/CMHP may downgrade or discontinue this level of watch after a face-to-face assessment of the incarcerated person outside the safe cell, in an environment that ensures privacy and confidentiality. Incarcerated persons assessed at cell-front shall have justification documented (i.e., refusal to leave cell) in the EHR progress note.

2. Close Watch

   a. Close watch shall /should be utilized as a step-down process from constant watch for persons whose behavior reflects high risk activities regardless of self-report of intent to die by suicide. Close watch shall/should be utilized for persons whose behavior or statements indicates or reflects elevated risk but not to the level that requires constant monitoring.

b. This level of watch requires the designated correction officer to observe incarcerated persons at irregular, staggered intervals, not to exceed fifteen (15) minutes, and with documentation of the person's condition as the observation occurs, using the Crisis Precautions and/or Immobilizing Restraints Log (DRC2534).

c. Only an ILMHP/CMHP may initiate this level of observation.

d. Any staff member may notify the shift supervisor to recommend upgrading the crisis precaution watch level of an incarcerated person.

e. Only an ILMHP/CMHP may downgrade or discontinue this level of watch after a face-to-face assessment of the incarcerated person outside the safe cell, in an environment that ensures privacy and confidentiality. Incarcerated persons assessed at cell-front shall have justification documented (i.e., refusal to leave cell, etc.) in the EHR progress note.

I.   Transport of Incarcerated Persons on Constant/Close Watch or MHSOS

1. Incarcerated persons on constant watch, close watch, or MHSOS shall not be transported while on any crisis precaution watch status unless they are being transported to a Residential Treatment Unit (RTU), a psychiatric hospital, or a medical facility for a medical emergency. Under extenuating circumstances this requirement can be waived utilizing the process outlined in ODRC Policy 67-MNH-04, Transfer and Discharge of the Mental Health Caseload.

2. Incarcerated persons being transported on constant watch, close watch, or MHSOS shall not be transported to a Residential Treatment Unit (RTU) on the hub.

3. The Crisis Precaution and/or Immobilizing Restraints Log (DRC2534) shall be completed by a transportation officer during the transport when an incarcerated person is transported on constant watch, close watch or MHSOS. The incarcerated person shall also be required to sit in the front seat of the secured passenger compartment of the transportation vehicle to assist officers conducting visual observations of the incarcerated person.

J.   Protocol

The following protocols shall be reviewed for additional guidance:
- I-26, Constant and Close Watch Precaution
- I-27, Initial Crisis Assessment
- I-28, Treatment on Watch Precautions
- I-29, Release from Watch Precautions and Watch Follow-Up

K.   Communication

1. In each institution, the MHA/MHM is responsible to ensure compliance with ODRC Policy 67-MNH-09, Suicide Prevention. This shall be completed in conjunction with the suicide prevention coordinator.

2. The suicide prevention coordinator shall track and monitor all suicide watches and provide quarterly updates to the MHA/MHM and the CQI committee and SPART subcommittee.

3. Any issues with compliance, safe cells, suicide drills, or restraint drills that are considered an immediate risk shall be communicated to the MHA/MHM immediately (same day). This

SUBJECT: **Suicide Prevention (67-MNH-09)** | PAGE___9___OF___10__.

information shall then be shared with the appropriate deputy warden and others as appropriate within one (1) working day.

4. Each institution shall develop a mechanism that allows for ease of sharing relevant crisis/suicide information between all OCHC staff, custody staff and unit staff that is involved or should be involved in an incarcerated person's care. The following information must be appropriately shared:

   a. Notification to shift supervisor about the continuation or discontinuation of watches.
   b. Notification to Medical when an incarcerated person's location has changed to ensure medication administration and chronic care treatment.
   c. Notification to other Behavioral Health staff as appropriate for identified interventions.
   d. Notification of changes in possessions (i.e., smock, uniform, reading material) and privileges (i.e., showers, dayroom, visiting, telephone calls).

5. MHM/designee shall ensure information is shared and coordinated when an incarcerated person is being transferred between institutions while on watch or if they have been on watch within the last seven (7) calendar days, or if the person presents with an elevated risk of self-harm, or if the person is under mental health follow-up due to being on watch pursuant to subsection VI.F.4 above. This information shall also be noted on the Mental Health Transfer Summary (DRC5180).

L. Intervention

1. Each institution shall develop a written plan for twenty-four (24) hour emergency mental health service availability. The plan shall include an on-site emergency crisis intervention. This plan shall be shared with the RBHA at least annually and any time there is a change to the plan.

2. An approved cut-down device to quickly cut through fibrous material shall be safely secured in a lock box in every housing unit or on the person of the correctional staff.

3. Officers need to enter the cell, cut down the incarcerated person and start basic life support while calling for medical assistance.

M. Notification

In the event of a completed suicide or suicide attempt that has left the incarcerated person unresponsive, the following should occur:

1. Institutional staff shall notify the MHA/MHM and HCA.

2. The MHA/MHM or HCA shall notify the managing officer, responsible deputy wardens, Behavioral Health Operations director, Office of Correctional Healthcare QIC, and respective RBHA/RNA as soon as the person is discovered.

3. The applicable institutional staff must report the incident to all appropriate prison officials and the Operation Support Center (OSC) staff in accordance with ODRC Policy 69-OCH-08, Continuous Quality Improvement for Health Services, using the Major Healthcare Occurrence Incident Notification/MH (DRC5370).

N.      Review – Suicide Prevention and Review Teams (SPART) & Mortality Reviews
          Refer to OHS Protocol G-11: High Risk Activity Notification and Investigation.

O.      Review of this policy shall be documented annually and upon revision by the managing officer
          and the MHA/MHM by both persons signing and dating a current copy of the policy.

**Referenced OHS Protocols:**

| | |
|---|---|
| D-5 | Diet Formulary Protocol |
| I-8 | Safe Cell Specifications and Inspections |
| I-14 | Mental Health Training Requirements |
| I-26 | Constant and Close Watch Precautions |
| I-27 | Initial Crisis Assessment |
| I-28 | Treatment on Watch Precautions |
| I-29 | Release from Watch Precautions and Watch Follow-Up |

**Referenced ODRC Policies:**

| | |
|---|---|
| 52-RCP-01 | Reception Admission Procedures |
| 67-MNH-02 | Mental Health Screening and Mental Health Classification |
| 67-MNH-04 | Transfer and Discharge of the Mental Health Caseload |
| 67-MNH-31 | Mental Health Procedures for TPU and Death Row Housing |
| 69-OCH-08 | Continuous Quality Improvement for Health Services |
| 310-SEC-01 | Incarcerated Person and Physical Plant Searches |

**Referenced Forms:**

| | |
|---|---|
| Crisis Precautions and/or Immobilizing Restraints Log | DRC2534 |
| Inmate Orientation Checklist | DRC4141 |
| EHR Wellness Plan | DRC5061 |
| EHR Detailed Mental Health Screening | DRC5163 |
| EHR Initial Medical/Mental Health/Substance Use Screening | DRC5170 |
| Mental Health Transfer Summary | DRC5180 |
| EHR Mental Health Treatment Plan | DRC5197 |
| EHR Authorization for Crisis Precaution | DRC5200 |
| Initial Crisis Assessment | DRC5201 |
| Crisis Precaution Disposition and Property | DRC5202 |
| EHR MH SOAP note | DRC5287 |
| Major Healthcare Occurrence Incident Notification/MH | DRC5370 |
| Restrictive Housing Admission Screening | DRC5404 |
| EHR MH Crisis Precaution Discontinuation Note | |



# INVESTIGATION SUMMARY REPORT
# USE OF FORCE



RECEIVED

JAN 1 3 2022

DEPUTY WARDEN
OF OPERATIONS

Exhibit E-1

To:   Warden R. Erdos

From: STG Coordinator F. Denney

Date: Jan 7, 2022

Pursuant to Administrative Regulation 5120-09-01 and in review of a documented Use of Force occurrence on
___Dec 3, 2021___, a Use of Force Investigation was assigned.

Investigation Report involves the following employees:

Lieutenant R. Setty, Officer J. Kinner, Officer J. Stevenson, Officer C. Justice, Officer W. Jewell, Officer T. Wellman, Officer L. Conley, Officer A. Stidham and Officer A. Watts

Investigation Report involves the following offenders:

RECEIVED S.O.C.F

Inmate T. Feaster A-551840

JAN 1 2 2022

Overview:

Inmate Feaster had been placed on the move sheet and had stated that if he was moved back to J2-01, that he was going to go back on suicide watch. Ms. Salyers went to see Inmate Feaster and reported to the captain's office that he would not be put back on watch. A five-man SRT was then authorized by Captain Frazie to extract and move Inmate Feaster from J2-41 and place him in J2-01 if he continued to be non-compliant. Medical was then notified and O.C. spray was authorized for utilization if necessary. At 3:10pm, Lieutenant R. Setty along with medical, negotiator (Officer Conley) and Officer A. Watts (camera operator) went to Inmate Feaster's cell to attempt negotiating with him to comply with the orders to move. However, Inmate Feaster would not comply, but instead started screaming that he was suicidal, that he was going to start harming himself and acted as if he was going to bite himself. He was given a direct order to not harm himself. He was once again ordered him to comply with order to be moved to J2-01 and or force would have to be utilized. The cuff port was then opened, and he was ordered to make himself available so handcuffs could be placed on him. However, he refused the order and blocked the cuff port with his suicide blanket. The negotiator and Lieutenant Setty issued more verbal commands, but Inmate Feaster continued to refuse the orders. Lieutenant Setty then utilized O.C. spray through the crack of the door to attempt to gain compliance as he repeatedly attempted to use his blanket to block the crack of the door and the cuff port. Inmate Feaster still refused further commands to comply with all orders. The Lieutenant then left the area as negotiations and O.C. exposure had failed. At 3:30pm, Lieutenant Setty returned with a SRT, medical and mental health to extract Inmate Feaster from J2-41. After the Lieutenant and SRT arrived at the cell front, Inmate Feaster was issued a final direct order to comply with the order to be moved to J2-01, which he refused. He then started yelling to the team "Lets go, come on in". The team was then ordered to make entry and as they did, Inmate Feaster began pushing back on the shield to try and prevent them from entering. The team was able to make entry, pushing Feaster towards the rear of the cell and was able to secure him on the floor. Multiple direct orders were being issued to him to lay on his stomach to place his hands behind him. After he was successfully restrained, he was assisted to his feet and escorted to the J2 strip cell. Once secured in the strip cage, he was assessed by medical, mental health Crum and MHA Salyers. When the assessment was complete, Inmate Feaster was strip searched and escorted to J2-01. The SRT did maintain control of him during the escort and he was placed in J2-01 with

DRC-2641 E (11/2018)                                                                                          Page 1 of 17

AGO Response to Discovery Request
000263

E - 2

no other force being utilized as he was compliant during this process. He was placed on the bunk, and his restraints removed.

Offender statement:

INMATE USE OF FORCE VOLUNTARY STATEMENT

Inmate Name: Feaster            Interview Date: 12/14/2021

Inmate Number: 551840           Incident Date: 12/03/2021

This is the use of force committee; I am STG Coordinator Fred Denney the Chairman. This interview is being conducted regarding an incident that occurred on 12/03/2021 and in accordance with Administrative Regulation 5120-9-02, Use of Force Report. As a result of all testimony taken in this case, the Use of Force Committee will determine what occurred and make a conclusion as to whether force was justified. I would like to advise you to be truthful to the committee. If it is found that you are not truthful to the committee, a conduct report may be issued. Do you understand? Yes

State your name and number for the panel. Inmate Name: Feaster

Inmate Number: A551840

Q: Do you wish to talk with the use of force committee concerning the incident on 12/03/2021?

A: Yes

Q: Can you explain to me in your own words what occurred during this incident?

A: I originally went on suicide watch due to the cell that I am in right now (J2-01). The cell is extremely disgusting, I can't flush my own toilet and they leave the cell door closed all day. There is some type of black mold that I have filed complaints on with the health and safety inspector, Mr. Holdren. I feel like I am dying when I am in there and that is the reason, I originally went on suicide watch. I was on watch for two days. I talked to Doctor Virginia about not being in that cell (J2-01) and he said he would see what he could do. I talked to him the next day and he said he could not keep me on watch for no reason. I asked him if he could move me to another cell and he said he would talk to them. He went to leave and said he could not keep me on watch and if I needed to go back on watch to do so. Ms. Salyers asked me to come to her office and I said no I would rather have had her come back down where I was so I could go back on watch. So, Ms. Salyers came to J2 and wanted me to come to the strip out cage. I said no, she could come down to my cell. She then came to my cell, and I explained to her the cell conditions. I told her I felt suicidal. Lieutenant Setty came down and I attempted to bite myself, so he sprayed me. I was not just going to let them spray me, so I blocked the door and the chute so I would not get sprayed in the face. Later they came back with a five-man extraction team. I told them I did not want to be hurt, that I was suicidal and to leave me in here. So, they came in and I did not fight back or resist at all. I literally walked to the back of the cell as Officer Kinner was pushing me and got against the wall. I saw that they could not restrain me while I was standing up, so I laid down for them. When they went to cuff me up, they all started punching me in the head, smashing my head in the ground, trying to break my leg and fingers. After this they extracted me from the cell, they mashed me up against the wall. They took me up to the strip out cage where I told Ms. Salyers

DRC-2641 E (11/2018)                                                           Page 2 of 17

AGO Response to Discovery Request
000264

E-3

that I was suicidal, because it was better than going back into that cell that was pretty much killing me (J2-01). I told her I wanted to make a statement and none of that occurred or happened. I spoke to medical and told them that my thumb was throbbing and may be broke. He said you are okay and would not let me make a statement.

Q: Did you see medical after that because he did note that you stated you had a broken finger.

A: No

Q: When they initially came to tell you that you had to move from that cell, did you comply?

A: No, when they came in there with mace, I told them I was not going over there. I acted like I was going to bite myself and that's when he expelled that mace.

Q: When the Lieutenant came back with the five-man team, did you still refuse direct orders?

A: No, I said if you all are going to jump me, I'm not going for that. That is when I turned around and Officer Kinner pushed me to the back of the cell and yelled to quit resisting, quit resisting and I got on the ground for them.

Q: If you were going to comply, why wasn't you restrained at that point?

A: I don't know. Like I said, the door opened, and Officer Kinner pushed me in and started yelling, quit resisting. I wasn't resisting and my back was turned and literally assumed the position for cuffs. He pushed me straight to the back of the wall. They could not get me down, so I got on the ground myself. Then they cuffed and shackled me and started to beat on me.

Q: After you were extracted and placed in the strip out cage, was anymore force used on you?

A: No, there was no other force used there other than they kind of aggressively escorted me to the cell.

Q: So, no more strikes, usage of a PR-24, etc. was used?

A: No

Q: Was a PR-24 utilized on you at any time during this incident?

A: I never saw any PR-24 used.


Signature:


Signature:

AGO Response to Discovery Request
000265

E-4

**Employee statement:**

EMPLOYEE USE OF FORCE VOLUNTARY STATEMENT

Inmate Name: Feaster                    Inmate Number A-551840

Incident Date: 12/03/2021          Interview Date: 12/28/2021

This is the Use of Force Committee; I am Fred Denney Use of Force Investigator. This interview is being conducted regarding an incident that occurred on 12/03/2021 and in accordance with Administrative Regulation 5120-9-02, Use of Force Report.

Before I ask you any questions, I want to make you aware that as an employee of the Department of Rehabilitation and Corrections you are under an affirmative duty to cooperate with the committee. Do you understand? YES or NO   INTIALS _Yes__

I want to also make you aware that disciplinary action could be taken as a result of this interview. Do you understand?  YES  or  NO   INTIALS __Yes___

State your name and occupation for the panel.

Employee Name:            Employee Occupation

J. Stevenson                 Correctional Officer

Q: Did you review your DRC 2181 that was submitted on 12/03/2021?

A: Yes

Q: Is the information in the report true and factual to the best of your recollection?

A: Yes

Q: Do you want to change or add anything to your report?

A: No

Q: Do you want Union Representation or a witness?

A: No

Q: Tell me what you witnessed during this incident.

A: I was part of a five-man SRT that was assembled to extract and move Inmate Feaster from J2-41 to J2-01 if he continued to refuse orders to comply on his own as negotiations and direct orders had already failed. Once we arrived at the cell front, Lieutenant Setty issued Inmate Feaster a final direct order to comply with the order to move, which he refused. The cell door was ordered to be opened and we made entry. As we made entry, Inmate Feaster began fighting with the shield Officer Kinner and refusing direct orders to quit resisting and comply. We were able to push Inmate Feaster towards the rear of the cell and I was able to take control of his left arm and assist him to the floor. However, he continued to resist us and refused directives to roll over onto his stomach so restraints could be applied. Officer Kinner removed the shield from him so the team could position themselves in an effort to place Inmate Feaster on his stomach as continued to resist us. I was still in control of his left hand as the team was able to roll him over on his stomach and I applied restraints to his wrists. When the other members announced his feet were secure, we assisted him to his feet and placed his Ferguson back on him as it had fallen off. Once his gown was placed on him, he was removed the cell and placed in the strip cage to be assessed by medical and mental health. Inmate Feaster was given clothes to put on after his strip search was completed, restraints were re-applied, and he was escorted to J2-01 where he was placed on the bed, and I removed his restraints. We then exited the cell and secured the door with no further incident.

Q: You stated that when you made entry, Inmate Feaster was fighting with Officer Kinner who was the shield man. How was he fighting with him?

A: Initially, Inmate Feaster was turned backwards applying pressure to the shield with his back. As we pressed him towards the rear of the cell, he turned and was trying to take the shield.

DRC-2641 E (11/2018)                                                      Page 4 of 17

AGO Response to Discovery Request
000266

E - 5

Q: While Inmate was on the ground, did you strike him or observe anyone else strike him?
A: No, nobody struck him that I am aware of.
Q: Did you observe his head being hit off the side of the toilet?
A: No
Q: Did you observe anyone slam him against the wall outside of the cell?
A: No, once I exited the cell, I was adjusting my vest strap. He was against the wall momentarily but was soon after moved to the strip cage after everyone had exited the cell.
Q: You stated that Inmate Feaster was assessed by both medical and mental health. Is this correct?
A: Yes.
Q: Once Inmate Feaster was taken from J2-41, did you observe any unnecessary or excessive force being utilized?
A: No. After he was restrained and removed from the cell, he was compliant with us for the rest of the process.

Signature:

Signature:

Employee statement:

EMPLOYEE USE OF FORCE VOLUNTARY STATEMENT
Inmate Name: Feaster                          Inmate Number A-551840

Incident Date: 12/03/2021              Interview Date: 12/28/2021
This is the Use of Force Committee; I am Fred Denney Use of Force Investigator. This interview is being conducted regarding an incident that occurred on 12/03/2021 and in accordance with Administrative Regulation 5120-9-02, Use of Force Report.
Before I ask you any questions, I want to make you aware that as an employee of the Department of Rehabilitation and Corrections you are under an affirmative duty to cooperate with the committee. Do you understand?  YES or NO    INTIALS _Yes___
I want to also make you aware that disciplinary action could be taken as a result of this interview. Do you understand?  YES  or  NO  INTIALS __Yes___
State your name and occupation for the panel.
Employee Name:                        Employee Occupation
J. Kinner                              Correctional Officer
Q: Did you review your DRC 2181 that was submitted on 12/03/2021?
A: Yes
Q: Is the information in the report true and factual to the best of your recollection?
A: Yes
Q: Do you want to change or add anything to your report?
A: No
Q: Do you want Union Representation or a witness?
A: No
Q: Tell me what you witnessed during this incident.
A: I was the shield operator on a five-man SRT. We were assembled due to Inmate Feaster refusing to move to his assigned cell. Once we reached cell front, Inmate Feaster was in front of the cell door stating, "come on in". Lieutenant Setty issued Inmate Feaster a final direct order to comply with being restrained and

DRC-2641 E (11/2018)                                                    Page 5 of 17

AGO Response to Discovery Request
000267

E - 6

removed from the cell, but he refused by stating "Come on in and get me". The Lieutenant ordered the cell door open, and I made entry as well as contact with Inmate Feaster as he was leaning back on the shield with his foot on the bed attempting to hold us back from entering. I was able to push him towards the rear of the cell using the shield, but he turned around and began to try and wrestle it away from me. I gave multiple direct orders to him to get on the ground and to quit resisting us. Although he continued to physically resist us, we were able to place him on the ground with utilizing the shield. He was then directed to lay on his stomach so restraints could be applied. He refused these orders, so I decided to remove the shield so the rest of the team could turn him and apply the restraints. The cell is confined, and the team members were struggling to turn as he was still being resistant as I continued to give him orders to turn over. Restraints were finally applied, and the team assisted him to feet as I retrieved his Ferguson gown which had fallen to the floor. After his gown was placed back on him, I ordered him to walk to the strip cage. He was then escorted to the strip cage without incident. Inmate Feaster was strip searched, assessed by medical and mental health and was compliant during this process. His restraints were then reapplied, and he was escorted to J2-01 where he was ordered to lay face down on the bed so his restraints could be removed. Inmate Feaster stated that he understood the directives and complied with all orders. His restraints were removed, and his cell door secured.

Q: Once you entered the cell, did you strike Inmate Feaster with anything other than the shield such as your fists, knees, or legs?
A: No, I did not.
Q: Did you witness any other team members striking Inmate Feaster?
A: No, they were only trying to turn him over onto his stomach to apply restraints, but he continued to resist.
Q: Did you witness his head getting beat off of the side of the toilet?
A: No
Q: Did you see any of the team members slam him into the wall outside of the cell?
A: No, as I recall he was already against the wall when I exited the cell.
Q: Did you witness any unauthorized or excessive use of force during this incident?
A: No, the extraction was very successful with nobody being hurt and Inmate Feaster was compliant throughout the rest of the process after the extraction.


Signature:


Signature:


Employee statement:

EMPLOYEE USE OF FORCE VOLUNTARY STATEMENT
Inmate Name: Feaster                    Inmate Number A-551840

Incident Date: 12/03/2021          Interview Date: 12/22/2021
This is the Use of Force Committee; I am Fred Denney Use of Force Investigator. This interview is being conducted regarding an incident that occurred on 12/03/2021 and in accordance with Administrative Regulation 5120-9-02, Use of Force Report.

AGO Response to Discovery Request
000268

E-7

Before I ask you any questions, I want to make you aware that as an employee of the Department of Rehabilitation and Corrections you are under an affirmative duty to cooperate with the committee. Do you understand? YES or NO   INTIALS _Yes__

I want to also make you aware that disciplinary action could be taken as a result of this interview. Do you understand?  YES  or  NO  INTIALS __Yes___

State your name and occupation for the panel.

Employee Name:                    Employee Occupation
W. Jewell                              Correctional Officer

Q: Did you review your DRC 2181 that was submitted on 12/03/2021?
A: Yes

Q: Is the information in the report true and factual to the best of your recollection?
A: Yes

Q: Do you want to change or add anything to your report?
A: No

Q: Do you want Union Representation or a witness?
A: No

Q: Tell me what you witnessed during this incident.
A: I was the fourth man of a five-man SRT that was called upon to extract Inmate Feaster as he was refusing to move to his newly assigned cell of J2-01. I was responsible for his lower right quadrant. The pepper ball launcher nor sting ball grenades were able to be utilized due to Inmate Feaster continually blocking the hatch with his Ferguson gown. After camera introductions were made, we went to Inmate Feaster's cell front where Lieutenant Setty issued a final direct order for Inmate Feaster to comply, to which Inmate Feaster refused. The cell door was then opened, and Inmate Feaster was met with the shield where he was being combative and aggressive. The team was able to push him to the rear of the cell where Inmate Feaster appeared as if he was attempting to go around the bed. I veered to the left to stop him from creating any distance between us. He continued to be aggressive towards the team as we were attempting to place him on the floor. Once he was successfully placed on the floor, he continued to resist orders to roll over onto his stomach so restraints could be applied. After a short while, the team was able to place him on his stomach, successfully restrain him and assist him to his feet. Once on his feet, his Ferguson gown was placed back on him as it had fallen off during the extraction. He was then escorted out of the cell by Officer Justice and I to the strip cage. While in the strip cage, Inmate Feaster was assessed by medical and mental health. We then proceeded with the strip search, gave him inmate clothing, placed restraints back on him and escorted him to J2-01. Once we arrived at cell 01, Inmate Feaster was ordered to lay face down on the bed so his restraints could be removed. He complied with these orders, the restraints were removed, and the team exited the cell with no further incident.

Q: In what ways was Inmate Feaster being combative and aggressive?
A: By applying his body weight back against the shield upon making entry and eventually turning and trying to take it away from the shield man. He continually resisted orders to turn over onto his stomach so restraints could be applied.

Q: While the team was attempting to restrain him, did you strike or witness anyone strike him?
A: No, it was more of just trying to roll him over so restraints could be applied. The cell is very confined and hard to maneuver in.

Q: Did you witness or you yourself purposefully bang his head from the toilet?
A: No

Q: When you exited the cell with Inmate Feaster, you stated that you and Officer Justice was the one's escorting him. Do you recall placing him against the wall?
A: Yes. We briefly placed against the cell wall awaiting the rest of the team to exit the cell.

Q: Do you feel the way you placed him against the wall was overly aggressive or was you trying to hurt

AGO Response to Discovery Request
000269

E-8

him?

A: Absolutely not. He was very easily placed against the wall to my recollection.

Q: After exiting the cell, did you witness any excessive or unnecessary force being utilized?

A: No. After he was restrained, he was very compliant with us, and no other force was used other than us guiding him while escorting him.

Q: And you did state that he was assessed by medical and mental health?

A: Yes, he was.

Signature:

Signature:

---

Employee statement:

EMPLOYEE USE OF FORCE VOLUNTARY STATEMENT

Inmate Name: Feaster                      Inmate Number A-551840

Incident Date: 12/03/2021          Interview Date: 01/07/2022

This is the Use of Force Committee; I am Fred Denney Use of Force Investigator. This interview is being conducted regarding an incident that occurred on 12/03/2021 and in accordance with Administrative Regulation 5120-9-02, Use of Force Report.

Before I ask you any questions, I want to make you aware that as an employee of the Department of Rehabilitation and Corrections you are under an affirmative duty to cooperate with the committee. Do you understand?  YES or NO    INTIALS _Yes__

I want to also make you aware that disciplinary action could be taken as a result of this interview. Do you understand?  YES or NO  INTIALS __Yes___

State your name and occupation for the panel.

Employee Name:                     Employee Occupation

T. Wellman                              Correctional Officer

Q: Did you review your DRC 2181 that was submitted on 12/03/2021?

A: Yes

Q: Is the information in the report true and factual to the best of your recollection?

A: Yes

Q: Do you want to change or add anything to your report?

A: No

Q: Do you want Union Representation or a witness?

A: No

Q: Tell me what you witnessed during this incident.

A: I was the fifth man on a five-man SRT that was ordered to extract Inmate Feaster from J2-41 and move him to J2-01 as he was refusing all orders to move, and negotiations had failed. Once the team had made camera introductions and we were at cell front, Lieutenant Setty gave Inmate Feaster a final order to

---

AGO Response to Discovery Request
000270

E-9

comply, which he refused. The cell door was opened, and Officer Kinner made contact with Inmate Feaster utilizing the shield. Inmate Feaster appeared to be trying to stop the team from making entry. After the team did make entry, Inmate Feaster tried to take the shield from the team. Multiple direct orders were given to him to stop resisting and to get on the ground. The team eventually was able to place him on the floor. Due to the cell structure, I was unable to help with restraining him, but did witness the rest of the team trying to turn him over onto his stomach while continually giving him direct orders to do so while he continued to be noncompliant. The team was able to place restraints on him and assist him to his feet. His Ferguson gown had fallen off during the struggle and was placed back on him before he was removed from the cell. He was then escorted to the strip cell, where he was assessed by medical and mental health. Once the assessment was complete, Inmate Feaster was strip searched, once again restrained, and escorted to J2-01, where he was ordered to lay face down on the bed to have his restraints removed. After the team removed the restraints, they backed out of the cell and his door was secured.

Q: You state that Inmate Feaster appeared to be trying to stop the team from making entry. In what way did he do this?

A: He had his back turned and was applying pressure backwards into the shield.

Q: Once Inmate Feaster was placed on the ground, did you observe any of the team members striking him with their fists or banging his head off the toilet?

A: No

Q: After he was removed from the cell, did you witness him being slammed into the any walls.

A: No. Once he was removed from the cell, he was placed against the wall between cells 41 and 42 and then escorted to the strip cage.

Q: Did you witness any unnecessary of excessive use of force during this incident?

A: No, after the extraction was complete, Inmate Feaster was compliant throughout the rest of the process.

Q: Was he assessed by medical?

A: Yes, he was.

Signature:

Signature:

Employee statement:

EMPLOYEE USE OF FORCE VOLUNTARY STATEMENT

Inmate Name: Feaster          Inmate Number A-551840

Incident Date: 12/03/2021          Interview Date: 01/07/2022

This is the Use of Force Committee; I am Fred Denney Use of Force Investigator. This interview is being conducted regarding an incident that occurred on 12/03/2021 and in accordance with Administrative Regulation 5120-9-02, Use of Force Report.

Before I ask you any questions, I want to make you aware that as an employee of the Department of Rehabilitation and Corrections you are under an affirmative duty to cooperate with the committee. Do you understand?  YES or NO  INTIALS _Yes__

I want to also make you aware that disciplinary action could be taken as a result of this interview. Do you understand?  YES or NO  INTIALS __Yes___

State your name and occupation for the panel.

AGO Response to Discovery Request
000271

E-10

| Employee Name: | Employee Occupation |
|---|---|
| C. Justice | Correctional Officer |

Q: Did you review your DRC 2181 that was submitted on 12/03/2021?
A: Yes

Q: Is the information in the report true and factual to the best of your recollection?
A: Yes

Q: Do you want to change or add anything to your report?
A: No

Q: Do you want Union Representation or a witness?
A: No

Q: Tell me what you witnessed during this incident.
A: I was called upon as part of a five-man SRT who was the number three man responsible for the Inmates upper left quadrant. We were called to extract Inmate Feaster from J2-41 and place him in J2-01 as he was refusing to move. Lieutenant Setty had tried deploying O.C. spray into the cell, but Inmate Feaster continually tried blocking it using his suicide gown. Therefore, the pepper ball launcher nor sting ball grenades were utilized. After making camera introductions, we went to J2-41 cell front where Lieutenant Setty gave Inmate Feaster a final direct order to comply. Inmate Feaster refused this last directive. The cell door was opened, and we made entry. Inmate Feaster was fighting and being combative with Officer Kinner who was on the shield, but our momentum as a team was able to push him to the rear of the cell and ultimately place him on the ground. Officer Kinner was giving loud and clear directives the entire time to Inmate Feaster stop resisting. As Feaster went to the ground, he was face up and refusing all orders to roll over on his stomach so restraints could be placed on him. I took control of one of his legs attempting to try and help roll him over, but he was trying to kick me with the leg I was not in control of. At this time, I took control of his other leg also and was able to trap it under my knee. The rest of the team was then able to roll him over onto his stomach as I controlled the movement of his legs until Officer Kinner was able to hand me the leg restraints which I was able to apply. After his wrists were also restrained, we assisted Inmate Feaster to his feet and placed his Ferguson back on him. It had fallen off during the extraction. After this was complete, we escorted Inmate Feaster out of the cell to the strip cage where he was checked by medical and mental health. After their assessment was completed, Inmate Feaster was strip searched, given his clothing, his restraints re-applied and we escorted to him to J2-01 by Officer Stevenson and me controlling his direction. Inmate Feaster was placed in cell J2-01 and was given orders to lay on the bed until his restraints were removed and we exited the with no further issues.

Q: How was Inmate Feaster fighting or being combative as you stated?
A: At first, it was more of a passive aggressiveness as he was just applying pressure back into the shield. Then he turned and was trying to wrestle the shield away from Office Kinner and once he was placed on the ground, he was kicking at me and refusing to roll over on his stomach.

Q: Did you strike him or witness anyone else striking him during this incident?
A: No

Q: As you were controlling his legs, did you witness anyone hitting Inmate Feaster's head of the toilet?
A: No, I did not.

Q: When you escorted Inmate Feaster out of cell J2-41, do you recall placing against the wall between cells 41 & 42?
A: Yes. We placed him there briefly awaiting the rest of the team to exit the cell.

Q: Did you have to place him there forcibly or aggressively?
A: No, after he was restrained, he was pretty much compliant.

Q: You did say that he was assessed by medical and mental health, correct?
A: Yes, he was.

AGO Response to Discovery Request
000272

E-11

Signature:

Signature:

Employee statement:

EMPLOYEE USE OF FORCE VOLUNTARY STATEMENT

Inmate Name: Feaster                     Inmate Number A-551840

Incident Date: 12/03/2021           Interview Date: 01/05/2021

This is the Use of Force Committee; I am Fred Denney Use of Force Investigator. This interview is being conducted regarding an incident that occurred on 12/03/2021 and in accordance with Administrative Regulation 5120-9-02, Use of Force Report.

Before I ask you any questions, I want to make you aware that as an employee of the Department of Rehabilitation and Corrections you are under an affirmative duty to cooperate with the committee. Do you understand? YES or NO   INTIALS _Yes__

I want to also make you aware that disciplinary action could be taken as a result of this interview. Do you understand? YES or NO   INTIALS __Yes___

State your name and occupation for the panel.

Employee Name:                     Employee Occupation

R. Setty                                  Correctional Lieutenant

Q: Did you review your DRC 2181 that was submitted on 12/03/2021?

A: Yes

Q: Is the information in the report true and factual to the best of your recollection?

A: Yes

Q: Do you want to change or add anything to your report?

A: No

Q: Do you want Union Representation or a witness?

A: No

Q: Tell me what you witnessed during this incident.

A: Inmate Feaster had been placed on the move sheet and had stated that if he was moved back to J2-01, that he was going to go back on suicide watch. Ms. Salyers went to see Inmate Feaster and reported to the captain's office that he would not be put back on watch. A five-man SRT was then authorized by Captain Frazie to extract and move Inmate Feaster from J2-41 and place him in J2-01 if he continued to be non-compliant. Medical was then notified and O.C. spray was authorized for utilization if necessary. At 3:10pm, I went with medical, negotiator (Officer Conley) and Officer A. Watts (camera operator) to Inmate Feaster's cell to attempt negotiating with him to comply with the orders to move. However, Inmate Feaster would not comply, but instead started screaming that he was suicidal, that he was going to start harming himself and acted as if he was going to bite himself. I gave him a direct order to not harm himself and brandished my canister of O.C. I once again ordered him to comply with the order to be moved to J2-01 and or force would have to be utilized. The cuff port was then opened, and I ordered him make himself available so handcuffs could be placed on him. However, he refused the order and blocked the cuff port with his suicide blanket. The negotiator and I issued more verbal commands, but Inmate Feaster continued to refuse the orders. I then utilized O.C. spray through the crack of the door to attempt to gain compliance as he repeatedly attempted to use his blanket to block the crack of the door and the cuff port. Eventually I believe that he had been fully exposed, but still refused further commands to comply with my orders. I

AGO Response to Discovery Request
000273

E-12

then left the area as negotiations and O.C. exposure had failed. At 3:30pm, I returned with a SRT, medical and mental health to extract Inmate Feaster from J2-41. After I arrived at the cell front, I gave Inmate Feaster a final direct order to comply with the order to be moved to J2-01, which he refused. He then started yelling to the team "Lets go, come on in". I then ordered the team to make entry and as they did, Inmate Feaster began pushing back on the shield to try and prevent them from entering. The team was able to make entry, pushing Feaster towards the rear of the cell and was able to secure him on the floor. I could hear orders being issued to him to lay on his stomach to place his hands behind him. After he was successfully restrained, he was assisted to his feet and escorted to the J2 strip cage. Once secured in the strip cell, he was assessed by medical, mental health Crum and MHA Salyers. When the assessment was complete, Inmate Feaster was strip searched and escorted to J2-01. The SRT did maintain control of him during the escort and he was placed in J2-01 with no other force being utilized as he was compliant during this process. He was placed on the bunk, and his restraints removed.

Q: Were all necessary measures used to preclude this Use of Force from having to occur?
A: Yes, he was given multiple direct orders to comply, he was negotiated with and spoke with by mental health. O.C. spray was utilized, but none of that was successful.

Q: Did he have the ability to cause the SRT harm or place them in jeopardy?
A: Yes, anytime we must enter a cell with a resistant or non-compliant inmate that has not been restrained, we are in harm's way.

Q: Did he have the opportunity to cause harm?
A: Yes, his wrists nor ankles were not restrained. We tried to negate this, but he would not comply with any orders.

Q: Did you observe any members of the SRT striking the inmate during this extraction?
A: No, I did not witness any strikes.

Q: When Inmate Feaster was removed J2-41, was he unnecessarily slammed into the wall?
A: No, he was not. He was placed against the wall between cells 41 and 42 until the entire SRT had exited the cell. He was never slammed into the wall.

Q: Once he was placed in the strip cage, was he assessed by medical?
A: Yes, he was assessed by medical and mental health.

Q: Did he repeatedly state that he was suicidal?
A: Yes, he did. However, mental health determined that he was not, and we proceeded with our orders to move him to J2-01.

Q: Once he was successfully extracted, was any other force utilized on him?
A: No. The SRT did keep control of him during the escort, but he did not resist any further orders.

Signature:

Signature:

Employee statement:

EMPLOYEE USE OF FORCE VOLUNTARY STATEMENT
Inmate Name: Feaster                    Inmate Number A-551840

AGO Response to Discovery Request
000274

E-13

Incident Date: 12/03/2021          Interview Date: 01/05/2021

This is the Use of Force Committee; I am Fred Denney Use of Force Investigator. This interview is being conducted regarding an incident that occurred on 12/03/2021 and in accordance with Administrative Regulation 5120-9-02, Use of Force Report.

Before I ask you any questions, I want to make you aware that as an employee of the Department of Rehabilitation and Corrections you are under an affirmative duty to cooperate with the committee. Do you understand? YES or NO   INTIALS _Yes__

I want to also make you aware that disciplinary action could be taken as a result of this interview. Do you understand? YES or NO  INTIALS __Yes___

State your name and occupation for the panel.

Employee Name:                    Employee Occupation
L. Conley                         Correctional Officer

Q: Did you review your DRC 2181 that was submitted on 12/03/2021?
A: Yes

Q: Is the information in the report true and factual to the best of your recollection?
A: Yes

Q: Do you want to change or add anything to your report?
A: No

Q: Do you want Union Representation or a witness?
A: No

Q: Tell me what you witnessed during this incident.
A: I was utilized as a crisis negotiator to speak with Inmate Feaster as he was refusing to move from J2-41 to J2-01 per the institutional move sheet. After introductions were made on camera, Lieutenant Setty, Nurse Sammons and I approached Inmate Feasters cell to speak with him. I began by asking Inmate Feaster if was going to comply with moving. He did not want to move, began acting if he was going to bite himself and saying he was suicidal. We had the wrong keys to the cuff port and Lieutenant Setty went to retrieve the correct one from the Officer. As the Lieutenant was doing this, I asked Inmate Feaster why he did not want to move. He stated that he was upset for being set up on a false ticket. I asked him if he had heard the conduct report yet and informed him that if not, he was only prolonging his stay in RH. Lieutenant Setty then returned and gave Inmate Feaster several direct orders to comply with being restrained and moved to J2-01. His cuff port was then opened, and Inmate Feaster began blocking the opening with his suicide gown. Lieutenant Setty ordered him to back up to the cuff port so restraints could be placed on him. Inmate Feaster continued to disobey the direct orders and Lieutenant Setty deployed several short bursts of O.C. spray through the crack of the door as Inmate Feaster continued to block the cuff port. Several more orders were given to Inmate Feaster to comply to which he refused them all. The negotiations and deployment of O.C. spray failed, so we exited the range.

Q: Other than the deployment of O.C., did you witness any other use of force?
A: No


Signature:

Signature:



Employee statement:

EMPLOYEE USE OF FORCE VOLUNTARY STATEMENT

AGO Response to Discovery Request
000275

E-14

Inmate Name: Feaster                    Inmate Number A-551840

Incident Date: 12/03/2021                    Interview Date: 01/04/2022

This is the Use of Force Committee; I am Fred Denney Use of Force Investigator. This interview is being conducted regarding an incident that occurred on 12/03/2021 and in accordance with Administrative Regulation 5120-9-02, Use of Force Report.

Before I ask you any questions, I want to make you aware that as an employee of the Department of Rehabilitation and Corrections you are under an affirmative duty to cooperate with the committee. Do you understand? YES or NO    INTIALS _Yes__

I want to also make you aware that disciplinary action could be taken as a result of this interview. Do you understand? YES or NO    INITIALS __Yes___

State your name and occupation for the panel.

Employee Name:                    Employee Occupation
A. Watts                    Correctional Officer

Q: Did you review your DRC 2181 that was submitted on 12/03/2021?
A: Yes

Q: Is the information in the report true and factual to the best of your recollection?
A: Yes

Q: Do you want to change or add anything to your report?
A: No

Q: Do you want Union Representation or a witness?
A: No

Q: Tell me what you witnessed during this incident.
A: I was utilized as the camera man for a five-man SRT for the extraction of Inmate Feaster who was refusing to move to his newly assigned cell of J2-01. Lieutenant Setty, CIT Officer Conley and I approached his cell where Officer Conley attempted to negotiate with Inmate Feaster and gave him multiple direct orders to comply with being restrained so he could be moved. However, Inmate Feaster refused the orders. Lieutenant Setty deployed O.C. spray into the cell to gain compliance, but Inmate Feaster still refused to cooperate with the orders. The five-man SRT was cleared by the shift captain and was assembled. We once again went to Inmate Feaster's cell front where Lieutenant Setty gave him a final direct order to comply. At this time, the cell door was opened and the SRT made entry as Inmate Feaster was being aggressive and physically resistive trying to combat the team members. After the team was able to restrain Inmate Feaster, they removed him from the cell and placed him in the strip cage where he was assessed by medical and mental health. He was then strip searched, once again restrained, and escorted to J2-01. His restraints were removed and the SRT exited the cell with no further incident.

Q: How was Inmate Feaster being combative or physically resisting the team?
A: He was pushing back against the shield as they made entry, turned, and tried to wrestle the shield away and refusing all directives to be restrained.

Q: While you were recording the incident, did you witness any of the team members striking Inmate Feaster.
A: No

Q: Did you witness anyone hitting Inmate Feaster's head off the toilet or floor?
A: No

Q: Did you hear the team giving loud, understandable orders to Inmate Feaster to comply?
A: Yes. Multiple direct orders were given to him.

Q: Once the team exited the cell, do you recall the team slamming Inmate Feaster into the wall outside of the cell?
A: No, that never happened as I recall. They had him against the wall awaiting all the team to exit, but he

AGO Response to Discovery Request
000276

E-15

was not slammed into it as I recall.

Q: After the cell extraction was complete, did you witness any unnecessary or excessive force being utilized?

A: No. Once the extraction was complete, Inmate Feaster was compliant and was only escorted to and from the strip cage as the team was guiding him.

Signature:

Signature:

Employee statement:

EMPLOYEE USE OF FORCE VOLUNTARY STATEMENT
Inmate Name: Feaster                    Inmate Number A-551840

Incident Date: 12/03/2021          Interview Date: 01/07/2022
This is the Use of Force Committee; I am Fred Denney Use of Force Investigator. This interview is being conducted regarding an incident that occurred on 12/03/2021 and in accordance with Administrative Regulation 5120-9-02, Use of Force Report.
Before I ask you any questions, I want to make you aware that as an employee of the Department of Rehabilitation and Corrections you are under an affirmative duty to cooperate with the committee. Do you understand? YES or NO    INTIALS _Yes__
I want to also make you aware that disciplinary action could be taken as a result of this interview. Do you understand?  YES or NO  INTIALS __Yes___
State your name and occupation for the panel.
Employee Name:                    Employee Occupation
A. Stidham                         Correctional Officer
Q: Did you review your DRC 2181 that was submitted on 12/03/2021?
A: Yes
Q: Is the information in the report true and factual to the best of your recollection?
A: Yes
Q: Do you want to change or add anything to your report?
A: No
Q: Do you want Union Representation or a witness?
A: No
Q: Tell me what you witnessed during this incident.
A: I was working J2 and Inmate Feaster who was on the move sheet refused to move. Lieutenant Setty and CIT Officer Conley went to his cell to negotiate with him, but he still he refused claiming that he was going to hurt himself. Due to the failed negotiations, Lieutenant Setty told me to keep watch on him until he could return with the extraction team. After Lieutenant Setty returned with the team, they made entry and it sounded like they were struggling with the inmate as I heard continual direct orders being given to stop resisting. Shortly thereafter, Inmate Feaster was removed form J2-41 and placed in the strip cage. Lastly, he was assessed by mental health and medical, and then placed in J2-01 without any further incident.
Q: Did you ever witness O.C. spray being deployed?
A: No

AGO Response to Discovery Request
000277

E - 16

**Medical Examination Findings:**    Date of ME: Dec 3, 2021      Time of ME: 04:22 PM

Inmate Name: Feaster

Inmate Number: A-551840

**Subjective Evaluation:**

Inmate states that he has a broken finger.

**Objective Evaluation:**

Movement noted to all extremities and digits before patient stated he had a fracture. No edema or discoloration noted to sight. No injuries noted to patient.

**Inconsistencies:**

Inmate Feaster 551840 stated that he was continually punched and that his head was being slammed. As he exits the cell, no trauma can be seen to his head nor reported on the medical exam. He also states that he was slammed into the wall once he was escorted out of the cell. This statement is also not factual compared to the video footage and reports.

**Consistencies:**

The reports are consistent with what can be viewed on camera. As well, all of the direct orders and opportunities that were given to Inmate Feaster to comply with were disregarded by Inmate Feaster via the camera observations. Security was left with no alternative but to use force as it had been established by mental health that he was not suicidal and was therefore to be placed in the security cell he was ordered to go to.

**Four Components of Use of Force:**

**Preclusion: Using Lesser Alternatives:**

Inmate Feaster 551840 had spoken with mental health and medical and was cleared to be moved to J2-01. He would not comply. He was negotiated with CIT staff and and given several direct orders by Lieutenant Setty to comply with the move, but refused these orders. O.C. spray was deployed into his cell and yet again he refused to comply. Lastly, he was given a final direct order to comply by Lieutenant Setty before being extracted by the five-man SRT that was at his cell front and failed to comply leaving security with no option but to extract him.

**Ability: An aggressor's ability to do harm:**

The SRT had to make entry on Inmate Feaster 551840 who was unrestrained which gives the inmate ability to do harm.

**Jeopardy: The perception by the defender of the aggressor:**

Entering a cell with an unrestrained inmate which has been non-compliant places the persons entering in jeopardy.

**Opportunity: Distance of the aggressor to do bodily harm:**

Inmate Feaster 551840 was being non-compliant, refusing to be restrained and seemingly very agitated as mental health would not place him back on constant watch which gave him the opportunity to do bodily harm.

Was force justified? ☒ Yes ☐ No      Was force appropriate under the circumstances? ☒ Yes ☐ No

DRC-2641 E (11/2018)                                                    Page 16 of 17

**AGO Response to Discovery Request**
**000278**

Conclusion:                                                                    E-17

The primary duty of the committee is to evaluate all of the testimonies and evidence surrounding the incident and render a determination as to what actually happened. I focused on the cause of the incident, was the force used in the incident justified and were the post orders, DR&C policy along with local policies and procedures followed. It is my determination that the incident occurred due to Inmate Feaster A-551840 refusing direct orders to be moved from J2-41 to J2-01 as mental health had removed from suicide watch. He was then given several direct orders by Lieutenant Setty to move. He refused them all. He was negotiated with CIT Officer Conley and that also failed. Lieutenant Setty issued Inmate Feaster more directives and when he reused those orders, O.C. Spray was deployed through the crack of his door as Inmate Feaster was blocking the cuff port with his suicide gown. Lastly, a five-man extraction was called upon to extract Inmate Feaster as all other measures of compliance was refused and negotiations failed leaving security no alternative but to forcefully remove him from J2-41, have him assessed by medical and mental health and placed in his assigned cell of J2-01.

Did any employee waive their right to representation?   ☒ Yes  ☐ No  ☐ N/A
If "Yes" were the DRC-1311 forms (acknowledgement and waiver of right to representative) completed & attached?                                      ☒ Yes      ☐ No       ☐ N/A

Fred Denney                                             1/7/2022
Signature of Investigating Official                    Date

**WARDEN'S REVIEW**

☑ I concur with the attached findings of the investigator and have initiated no disciplinary action against the staff member(s):

☐ I concur with the attached findings of the investigator and have initiated the following disciplinary action(s) against the staff member(s):

☐ I do not concur with the attached findings of the investigator and have taken the following action:

Explain:

Warden's Signature: _____                    Date: 1-12-22

DRC-2641 E (11/2018)                                    Page 17 of 17

AGO Response to Discovery Request
000279

Exhibit G-1

## Ohio Department of Rehabilitation and Correction
# Deputy Warden of Operations Review of Use of Force

RECEIVED

| Date of Incident:<br>Dec 3, 2021 | Time:<br>3:10 PM | Location:<br>J2-41 | |
|---|---|---|---|

DEC 1 3 2021

| Inmate(s) involved: |
|---|
| FEASTER A551840 |

| Staff Whom Used Force: |
|---|
| ROBERT SETTY, JOSHUA KINNER, JUSTIN STEVENSON, CARL JUSTICE, WILLIAM JEWELL, TRAVIS WELLMAN |

| Staff Witnesses to Forced Used: |
|---|
| LANDON CONLEY, AARON STIDHAM, AUSTEN WATTS |

### Reason for the Use of Force

- [ ] Self defense from assault by the inmate(s)
- [ ] Defense of a third party
- [x] Controlling or subduing an inmate who refuses to obey prison rules.
- [ ] Prevention of a crime (such as malicious destruction of private property or prison riot)
- [ ] Controlling an inmate to prevent self-inflicted harm

### Type of Force Utilized

- [ ] Discharged a firearm
- [ ] Struck an inmate with any part of the body or a weapon
- [x] Use of chemical mace
- [x] Struggled with an inmate, pushed an inmate or exerted physical restraint or control
- [ ] Immobilizing restraints

### Brief summary of incident:

Inmate Feaster refused orders to be moved to J2-01. Lt. Setty assembled a five man team and Officer Conley began negotiations. Inmate Feaster continued to refuse orders and then began biting himself. Lt. Setty deployed chemical agent. Inmate Feaster was given a final direct order to be cuffed and moved to J2-01 but again this inmate refused. The team made entry and secured this inmate on the ground. Restraints were applied and this inmate placed on his feet and escorted to the J2 strip cell. Inmate Feaster was checked by medical and mental health personnel and a strip search conducted. Inmate Feaster was then escorted to J2-01.

## Review Completed as Follows:

- [x] Review Written Reports
- [ ] Additional interviews/information obtained (see attached)

### Recommendation to the Managing Officer

RECEIVED

DEC 1 0 2021

S.O.C.F. WARDEN'S OFFICE

- [ ] Refer to employee disciplinary process
- [ ] No further action required
- [x] Refer to Use of Force Committee
- [ ] Refer to Chief Inspector

| Deputy Warden of Operations: | Date:<br>12-7-21 |
|---|---|

### Managing Officer's Action

- [ ] Concur with recommendation
- [ ] Do not concur (explain): _____
- [x] Assigned to Use of Force Committee: Fred Denney _____ Chairman,
- and, _N/A_____ to conduct a Use of Force Investigation.
  Member's Name

The committe must report their findings to the Managing Officer within thirty (30) working days after being assigned.

| Managing Officer: | Date:<br>12·10·21 |
|---|---|

DRC 4181 E (Rev. 11/18)                                      Page 1 of 1

AGO Response to Discovery Request
000280

# STATEMENT

Exhibit F

I, Inmate **TERRANCE FEASTER #A551-840**, do state that on this date, I was given the opportunity to review a copy of the following video and audio recordings:

_____ security video 666-21        ___X___ Handheld camera footage RIMG-0469

___X___ RIB audio for Case No. SOCF-21-003966     ___X___ Handheld camera footage RIMG-0470

pursuant to the pending litigation Feaster v. Chambers-Smith, *et al.*, in the United States District Court, Southern Division - Case No. 1:22CV313.

_____
TERRANCE FEASTER, #A551-840

_4/11/2024_____
Date

___X___ I was permitted to take notes

_____ I was NOT permitted to take notes

_____
Witness

_4/11/24_____
Date

Exhibit G-2

## USE OF FORCE CHECKLIST

**Date of Incident:** 12-03-2021      **Time of Incident:** 3:10 PM

**Inmate's Name:** Feaster      **Inmate's Number:** 551840

**Housing Assignment:** J2-01      **Incident Location:** J2-41

### THE FOLLOWING INFORMATION IS ENCLOSED:

| | |
|---|---|
| Use of Force Checklist | 1 |
| Planned Use of Force Checklist | 1 |
| Supervisor's Use of Force Summary (DRC 2611) | 1 |
| Use of Force Report (DRC2181) | 9 |
| Inmate(s) Voluntary Statement (DRC2737) | 1 |
| Medical Evaluation Form Inmate(s) (DRC5251) | 1 |
| Medical Evaluation Form Staff (s) (DRC5251) | 6 |
| Report of Change of Confinement (DRC4019) | electronic |
| Conduct Report(s) (DOTSPortal Print DRC4018) | 2 |
| Assault on Staff Report (DRC 2460, 2461, 2462) | NA |
| Authorization for Suicide Watch (DRC 5200/5202) | NA |
| Immobilizing Restraints Report (DRC2533) | 0 |
| Crisis Precaution and/or Immobilizing Restraint Log (DRC2534) | 0 |
| Crisis/Hostage Situations Intervention Report (DRC2699) | 1 |
| Photos (documenting injuries-if applicable) | 0 |
| DVD - Planned Use of Force | NA |
| OSHP Notification | NA |
| Special Incident Required (Yes/No) | No |
| **+** DVR Available, provide # | DVR-#666-21 |

RECEIVED

DEC -8 2021

DEPUTY WARDEN
OF OPERATIONS

| DEPUTY WARDEN OF OPERATIONS' USE ONLY | |
|---|---|
| ☐ Deputy Warden – Spec. Serv. | ☑ Committee Referral |
| ☐ M.H. Admin. | ☐ No Further Action |
| ☐ Investigator | |
| ☐ QIC | Signature: |
| ☒ HNT | _Cyntth Davis_ |
| ☐ Safety | |
| ☐ Other | Review Date: |
| R/MH: B/N | 12-6-21 |

eh-no

_CAPT. P.L. Haze_
Shift Commander's Signature
Southern Ohio Correctional Facility

_12.3-2021_
Date

Revised: 9/04/2019

AGO Response to Discovery Request
000281

Exhibit G-3

## PLANNED USE OF FORCE CHECK LIST

Supervisor's Name: Robert Setty

Today's Date: 12-3-2021                    Time: 3:10 pm

Camera Operator: A. WATTS

Shift Commander Authorizing Planned UOF: Captain P. FRAZIE

Inmate Name: FEASTER

Inmate Number: 551840

Cell Location: J2-41

Crisis Negotiator/CIT: C/o

OC was cleared by Medical Nurse: RN SAMMONS AT 2:35 pm

Medical: RN SAMMONS

Mental Health: RN CRUM / MH adm. Salyers

Reason For: Extraction / 5-Way Restraint / Release:

I/m Feaster is refusing to move to J2-1

### 5 MAN SRT

**SRT Member Name and Assignment:**

#1 Shield - J. Kinner

#2 Upper Right - J STEVENSON

#3 Upper Left - C JUSTICE

#4 Lower Right - W Jewell

#5 Lower Left - T WELLMAN

5-Way Restraints: ☐ Will / ☒ Will Not, be utilized. If so; Cell Location:          Time:

Supervisor's Signature: Sgt Robt Setty

G-4

# Supervisor's Use of Force Summary Report

*(To be completed by shift supervisor before distribution to Deputy Warden of Operations)*

| Date of Force:<br>Dec 3, 2021 | Time of Force:<br>3:10 PM | |
|---|---|---|
| | | AM / PM |

| Location of Incident:<br>J2-41 | | |

Inmate(s) on Whom Force was Used:

| Name | Number | Injured in Incident | |
|---|---|---|---|
| 1. Feaster (no stg code found) | A-551840 | ☐ YES | ☒ NO |

Staff Member(s) who Used Force:                                                                 Injured in Incident

| | | Injured in Incident | |
|---|---|---|---|
| 1. Lieutenant Robert Setty | | ☐ YES | ☒ NO |
| 2. Correction Officer Joshua Kinner | | ☐ YES | ☒ NO |
| 3. Correction Officer Justin Stevenson | | ☐ YES | ☒ NO |
| 4. Correction Officer Carl Justice | | ☐ YES | ☒ NO |
| 5. Correction Officer William Jewell | | ☐ YES | ☒ NO |
| 6. Correction Officer Travis Wellman | | ☐ YES | ☒ NO |

Staff and Inmate Witnesses to Force Used:

| Name | Staff Title | Number |
|---|---|---|
| 1. Landon Conley | Correction Officer | |
| 2. Aaron Stidham | Correction Officer | |
| 3. Austin Watts | Correction Officer | |

Supervisor's Summary of Incident:

- Videotape (if a planned Use of Force?   ☒ YES   ☐ NO
- Security footage available and preserved?   ☒ YES   ☐ NO
- Copies attached?   ☐ YES   ☒ NO   DVR #666-21
                                                            label/description
- OC used?   ☒ YES   ☐ NO   If yes, time of decontamination: 3:30 PM

Summary:
Per reports submitted and DVR #666-21: IM Feaster 551840 was placed on the institutional moves sheet to go to J2-01. Lt. Robert Setty notified Ms Salyers about the situation. Ms Salyers went to J2 and spoke with IM Feaster and afterwards she advised the Captain's office that IM Feaster would not be put on watch. Due to this a 5 man SRT was authorized by Captain Frazie, to extract and move IM Feaster 551840 from J2-41 to J2-01 due to the pending refusal to move. Lt. Setty contacted medical and was advised that OC was authorized to be utilized if necessary. At 310 pm Lt. Setty went to J2, with medical nurse Corey Sammons on standby in J corridor, a negotiator (Officer L.Conley) and a camera operator (Officer A Watts) to attempt to negotiate with IM Feaster and gain compliance from him to move. IM Feaster would not comply with negotiations and instead began yelling he was suicidal and was going to hurt himself. IM Feaster then began acting like he was biting his arm. Lt. Setty reported he did not think he was actually biting it but he and Officer Conley did issue orders to him to stop self harming and those orders along with Lt. Setty brandishing his OC canister appeared to stop his behavior. At this time Lt Setty reports issuing more direct orders to IM Feaster to move to J2-01 or force would be utilized on him. Lt. Setty then opened the hatch for IM Feaster to cuff up and issued direct orders to him to cuff. IM Feaster then used his suicide blanket to cover the entrance. Lt Setty and Officer Conley issued more orders and IM Feaster continued to not comply. At that time Lt Setty utilized OC to the facial area of IM Feaster through the crack of the cell door to attempt to gain compliance. Due to not being able to get a full exposure

AGO Response to Discovery Request
000283

G-5

to IM Feaster's facial area because IM Feaster began using his suicide blanket to go back and forth blocking both the crack and the food hatch, Lt Setty made multiple attempts through the food hatch and the crack and did manage to deploy OC to the facial area of IM Feaster to the point that he felt he was fully exposed. IM Feaster continued to disobey directives and refuse to move. As a precaution Lt Setty instructed range Officer Aaron Stidham to watch IM Feaster until the SRT returned. At 330 pm Lt Setty returned with the SRT. Officer Josh Kinner was assigned to shield, Officer Justin Stevenson assigned to upper left, Officer Carl Justice assigned to lower right, Officer William Jewell assigned to lower left (RN Corey Sammons), and mental health (RN Roxanne Crum) the SRT went to J2 41 to extract IM Feaster. At the cell front Lt. Setty gave IM Feaster a final order to be handcuffed and move to J2-01. IM Feaster would not comply and instead started yelling at the SRT something to the effect of "lets go" "come on in". At this time Lt Setty ordered the SRT to enter the cell. The SRT entered and IM Feaster began attempting to push into the shield and prevent them from entering. The SRT did force their way into the cell and push IM Feaster back and begin taking control and securing IM Feaster on the cell floor. SRT issued orders to IM Feaster to lay on his stomach and put his hands behind him. IM Feaster would not comply and the SRT struggled with him attempting to gain control. The SRT did manage to secure IM Feaster on the cell floor. Officer Stevenson reported applying handcuffs and Officer Justice applied leg irons. Once IM Feaster was secured and restraints applied he was assisted to standing and escorted to the J2 strip cage. Once in the strip cage IM Feaster was checked by medical and spoken to by Mental health Nurse Crum. He stated he was suicidal and MHA Salyers who was in the area at that time came to the strip cage and addressed IM Feaster. Ms Salyers again advised IM Feaster was not being placed on watch. IM Feaster was then strip searched and dressed in segregation clothing. IM Feaster was compliant throughout this process. Once finished IM Feaster was placed back in restraints and escorted to J2-01. SRT members did maintain control throughout all escorting in case IM Feaster resisted but he was compliant with being escorted from J2-41 to the strip cage and then to J2-01. Once in J2-01 IM Feaster was escorted into the cell and ordered to lie face down on the bunk. The SRT removed the restraints and backed out of the cell. This concluded the extraction of IM Feaster. No other force was reported during this incident. All staff involved in using force and inmate Feaster were checked by medical. No injuries reported per MERs. All SRT equipment was inventoried accounted for and sanitized.

**As the Shift Supervisor, I have reviewed all of the documents, including all attachments, for accuracy, completeness and consistency prior to submitting them to the Chief of Security.**

| Prepared By (Shift Supervisor's Name): Robert Setty | Title: Lieutenant | Date: Dec 3, 2021 |
|---|---|---|

**Note to Shift Supervisors:** When submitting this packet to the Deputy Warden of Operations, you must include the following:

1. Incident Report from each staff member listed above (DRC1000).
2. Statements from each inmate on whom force was used and statements from inmate witnesses.
3. Medical Examination results of any staff or inmates involved in the use of force (DRC5251).
4. Any readily available video of the incident or photos of the scene, evidence or injuries.
5. Any other relevant documentation (example: Conduct Report - DRC4018).

| Chief of Security Signature | Date: Dec. 6, 2021 |
|---|---|

AGO Response to Discovery Request
000284

G-4

# Use Of Force Report

| Name (Last, First, MI) Setty, Robert D | | Title Lieutenant | Date Dec 3, 2021 | OAKS ID Redacted |
|---|---|---|---|---|
| Incident Date Dec 3, 2021 | Incident Time 3:10 PM | Incident Location J2-41 | | |
| Inmate(s) Involved: Feaster 551840 | | | | |

Type of Force:

☐ Reactive  ☒ Planned/TAC Force  ☐ Witness

Did you call for assistance?

☐ Yes  ☒ No  If No, Why?
I had Officer Stidham and Officer Conley available to assist

Did you use OC?
☒ Yes  ☐ No  If yes, how many grams?
Amount: 95

Did you use a baton (i.e.PR-24)?

☐ Yes  ☒ No

Did you utilize a less lethal device?

☐ Yes  ☒ No  If Yes, What Type: _____

Did you utilize a firearm?

☐ Yes  ☒ No  If Yes, Make, Model, Serial #: _____

Was a certified first responder utilized:

☐ CRT  ☐ HNT  ☒ CIT  ☐ Other  ☐ UNK  ☐ If No, Why: _____

Was a video camera with audio capabilities utilized:

☒ Yes  ☐ No  If No, Why: _____

Did you give the offender(s) a final order to comply?

☒ Yes  ☐ No  If No, Why: _____

Describe the circumstances requiring force:

IM Feaster 551840 J2-41 was refusing to move from J2-41 to J2-01 per the institutional move sheet. Speaking with Mental Health and speaking with a crisis negotiator as well as myself still did not gain voluntary compliance.

Describe any and all reasonable efforts made to preclude the situation:

Prior to any force being used IM Feaster was spoken to by mental health and was spoken to by a CIT negotiator and myself. I advised the inmate exactly what would occur if he did not comply. Prior to utilizing force I brandished the OC canister and had assisting staff present.

Summarize actions taken to resolve the incident:

Through communicating with the J2 officers and earlier encounters IM Feaster 551840 J2-41 had made it very clear earlier when he was removed from constant watch that if he was going to be moving to the 'slammer side' he would go back on watch. IM Feaster was placed on the institutional moves sheet to go to J2-01. I notified Ms Salyers who went to J2 and spoke with IM Feaster and advised me he would not be put on watch. A 5 man SRT was authorized by Captain Frazie, to extract and move IM Feaster 551840 from J2-41 to J2-01 due to pending refusal to move. I contacted medical and was advised that OC was authorized to be utilized if necessary. At 310 pm I went with medical on standby in J corridor, a negotiator (Officer L.Conley) and a camera operator (Officer A Watts) to attempt to negotiate with IM Feaster and gain compliance from him to move. IM Feaster would not comply with negotiations and instead began yelling he was suicidal and was going to hurt himself and he started acting like he was biting his arm. I did not think he was actually biting it but myself and Officer Conley did issue orders to him to stop self harming and those orders along with brandishing my OC canister stopped his behavior. At this time I gave direct orders to IM Feaster to move to J2-01 or force would be utilized on him. I opened the hatch for IM Feaster to cuff up and issued direct orders to him to cuff, he then used his suicide blanket to cover the

DRC-2181 E (03/2019)

AGO Response to Discovery Request
000285

G - 7

entrance. I and the negotiator issued more orders and IM Feaster continued to not comply At that time I utilized OC to his facial area through the crack of the cell door to attempt to gain compliance. I was not able to get a full exposure to IM Feaster's facial area but at that time IM Feaster began using his suicide blanket to go back and forth blocking both the crack and the food hatch. With multiple attempts through the food hatch and the crack I did manage to deploy OC to his facial area to the point that I felt he was fully exposed and was either going to comply or not due to OC exposure. IM Feaster continued to disobey directives and refuse to move. As a precaution I instructed Officer Stidham to watch IM Feaster until I returned with the SRT. At 330 pm I returned with the SRT. After introductions of the SRT, medical, and mental health we went to J2 41 to extract IM Feaster. At the cell front I gave IM Feaster a final order to be handcuffed and move to J2-01. IM Feaster would not comply and instead started yelling at the SRT something to the effect of "lets go" "come on in". At this time I ordered the SRT to enter the cell. The SRT entered and I observed IM Feaster attempting to push into the shield and prevent them from entering. They did force their way into the cell and push IM Feaster back and begin taking control and securing IM Feaster on the cell floor. I heard orders being issued to IM Feaster to lay on his stomach and put his hands behind him. Once IM Feaster was secured and restraints applied he was assisted to standing and escorted to the J2 strip cage. Once in the strip cage IM Feaster was checked by medical and spoken to by Mental health Nurse Crum and MHA Saylers. IM Feaster was the strip searched and dressed in segregation clothing. IM Feaster was compliant throughout this process. Once finished IM Feaster was placed back in restraints and escorted to J2-01. SRT members did maintain control throughout all escorting in case IM Feaster resisted but he was compliant with being escorted from J2-41 to the strip cage and then to J2-01. Once in J2-01 IM Feaster was escorted into the cell and ordered to lie face down on the bunk. The SRT removed the restraints and backed out of the cell. This concluded the extraction of IM Feaster. All SRT equipment was inventoried, accounted for and sanitized. No other force was witnessed or used by myself in this incident.

| Signature: Robert D. Setty | *Robt Setty* | Date: 12/3/2021 |
|---|---|---|

Action Taken:

| Signature of Managing Officer: | Date: |
|---|---|
| | |

Distribution: ALL COPIES TO MANAGING OFFICER who will distribute appropriately.

AGO Response to Discovery Request
000286

## Use Of Force Report

G-8

| Name (Last, First, MI)<br>Kinner, Joshua, A | | Title<br>Correction Officer | Date<br>Dec 3, 2021 | OAKS ID<br>Redacted |
|---|---|---|---|---|
| Incident Date<br>Dec 3, 2021 | Incident Time<br>3:33 PM | Incident Location<br>J2-41 | | |

Inmate(s) Involved:
Feaster 551-840

Type of Force:

☐ Reactive          ☒ Planned/TAC Force          ☐ Witness

Did you call for assistance?                                    Did you use OC?    If yes, how many grams?

☐ Yes  ☒ No  If No, Why?                                   ☐ Yes  ☒ No  Amount:
I was part of a five man extraction team, Supervisor
was present

Did you use a baton (i.e.PR-24)?

☐ Yes      ☒ No

Did you utilize a less lethal device?

☐ Yes      ☒ No    If Yes, What Type:

Did you utilize a firearm?

☐ Yes      ☒ No    If Yes, Make, Model, Serial #:

Was a certified first responder utilized:

☐ CRT    ☐ HNT    ☒ CIT    ☐ Other    ☐ UNK    ☐ If No, Why:

Was a video camera with audio capabilities utilized:

☒ Yes      ☐ No    If No, Why:

Did you give the offender(s) a final order to comply?

☐ Yes      ☒ No    If No, Why:  Final order to comply was issued by Lt. Setty

Describe the circumstances requiring force:

On the above date and approximate time I Officer Kinner was utilized as the shield operator in a five man extraction team to remove inmate Feaster 551-840 from J2-41. Inmate Feaster was ordered to move to J2-01 but refused all orders to comply, Lt. Setty ordered him to place his hands in the cuff port to allow for restraints to be applied multiple time prior to our arrival to J2. CIT Negotiator Officer Conley attempted to gain compliance but negotiations failed. Lt. Setty issued inmate Feaster a final order to comply but he refused to do so, inmate Feaster placed himself at the cell front and told Lt. Setty to come in and get him. At this time the cell door was ordered to be opened and I made entry with the shield followed by the team. Inmate Feaster immediately began physically resisting us and disobeyed multiple direct orders I issued to him.

Describe any and all reasonable efforts made to preclude the situation:

Direct orders were issued to inmate Feaster on multiple occasions by Lt. Setty for him to move compliantly but he continuously refused. Inmate Feaster was allowed the opportunity to speak with mental health staff, and negotiations were attempted by CIT Officer Conley. All attempts to gain compliance failed, once myself and the five man extraction team were cell front inmate Feaster was given a final order to comply to which he also refused.

Summarize actions taken to resolve the incident:

I Officer Kinner was assembled as the shield operator in a five man extraction team to remove inmate Feaster from J2-41. Once cell front I could see that inmate Feaster was positioned in front of the cell door and was saying "come on in!". Lt. Setty issued a final order for inmate Feaster to comply to which he stated "Come on in and get me". At this time the cell door was ordered to be opened, I made entry with the shield and was immediately met by inmate Feaster who was attempting to block our entry by leaning back against the shield and holding his foot up on the bed in effort to hold us back. I was able to push him further into the cell utilizing the shield

DRC-2181 E (03/2019)                                                                                              Page 1 of 3

G-9

at which time inmate Feaster quickly turned around and began attempting to wrestle the shield away from me. I issued multiple loud verbal orders for inmate Feaster to get on the ground face down and stop resisting us. He continued to physically resist making it difficult for us to place him on the floor, with the assistance of the team I was able to place him on the floor utilizing the shield. Inmate Feaster continued to physical resist and would not roll onto his stomach so that restraints could be applied, it was at this time I decided it was necessary to remove the shield from him so that team members could roll him onto his stomach and apply the restraints. Due to the close confines of the cell structures the team struggled to roll him over as he continued to resist, I continuously issued orders for inmate Feaster to comply but he remained resistant. Team members were able to get him restrained and announced his hands and legs were secured, I then ordered inmate Feaster to stand up and face the wall. Team members assisted him to his feet and I retrieved the ferguson gown that had fallen off of him, I then assisted the team in placing the gown back onto inmate Feaster and once he was covered I ordered him to walk to the strip cage. Inmate Feaster was escorted to the strip cage by team members Justice and Jewell without issue. He became compliant with my orders and I conducted the strip search once he was secured in the strip cage. Inmate Feaster was assessed by medical and mental health staff, placed back into restraints, and ordered to back out of the strip cage. An escorting technique was maintained by team members Justice and Stevenson as we walked him to J2-01, once at the cell front I ordered inmate Feaster to lay face down on the bed so that restraints could be removed. Inmate Feaster stated that he understands and he would comply, the restraints were removed and we back out of the cell. The cell door was secured closed and we exited the range without issue. End of Report.

| Signature: | | Date: |
|---|---|---|
| Joshua A Kinner | *Josh Kinner* | 12/3/2021 |

Action Taken:

| Signature of Managing Officer: | Date: |
|---|---|
| | |

Distribution: ALL COPIES TO MANAGING OFFICER who will distribute appropriately.

AGO Response to Discovery Request
000288

## Use Of Force Report

G-10

| Name (Last, First, MI) | | Title | Date | OAKS ID |
|---|---|---|---|---|
| Wellman, Travis, D | | C/O | Dec 3, 2021 | Redacted |

| Incident Date | Incident Time | Incident Location | | |
|---|---|---|---|---|
| Dec 3, 2021 | 3:33 PM | J2-41 | | |

Inmate(s) Involved:
Feaster #551-840

Type of Force:

☐ Reactive   ☒ Planned/TAC Force   ☐ Witness

Did you call for assistance?  Did you use OC?  If yes, how many grams?

☐ Yes  ☒ No  If No, Why?  ☐ Yes  ☒ No  Amount:

I was the 5th man in a 5 man extraction team

Did you use a baton (i.e.PR-24)?

☐ Yes   ☒ No

Did you utilize a less lethal device?

☐ Yes   ☒ No   If Yes, What Type:

Did you utilize a firearm?

☐ Yes   ☒ No   If Yes, Make, Model, Serial #:

Was a certified first responder utilized:

☐ CRT   ☐ HNT   ☒ CIT   ☐ Other   ☐ UNK   ☐ If No, Why:

Was a video camera with audio capabilities utilized:

☒ Yes   ☐ No   If No, Why:

Did you give the offender(s) a final order to comply?

☐ Yes   ☒ No   If No, Why:  LT. Setty gave the final order

Describe the circumstances requiring force:

On the above date and approximate time I, C/O Wellman, was utilized as the 5th man on a 5 man extraction team. Inmate Feaster #551-840 was refusing all direct orders to comply with a move from cell J2-41 to J2-01.

Describe any and all reasonable efforts made to preclude the situation:

Prior to the extraction team being cell front, LT. Setty and C.I.T. negotiator Conley attempted to talk to the inmate and get the inmate to comply with all orders so no force needed to be used. Negotiations failed and O.C. was deploy.

Summarize actions taken to resolve the incident:

On the above date and approximate time I, C/O Wellman, was utilized as the 5th man on a 5 man extraction team. Inmate Feaster #551-840 was refusing all direct orders to comply with a move from cell J2-41 to J2-01. We were informed that negotiations failed and O.C. had been deployed. Once in J-Corridor introductions were made and the team went to the front of J2-41. LT. Setty gave the inmate a final order to comply but the inmate refused. The door was opened and the inmate met the shield at the door and appeared to be attempting to stop the team from entering the cell. The team was able to make entry and began to try to take control of the shield and take it from the team. I heard multiple direct orders be given to the inmate stating "stop resisting" and "get on the ground." The team was able to get the inmate to the ground. Due to the way the cell was structured I was unable to assist the team with the resistive inmate without hindering the teams ability to restrain the inmate. I seen the team struggling to roll the inmate onto his stomach and heard multiple orders instructing the inmate but he appeared to disobey all direct orders. Team members were able to restrain the inmate and assist him to his feet. Once on his feet the team placed the Ferguson gown back on the inmate that had fallen off. Inmate Feaster was then placed into the strip cage by team members Justice and Jewell. Medical and mental health spoke with the inmate and the inmate was strip searched. After the strip search the inmate was taken to J2-01 by members Justice and Stevenson. The inmate was

DRC-2181 E (03/2019)                                                                 Page 1 of 3

AGO Response to Discovery Request
000289

G·11

order to lay face down on the bed while restraints were removed. The team exited the cell and once the doors to the cell were secured the team left the range. E.O.R.

| Signature: | | Date: |
|---|---|---|
| | *Kai Wellman* | 12/3/2021 |

Action Taken:

| Signature of Managing Officer: | | Date: |
|---|---|---|
| | | |

Distribution: ALL COPIES TO MANAGING OFFICER who will distribute appropriately.

**AGO Response to Discovery Request**
**000290**

## Use Of Force Report

G-12

| Name (Last, First, MI) | | Title | Date | OAKS ID |
|---|---|---|---|---|
| Jewell, William J | | Correctional Officer | Dec 3, 2021 | Redacted |

| Incident Date | Incident Time | Incident Location |
|---|---|---|
| Dec 3, 2021 | 3:33 PM | J2 - 41 |

Inmate(s) Involved:
Feaster 551 - 840

Type of Force:

☐ Reactive  ☒ Planned/TAC Force  ☐ Witness

Did you call for assistance?

☐ Yes  ☒ No  If No, Why?
4th member of a 5 man cell extraction team

Did you use OC?  If yes, how many grams?

☐ Yes  ☒ No  Amount: 0

Did you use a baton (i.e.PR-24)?

☐ Yes  ☒ No

Did you utilize a less lethal device?

☐ Yes  ☒ No  If Yes, What Type:

Did you utilize a firearm?

☐ Yes  ☒ No  If Yes, Make, Model, Serial #:

Was a certified first responder utilized:

☐ CRT  ☐ HNT  ☒ CIT  ☐ Other  ☐ UNK  ☐ If No, Why:

Was a video camera with audio capabilities utilized:

☒ Yes  ☐ No  If No, Why:

Did you give the offender(s) a final order to comply?

☐ Yes  ☒ No  If No, Why:  Lt. Setty gave the final direct order to comply.

Describe the circumstances requiring force:

On the above date and approximate time I C/O Jewell was utilized as the 4th man of a 5 man cell extraction team for inmate Feaster 551 - 840 who was housed in J2 - 41. Inmate Feaster was refusing all direct orders to be placed in restraints to be removed from his cell and placed in J2 - 1.

Describe any and all reasonable efforts made to preclude the situation:

Lt. Setty and CIT Conley attempted negotiations, to which negotiations failed. Lt. Setty utilized OC spray in attempt to gain compliance. The OC spray rendered ineffective due to inmate Feaster blocking the hatch with his Ferguson gown. The 5 man cell extraction team was stacked outside the cell door, when Lt. Setty gave the final direct order for inmate Feaster to comply, to which he refused to comply.

Summarize actions taken to resolve the incident:

I was utilized as the 4th member of the 5 man cell extraction team. As the 4th member I was responsible for the lower right quadrant of inmate Feaster 551-840. After OC was deployed by Lt. Setty and it rendered ineffective due to inmate Feaster blocking the hatch with his Ferguson gown. Due to inmate Feaster being in such close proximity of the cell front and was blocking the hatch the pepper ball launcher and stingball grenade was not utilized. Introductions were made in J - Corridor, after introductions we then approached the cell front for the final direct orders to be given. Lt. Setty gave the final order to comply, to which inmate Feaster refused to comply. At this time the cell door was ordered open by Lt. Setty and the cell extraction team made entry to the cell. Inmate Feaster met the shield/team the the cell front as he was being aggressive and combative as we made entry. The momentum of the team placed inmate Feaster towards the back of the cell, at which time inmate Feaster appeared to attempt to go around the bed at which time I C/O Jewell veered left to prevent the combative inmate from creating distance. Inmate Feaster continued being combative to the 5 man cell

DRC-2181 E (03/2019)

AGO Response to Discovery Request
000291

G-13

extraction team, we continued to attempt to place inmate Feaster on the ground. After further help of the team we were successful in placing the combative inmate to the floor. Once on the floor inmate Feaster continued being physically resistive and combative, refusing to roll over onto his stomach. Due to the placement of inmate Feaster in the cell and inmate Feaster physically resisting it made it difficult to roll him onto his stomach and secured his arms. I was located towards the upper portion of his torso. Direct ordered were continuously being given to roll over and to stop resisting. Team members were then able to roll inmate Feaster over onto his stomach to place him in restraints. Once secured in restraints and the team announced that his upper and lower extremities we secured, he then was ordered to stand up and face the wall. Myself and fellow team members assisted inmate Feaster to his feet, once to his feet we then placed the Ferguson gown back onto inmate Feaster which had fallen off during the extraction. Once the gown was placed onto inmate Feaster myself and C/O Justice escorted inmate Feaster from his cell to the J2 strip cage. Once secured in the strip cage, restraints were removed and inmate Feaster was assessed by medical, once cleared by medical the spoke with mental health then a strip search was conducted. After the strip search was concluded and was given clothing he then was placed in restraints wand escorted by C/O Justice and C/O Stevenson from the strip cage to J2 - 1. Once to the cell front of J2 - 1 he was ordered to enter the call and to lay face down onto the bed so restraints could be removed. Restraints were removed without incident and the cell extraction team backed out of the cell. Once all members were out of the cell, the cell door was secured and the door was ordered shut. No other force was used or witnesed. EOR.

| Signature: | | Date: |
|---|---|---|
| William J Jewell | *wjl* | 12/3/2021 |

Action Taken:

| Signature of Managing Officer: | Date: |
|---|---|
| | |

Distribution: ALL COPIES TO MANAGING OFFICER who will distribute appropriately

AGO Response to Discovery Request
000292

## Use Of Force Report

G-14

| Name (Last, First, MI) | | Title | Date | OAKS ID |
|---|---|---|---|---|
| Justice, Carl, E | | C/O | Dec 3, 2021 | Redacted |

| Incident Date | Incident Time | Incident Location | | |
|---|---|---|---|---|
| Dec 3, 2021 | 3:33 PM | J2-41 | | |

Inmate(s) Involved:
Inmate Feaster 551-840

Type of Force:

☐ Reactive  ☒ Planned/TAC Force  ☐ Witness

Did you call for assistance?  Did you use OC?  If yes, how many grams?

☐ Yes  ☒ No  If No, Why?  ☐ Yes  ☐ No  Amount:

I was part of a five man extraction team.

Did you use a baton (i.e.PR-24)?

☐ Yes  ☒ No

Did you utilize a less lethal device?

☐ Yes  ☒ No  If Yes, What Type: _____

Did you utilize a firearm?

☐ Yes  ☒ No  If Yes, Make, Model, Serial #: _____

Was a certified first responder utilized:

☒ CRT  ☐ HNT  ☐ CIT  ☐ Other  ☐ UNK  ☐ If No, Why: _____

Was a video camera with audio capabilities utilized:

☒ Yes  ☐ No  If No, Why: _____

Did you give the offender(s) a final order to comply?

☐ Yes  ☒ No  If No, Why: Lt. Setty Gave the final order to comply.

Describe the circumstances requiring force:

I was called upon to be the number three man upper left, in a five man extraction team. The reason for the extraction team was that inmate Feaster 551-840 was refusing all orders to cuff up and be removed from cell J2-41, and be placed in J2-1.

Describe any and all reasonable efforts made to preclude the situation:

Lt. Setty and CRT negotiator Conley attempted negotiations, those negotiations failed however and Lt. Setty utilized OC Spray to try and gain compliance. The OC did not have the desired effect due to inmate Feaster blocking the hatch with his Ferguson Gown. The five man team was assembled and was brought cell front Lt. Setty gave inmate Feaster a final direct order to cuff up and be moved to cell J2-1, inmate Feaster disobeyed this final direct order.

Summarize actions taken to resolve the incident:

I was called upon to be the number three man in a five man extraction team, I was responsible for the upper left quadrant of inmate Feaster 551-840. Lt. Setty had already utilized OC spray and it was deemed infective due to the fact Feaster was using his Ferguson Gown as a shield to cover the cuff port with it. Due to him covering the cuff port we decided to not try and use the pepperball launcher or a sting ball grenade. The team made introduction in J-Corridor, and then we went cell front (J2-41) Lt. Setty gave a final direct order to inmate Feaster to cuff up and move to cell J2-1 Feaster refused this direct order. At this time the door was opened and Officer Kinner who was the shield operator made contact with a fighting and combative inmate Feaster at the cell front. The team made entry into the cell and I could tell that Feaster was continuing to fight with Officer Kinner, the team's momentum moved Feaster to the back of the cell, he was fighting with Officer Kinner and then went to the ground. Officer Kinner was giving loud clear directives to comply and to stop fighting the whole time. Once on the ground Feaster was face up and was refusing to roll over onto his stomach, I took control of one of Feasters legs and tried to assist the team to get him rolled over onto his stomach so that restrains could be applied.

DRC-2181 E (03/2019)  Page 1 of 3

G - ☒ 15

Feaster was trying to kick me with the leg I was not in control of, at this time I took control of the other leg by trapping in under my knee while still controlling his other leg with my hands. Feaster still was resisting, the team rolled him onto his stomach, I still maintained control of his legs Officer Jewell gave me the leg restraints and I applied the leg restraints as one Officer stated arms secure. I then announced legs secure, I stood up and assisted placing the Ferguson Gown back onto Feaster. Fester was then backed out of the cell and I took control of his right side by placing him into a escorting technique. Officer Jewell and myself escorted Feaster to the J2 strip cage, he was ordered to stay on the wall and comply with all orders. The strip cage door was closed, Medical came in and assessed Feaster, then Mental Health came in and assessed him, Feaster was cleared to go to cell J2-1. I removed the leg irons and handcuffs, Officer Kinner than ran Feaster through the strip out process, Feaster then was given cloths and put them on. Officer Stevenson then put the restraints on Feaster, the strip cage door was opened and Officer Stevenson and myself took control of him and placed him in a escort technique we escorted him to cell one. Feaster was then placed on the bed, he was given clear directives to lay on the bed and not move until we were out of the cell and the door was secured, his leg irons were removed, his hand restraints were removed and we backed out of the cell and the door was closed and the outer door was closed.

| Signature: | Date: |
|---|---|
| | 12-3-21 |

Action Taken

| Signature of Managing Officer: | Date: |
|---|---|
| | |

Distribution: ALL COPIES TO MANAGING OFFICER who will distribute appropriately.

AGO Response to Discovery Request
000294

## Use Of Force Report

G-16

| Name (Last, First, MI) | | Title | Date | OAKS ID |
|---|---|---|---|---|
| Stevenson J S | | Correction Officer | Dec 3, 2021 | Redacted |

| Incident Date | Incident Time | Incident Location | | |
|---|---|---|---|---|
| Dec 3, 2021 | 3:33 PM | J2-41 | | |

Inmate(s) Involved:
I/M Feaster 551-840

Type of Force:

    ☐ Reactive     ☒ Planned/TAC Force     ☐ Witness

Did you call for assistance?                Did you use OC?     If yes, how many grams?

☐ Yes    ☒ No    If No, Why?          ☐ Yes   ☒ No    Amount:
                    #2 in a 5 man team

Did you use a baton (i.e.PR-24)?

     ☐ Yes    ☒ No

Did you utilize a less lethal device?

     ☐ Yes    ☒ No    If Yes, What Type:

Did you utilize a firearm?

     ☐ Yes    ☒ No    If Yes, Make, Model, Serial #:

Was a certified first responder utilized:

     ☒ CRT    ☐ HNT    ☐ CIT    ☐ Other    ☐ UNK    ☐ If No, Why:

Was a video camera with audio capabilities utilized:

     ☒ Yes    ☐ No    If No, Why:

Did you give the offender(s) a final order to comply?

     ☐ Yes    ☒ No    If No, Why:   Lt.Setty gave the final order to comply

Describe the circumstances requiring force:

I/M Feaster 551-840 refused to move from J2-41 to J2-01.

Describe any and all reasonable efforts made to preclude the situation:

Lt. Setty and CRT Officer Conley went to J2-41 with a camera operator to negotiate with I/M Feaster 551-840 in an attempt for him to move from J2-41 to J2-01. Negotiations failed and Lt. Setty then assembled the 5 man extraction team. Once the 5 man team was assembled and introductions were complete, the 5 man team along with Lt. Setty entered the range. Lt. Setty gave I/M Feaster 551-840 a final order to comply to which I/M Feaster refused, Lt. Setty then ordered the door open as I/M Feaster was at the cell front and the 5 man team made entry.

Summarize actions taken to resolve the incident:

Upon entry into the cell, I/M Feaster 551-840 began fighting with shield Officer Kinner as Officer Kinner gave him several direct orders to stop resisting and fighting. The teams momentum pushed I/M Feaster to the back of the cell as I Officer Stevenson took control of I/M Feaster's left arm and assisted him to the floor. I/M feaster continued to resist and as he was being placed on the floor and would not comply with commands to roll over for restraints to be applied. Officer Kinner removed the shield so the team could position I/M Feaster on his stomach for restraints to be applied. I/M Feaster continued to resist as the team rolled him onto his stomach, I Officer Stevenson maintained control of I/M Feaster's left hand as I placed handcuffs on I/M Feaster and announced hands secured. Another Officer then announced legs were secured and I/M Feaster 551-840 was then assisted to his feet and placed on the wall as the team placed the gown back on I/M Feaster before he exited the cell and was escorted to the strip cage. Restraints were removed and a strip search was conducted and then given clothes. I/M Feaster was checked by medical and mental health staff and

DRC-2181 E (03/2019)                                          Page 1 of 3

AGO Response to Discovery Request
000295

G-17

once cleared by both, restraints were placed on I/M Feaster and I Officer Stevenson and Officer Justice escorted him to J2-01 where I/ M Feaster was placed on the bed. I Officer Stevenson removed the restraints and the team exited the cell, cell doors were locked and shut. All staff then exited the range. End of Report.

| Signature: Justin S. Stevenson | *Just Steam* | Date: 12/3/2021 |
|---|---|---|

Action Taken:

| Signature of Managing Officer: | Date: |
|---|---|

Distribution: ALL COPIES TO MANAGING OFFICER who will distribute appropriately.

AGO Response to Discovery Request
000296

## Use Of Force Report

G-18

| Name (Last, First, MI) | | Title | Date | OAKS ID |
|---|---|---|---|---|
| Watts, Austen B | | C/O | Dec 3, 2021 | Redacted |

| Incident Date | Incident Time | Incident Location | | |
|---|---|---|---|---|
| Dec 3, 2021 | 3:10 PM | J2-Cell 41 | | |

Inmate(s) Involved:
I/M Feaster 551-840

Type of Force:

☐ Reactive      ☐ Planned/TAC Force      ☒ Witness

Explain in detail what you observed during this Use of Force Incident:

At the above date and approximate time listed, I (C/O Watts) was utilized as the camera operator for a five man extraction team for I/M Feaster(551-840) who was refusing to move from his cell to his new designated cell per afternoon move sheet. At the above time, myself, LT. Setty and CIT Conley approached I/M Feasters cell where CIT Conley started to utilize IPC skills with multiple direct orders to be hand restrained and exit the cell, due to the inmate having total disregard for all directives, LT Setty deployed o/c into the cell towards the inmates facial region in order to gain compliance before utilizing the five man extraction team for the planned use of force that was issued by the shift captain. I/M Feaster still was disregarding all direct orders after o/c was deployed. After the five man team was assembled, once again myself and LT Setty with the addition of the five man team went down and approached the cell front of I/M Feaster's cell where the final order was given by LT Setty, I/M Feaster refused to comply with the final order. At this point, the cell door was open per LT Setty request, then the five man extraction team made entry into the cell where I/M Feaster was still highly aggressive, combative with the five man team and physically resisting and combating the team members. After the inmate was properly restrained with hand and leg restraints the five man team moved I/M Feaster to the strip out cage in J2 where the inmate talked with medical, mental health, was strip searched, clothed and then placed back in hand and leg restraints then moved to J2-01 where the restraints were removed off the inmate and then the five man team exited the cell. No other force was used or witnessed. EOR.

| Signature: | | Date: |
|---|---|---|
| *Austen Watts* | | 12/3/2021 |

Action Taken:

| Signature of Managing Officer: | | Date: |
|---|---|---|
| | | |

Distribution: ALL COPIES TO MANAGING OFFICER who will distribute appropriately.

DRC-2181 E (03/2019)                                                              Page 1 of 1

AGO Response to Discovery Request
000297

## Use Of Force Report

G-19

| Name (Last, First, MI) | | Title | Date | OAKS ID |
|---|---|---|---|---|
| Stidham, Aaron, L | | C/O | Dec 3, 2021 | Redacted |

| Incident Date | Incident Time | Incident Location | | |
|---|---|---|---|---|
| Dec 3, 2021 | 3:15 PM | J2-41 | | |

Inmate(s) Involved:
Feaster 551-840

Type of Force:

☐ Reactive　　　　☐ Planned/TAC Force　　　　☒ Witness

Explain in detail what you observed during this Use of Force Incident:

On the above date and time, While I was working in J2 South I/M Feaster 551-840 was supposed to be moved from J2-41 to J2-1 but was refusing to comply. I witnessed Lt Setty and C.I.T Negotiator Conley approach the cell front to get I/M Feaster to comply without any Use Of Force. I/M Feaster was refusing direct orders and threatening to harm himself. Due to the negotiations failing Lt Setty made multiple attempts to deploy O/C into the cell. The I/M refused to comply, and Lt Setty told me to stay and watch I/M Feaster while he retrieved the extraction team. After the team arrived, I/M Feaster was given final directives to comply but refused. The team entered the cell and I could hear direct orders were being given telling I/M to stop resisting. It sounded as if there was a struggle in the cell and I heard more direct orders being given. After a short time the I/M was brought out and placed into the J2 strip cage. The I/M was checked by mental health and the nurse, then was placed into J2 cell 1 without any further incidents.

| Signature: | | Date: |
|---|---|---|
| Aaron L. Stidham | *Aaron Stha* | 12/3/2021 |

Action Taken:

| Signature of Managing Officer: | Date: |
|---|---|
| | |

Distribution: ALL COPIES TO MANAGING OFFICER who will distribute appropriately.

DRC-2181 E (03/2019)　　　　　　　　　　　　　　　　　　　　　　　　　　　Page 1 of 1

AGO Response to Discovery Request
000298

## Use Of Force Report

G-20

| Name (Last, First, MI) | | Title | Date | OAKS ID |
|---|---|---|---|---|
| Conley Landon | | Corrections Officer | Dec 3, 2021 | Redacted |
| Incident Date | Incident Time | Incident Location | | |
| Dec 3, 2021 | 3:15 PM | J2 cell 41 | | |
| Inmate(s) Involved: | | | | |
| I/M Feaster #551-840 | | | | |

Type of Force:

☐ Reactive      ☐ Planned/TAC Force      ☒ Witness

Explain in detail what you observed during this Use of Force Incident:

Be advised on the above date and approximate time. I Officer Conley was pulled from my bid post to be a crisis Negotiator. A 5 man team was assembled (Officers Kinner, Stevenson, Jewell, Justice and Wellman) along with camera operator (Officer Watts), Mental Health Administrator (Salyers), Medical staff (Sammons) and Lt. Setty. The reason being was because I/M Feaster refused to be moved from J2 cell one to J2 North. Be advised that Mental Health Administrator Salyers talked with I/M Feaster and determined that he was not suicidal. Once myself, Lt. Setty, Nurse Sammons and camera operator Watts introduced ourselves to the camera, we walked to the cell front of J-2 cell 41 which housed I/M Feaster. I asked I/M Feaster if he was going to move to J2 North. I/M Feaster did not want to move and began saying he was suicidal and acting like he was going to bite his arm to harm himself. Lt. Setty and myself attempted to open the food hatch of cell 41 to give I/M Feaster a order to cuff up and move to J2 North. This attempt was unsuccessful due to having the wrong keys to open the food hatch. While Lt. Setty exited the range to get the correct keys. I asked I/M Feaster why he did not want move to J-2 North. I/M Feaster said he was upset at being in the hole because of a fake ticket. I asked I/M Feaster if his ticket had been heard yet and informed I/M Feaster that by him staying in J2 on observation only prolongs his stay in J2. Lt. Setty entered the range and gave I/M Feaster several direct orders to cuff up and move to J2 North. I/M Feaster refused Lt. Setty orders to cuff up and move to J-2 North. The food hatch was opened and I/M Feaster put his constant watch blanket in the food hatch to block the food hatch entrance of the cell. Lt. Setty gave direct orders to I/M Feaster to backup and cuff up. I/M Feaster did not comply to orders. Lt. Setty then deployed several burst of OC spray in the crack of cell 41, Lt. Setty tried to deploy spray in the food hatch but I/M Feaster was still blocking the food hatch entrance with the constant watch blanket. At this time myself and Lt. Setty gave several direct orders to I/M Feaster to get back from the food hatch. I/M Feaster did not comply to orders to back away from the food hatch. I Office Conley then exited the range. No other force was used or witnessed by this officer. EOR

| Signature: | Date: |
|---|---|
| [signature] | 12-3-21 |

Action Taken:

DRC 1000

| Signature of Managing Officer: | Date: |
|---|---|
| | |

Distribution: ALL COPIES TO MANAGING OFFICER who will distribute appropriately.

DRC-2181 E (03/2019)      Page 1 of 1

AGO Response to Discovery Request
000299

Exhibit H-1

## Inmate Use of Force Statement

| | | Date: 12-3-2021 |
|---|---|---|
| Inmate Name: _Feaster_ | Number: 551840 | Time: 4¹⁰ pm |

I, _Feaster_, hereby make the following written voluntary statement concerning a Use of Force incident that I was involved in or witnessed on _12-3-2021_ at approximately _33⁰_ am/~~pm~~.

"No Comment"

"Refused to Sign"

| Inmate Signature: | Date: 12-3-2021 |
|---|---|
| Staff Witness Signature: _C. S. Hale / LT. WC R_ | Date: 12-3-2021 |

DRC2737 (01/08)

AGO Response to Discovery Request
000300

H-2

## INMATE USE OF FORCE VOLUNTARY STATEMENT

Inmate Name: Feaster

Interview Date: 12/14/2021

Inmate Number: 551840

Incident Date: 12/03/2021

This is the use of force committee; I am STG Coordinator Fred Denney the Chairman. This interview is being conducted regarding an incident that occurred on 12/03/2021 and in accordance with Administrative Regulation 5120-9-02, Use of Force Report. As a result of all testimony taken in this case, the Use of Force Committee will determine what occurred and make a conclusion as to whether force was justified. I would like to advise you to be truthful to the committee. If it is found that you are not truthful to the committee, a conduct report may be issued. Do you understand? Yes

State your name and number for the panel. Inmate Name: Feaster

Inmate Number: A551840

Q: Do you wish to talk with the use of force committee concerning the incident on 12/03/2021?

A: Yes

Q: Can you explain to me in your own words what occurred during this incident?

A: I originally went on suicide watch due to the cell that I am in right now (J2-01). The cell is extremely disgusting, I can't flush my own toilet and they leave the cell door closed all day. There is some type of black mold that I have filed complaints on with the health and safety inspector, Mr. Holdren. I feel like I am dying when I am in there and that is the reason, I originally went on suicide watch. I was on watch for two days. I talked to Doctor Virginia about not being in that cell (J2-01) and he said he would see what he could do. I talked to him the next day and he said he could not keep me on watch for no reason. I asked him if he could move me to another cell and he said he would talk to them. He went to leave and said he could not keep me on watch and if I needed to go back on watch to do so. Ms. Salyers asked me to come to her office and I said no I would rather have had her come back down where I was so I could go back on watch. So, Ms. Salyers came to J2 and wanted me to come to the strip out cage. I said no, she could come down to my cell. She then came to my cell, and I explained to her the cell conditions. I told her I felt suicidal. Lieutenant Setty came down and I attempted to bite myself, so he sprayed me. I was not just going to let them spray me, so I blocked the door and the chute so I would not get sprayed in the face. Later they came back with a five-man extraction team. I told them I did not want to be hurt, that I was suicidal and to leave me in here. So, they came in and I did not fight back or resist at all. I literally walked to the back of the cell as Officer Kinner was pushing me and got against the wall. I saw that they could not restrain me while I was standing up, so I laid down for them. When they went to cuff me up, they all started punching me in the head, smashing my head in the ground, trying to break my leg and fingers. After this they extracted me from the cell, they mashed me up against the wall. They took me up to the strip out cage where I told Ms. Salyers that I was suicidal, because it was better than going back into that cell that was pretty much killing me (J2-01). I told her I wanted to make a statement and none of that occurred or happened. I spoke to medical and told them that my

H-3

thumb was throbbing and may be broke. He said you are okay and would not let me make a statement.

Q: Did you see medical after that because he did note that you stated you had a broken finger.

A: No

Q: When they initially came to tell you that you had to move from that cell, did you comply?

A: No, when they came in there with mace, I told them I was not going over there. I acted like I was going to bite myself and that's when he expelled that mace.

Q: When the Lieutenant came back with the five-man team, did you still refuse direct orders?

A: No, I said if you all are going to jump me, I'm not going for that. That is when I turned around and Officer Kinner pushed me to the back of the cell and yelled to quit resisting, quit resisting and I got on the ground for them.

Q: If you were going to comply, why wasn't you restrained at that point?

A: I don't know. Like I said, the door opened, and Officer Kinner pushed me in and started yelling, quit resisting. I wasn't resisting and my back was turned and literally assumed the position for cuffs. He pushed me straight to the back of the wall. They could not get me down, so I got on the ground myself. Then they cuffed and shackled me and started to beat on me.

Q: After you were extracted and placed in the strip out cage, was anymore force used on you?

A: No, there was no other force used there other than they kind of aggressively escorted me to the cell.

Q: So, no more strikes, usage of a PR-24, etc. was used?

A: No

Q: Was a PR-24 utilized on you at any time during this incident?

A: I never saw any PR-24 used.

Signature:

Signature:

Exhibit I

# OAC Ann. 5120-9-55

Copy Citation

This document is current through updates effective April 14, 2024.

- **OHIO ADMINISTRATIVE CODE**
- **5120 Department of Rehabilitation and Corrections - Administration and Director**
- **Chapter 5120-9 Use of Force; Institutional Rules**

## 5120-9-55. Contraband.

(A) There shall be two classes of contraband as defined in this rule. Contraband shall be classified as "major" or "minor" contraband. This distinction shall determine the method or manner of disposition of such contraband.

(1) "Major contraband, " as used in this rule, shall refer to items possessed by an inmate which, by their nature, use, or intended use, pose a threat to security or safety of inmates, staff or public, or disrupt the orderly operation of the facility. Major contraband also includes any material related to unauthorized group activity that is found in the possession of an inmate. Any items referred to in section 2921.36 of the Revised Code shall also be considered major contraband, including deadly weapons or dangerous ordnance, drugs of abuse, intoxicating liquor and cash.

(2) "Minor contraband," as used in this rule, shall refer to items possessed by an inmate without permission and:

(a) The location in which these items are discovered is improper; or

(b) The quantities in which an allowable item is possessed is prohibited; or

(c) The manner or method by which the item is obtained was improper; or

(d) An allowable item is possessed by an inmate in an altered form or condition.

(B) Any staff member who confiscates contraband from an inmate shall enter the fact of such confiscation on a log designed for such a purpose. The log shall specify the date of the confiscation, the person or inmate from whose possession the contraband was taken, if known, and a brief description of the contraband.

(C) Disposition of contraband: any item considered contraband under this rule may be confiscated.

(1) Minor contraband.

(a) When appropriate, such items should be returned to their proper locations or to their original owners. However, if the item came into the inmate's possession through a violation of the rules by the original owner, such item may not be returned to the owner, if the original owner is an inmate.

(b) Minor contraband received in the mail may be returned to the sender if the inmate agrees to pay postage costs.

(c) Minor contraband, valued at one hundred dollars or less, may, thirty days after confiscation, be destroyed, donated, utilized by the institution for training or other official purposes, or utilized in non-monetary offers to compromise in accordance with rule 5120-9-32 of the Administrative Code, by the order of the warden when the institution has attempted to contact or identify the owner of the personal property and those attempts have been unsuccessful or the inmate who owns the personal property agrees in writing to the disposal of the property in question.

(d) Minor contraband, valued at over one hundred dollars, which cannot be returned to the original owner if either an inmate or unknown and cannot be returned to sender, may, upon the issuance of an order of forfeiture by the court of common pleas in the county in which the institution is located, be destroyed or utilized by the institution for training or other official purposes, sold at public auction, or utilized in non-monetary offers to compromise in accordance with rule 5120-9-32 of the Administrative Code. The warden may file a petition for forfeiture with the court, asking the order be issued. The petition shall attach a list of the property involved and shall state briefly why the property cannot be returned. Each institution shall record the manner in which the contraband was disposed. In the event a court of common pleas issues an order that forfeited contraband be sold at public auction, the institution shall deposit any money received in the inmates' industrial and entertainment fund and record the date of disposition, the amount the forfeited contraband was sold for, and the name of any person who purchased the forfeited contraband at public auction.

(2) Major contraband.

(a) When criminal prosecution or disciplinary action is contemplated with respect to the contraband, it shall be locked in a secure area designated for contraband or turned over to local or state law enforcement authorities. Institutional personnel shall minimize any handling of such items until turned over to law enforcement authorities.

(b) When such items are no longer needed for disciplinary or criminal action, they shall be disposed of in accordance with the provisions of this rule.

(3) Contraband such as rings, watches, radios, televisions and tape players shall be stored in a secure place. Reasonable attempts should be made to return such items to their rightful owner if an inmate, or sent to the inmate's home at the inmate's expense. Contraband obtained in violation of the rules of the Administrative Code shall be subject to confiscation. If valuable contraband cannot be returned to the rightful owner, the warden may initiate forfeiture consistent with this rule.

(4) Confiscated money shall be processed in accordance with rule 5120-5-08 of the Administrative Code.

Exhibit J-1

☐ **Mark the form as confidential**

# INCIDENT REPORT

| | Report Date (will be set when report is signed): 11/27/2021 |
|---|---|

| Work Location: Southern Ohio Correctional Facility | | Location of Incident: L6 Cell 54 |
|---|---|---|
| Name of Reporting Staff: Brennan Crank | Title: Correctional Officer | INCIDENT DATE: Nov 27, 2021 |
| Involves: I/M Feaster 551-840 | | INCIDENT TIME: 7:22 PM |

**Check Item Indication Subject Of This Report:**

| | | |
|---|---|---|
| ☒ Employee Action | ☐ Facility Maintenance | ☐ Medical | ☐ Recommendations |
| ☐ Inmate/Offender Affairs | ☐ Security | ☐ Victim Issue | ☐ Crisis Intervention Team (CIT) |
| ☐ Use of Force | ☐ Workplace Violence | ☐ Equipment Issue | ☐ Other: |

**Description of Incident:**

Please be advised on the above date and time I C/O B. Crank was conducting a routine shakedown on I/M Feaster 551-840 when I happened to find 1 Piece of soaked brown paper along with 2 "roaches" and a small piece of white paper that is commonly known as "K2" on his bookshelf under his blue towel. I also found a "scribe" in his toilet which reads (Yo homie its JRock. I wanted to holla plus run somethin by youas you no my word means alot to me, I get over a band every month on first for my rental propertys, it will actually hit at midnight on 31st so 2morrow night. Im kinda dead till then lol. I was thinkin that maybe we could help each other out. Can your bay either borrow 20 on app or maybe borrow 1/2 face and at midnight 2morrow I can pay you back with 50% mark up, So ill send $30 back for the 24 hour wait. I been collecting this money every month for over 6 years now and have never missed a bet so I can gurantee payment if you can help bro. -White) I then returned to the booth and notified zone LT. EOR

| Signature of Reporting Staff Member: Brennan Crank | Date: 11/27/2021 | |
|---|---|---|

**Action Taken:**

Capt Dyer

| Signature of Managing Officer: | Date: |
|---|---|

**Distribution: ALL COPIES TO MANAGING OFFICER** who will check appropriate distribution list below and distribute the copies.

| | | | |
|---|---|---|---|
| ☐ Operations | ☐ Administration | ☐ Special Services | ☐ Department Head |
| ☐ Investigator | ☐ EEO | ☐ Personnel Officer | ☐ Administrative Assistant |
| ☐ Record Officer | ☐ Medical | ☐ Health & Safety | ☐ Office of Victim Services |

DRC1000 E (Rev. 10/19)

Page 1 of 1

AGO Response to Discovery Request
000023

Exhibit J-2

Yo homie its 3Pac, I wanted to holle plus
fun somethin by you. As you no my word
Means alot to me, I get over a band
every month on first for my rental Property,
it will Certenly hit at Midnight On 31st
So 2more night, Im kinda dead till then b/

I was thinkin maybe we could help
each other out.

Can your boy either borrow 20 on app
or maybe borrow 1/2 a face and at
Midnit 2more I can Pay you back
with a 50% mark up, So ill send
$30 back for the 24 hour wait.

I been Collecting this money every
month for over 6 years now and
have never missed a beat so I
Can gurentee payment if you can help bro.

White

AGO Response to Discovery Request
000024



**Ohio** | Department of
Rehabilitation & Correction

Mike DeWine, Governor
Annette Chambers-Smith, Director

Exhibit J-4      3966

TO:         RIB CHAIRPERSON

FROM:       Investigator Charles Miller

DATE:       11/30/2021

CONCERNING:   Feaster A551-840

In my professional opinion, through my experience and training I have received as an Investigator/STG
Coordinator/Drug Coordinator  I believe the substance to be consistent with the manner of how drugs or illicit
substances have been found or packaged in this facility.

| | | |
|---|---|---|
| ☐Amphetamine (AMP) | ☐Cocaine (COC) | ☐Methadone (MTD) |
| ☐Barbiturate (BAR) | ☐Fentanyl (FYL) | ☐Opiates (OPI) |
| ☐Buprenorphine (BUP) | ☒Spice (K2) | ☐Oxycodone (OXY) |
| ☐Benzodiazepine (BZO) | ☐Methamphetamine (MET) | ☐Marijuana (THC) |
| ☐Other | | |

COMMENTS:

Southern Ohio Correctional Facility
P. O. Box 45699
Lucasville, OH 45699
www.drc.ohio.gov



AGO Response to Discovery Request
000026

#2021-374                    Exhibit J-3

## Contraband Control Slip

Institution: SOCF

Inmate: FEASTER          #551-840    Lock: L654

Date: 11-27-2021         Time: 7:22    AM / PM

Confiscated By: C/O B. Crank

Contraband Description: 2 "Roaches" 1 small piece white paper K2 Scribe, and 1 piece brown paper.

Contraband Found (Location): On bookshelf under blue towel. L6.54

Contraband found in the Possession of: I/M FEASTER 551-840

Contraband Belongs To: I/M FEASTER 551-840

Contraband/Disposition:

## CHAIN OF CUSTODY

| From: | Received By: |
|---|---|
| I/M FEASTER 551-840 | C/O O. CRANK |
| Date: 11-27-2021 | Time: 7:22   AM / PM |
| From: C/O B. CRANK | Received By: OSP VAULT |
| Date: 11-27-2021 | Time: 900   AM / PM |
| From: | Received By: |
| Date: | Time:   AM / PM |
| From: | Received By: |
| Date: | Time:   AM / PM |
| From: | Received By: |
| Date: | Time:   AM / PM |

DRC4086 (Rev. 02/04)
DIST:   White - Conduct Report Copy;   Canary - Evidence Tag Copy;   Pink - Inmate's Copy

AGO Response to Discovery Request
000025

Exhibit K-1

| | | |
|---|---|---|
| 11/24/2021 2:10:00 AM | Range Check Malone | MALONEAA |
| 11/24/2021 2:15:00 AM | Count Good: 61 Lt Stambaugh | MALONEAA |
| 11/24/2021 2:30:00 AM | Range Check Malone | MALONEAA |
| 11/24/2021 2:50:00 AM | Range Check Malone | MALONEAA |
| 11/24/2021 3:01:00 AM | UAR Warden Erdos | MALONEAA |
| 11/24/2021 3:07:00 AM | UAR Lt.Bradley | MALONEAA |
| 11/24/2021 3:10:00 AM | Range Check Malone | MALONEAA |
| 11/24/2021 3:30:00 AM | Range Check Malone | MALONEAA |
| 11/24/2021 3:50:00 AM | Range Check Malone | MALONEAA |
| 11/24/2021 3:55:00 AM | E LOG CHECKED BY LT. M. SMITH | SMITHML |
| 11/24/2021 4:10:00 AM | Range Check Potts | MALONEAA |
| 11/24/2021 4:30:00 AM | Range Check Potts | MALONEAA |
| 11/24/2021 4:56:00 AM | Range Check Potts late due to IDR | MALONEAA |
| 11/24/2021 5:15:00 AM | Range Check Potts | MALONEAA |
| 11/24/2021 5:20:00 AM | Count Good: 60 Lt Cooper | MALONEAA |
| 11/24/2021 5:44:00 AM | Range Check Potts | MALONEAA |
| 11/24/2021 5:51:00 AM | ----End of Shift---- | MALONEAA |
| 11/24/2021 6:03:00 AM | 1st shift, Fisher and Hartlage, 5 + 1 keys, two nail clippers, flashlight, cuffs and pr24, narcan checked, log reviewed and commom areas checked. | FISHERM |
| 11/24/2021 6:07:00 AM | 2 push brooms, 2 straight brooms, 2 dust pans, 4 spray bottles, 2 mop handles, 2 mop buckets, 2 mop ringers, 4 wet floor signs, 1 plunger, 1 ice bucket, 2 toilet brush's, 4 scratch pads, 1 ice scoop, 2 shower pitchers and 8 mop heads-checked. | FISHERM |
| 11/24/2021 6:14:00 AM | Range check C/O Hartlage | FISHERM |
| 11/24/2021 6:42:00 AM | Range check C/O Hartlage | FISHERM |
| 11/24/2021 7:06:00 AM | Range check C/O Hartlage | FISHERM |
| 11/24/2021 7:34:00 AM | Chow out/ Range check C/O Hartlage | FISHERM |
| 11/24/2021 8:04:00 AM | Range check C/O Hartlage | FISHERM |
| 11/24/2021 8:12:00 AM | Chow in | FISHERM |
| 11/24/2021 8:32:00 AM | Range check C/O Hartlage | FISHERM |
| 11/24/2021 9:00:00 AM | Range check C/O Hartlage | FISHERM |
| 11/24/2021 9:07:00 AM | Lt. Little UAR | FISHERM |
| 11/24/2021 9:26:00 AM | Range check C/O Hartlage | FISHERM |
| 11/24/2021 9:50:00 AM | Range check C/O Hartlage | FISHERM |
| 11/24/2021 10:01:00 AM | RANGE CHECK FISHER | HARTLAGERL |
| 11/24/2021 10:30:00 AM | COUNT 55 | HARTLAGERL |
| 11/24/2021 11:00:00 AM | RECREATION OUT ~ RANGE CHECK | HARTLAGERL |
| 11/24/2021 11:07:00 AM | UM NOLAN UAR | HARTLAGERL |
| 11/24/2021 11:07:00 AM | CPS MILLER UAR | HARTLAGERL |
| 11/24/2021 11:07:00 AM | SGT TERRY UAR | HARTLAGERL |
| 11/24/2021 11:24:00 AM | Lt. R. Broughton Reviewed Log | BROUGHTONRD |
| 11/24/2021 11:30:00 AM | RANGE CHECK FISHER | HARTLAGERL |
| 11/24/2021 11:45:00 AM | RECREATION IN ~ RANGE CHECK | HARTLAGERL |
| 11/24/2021 12:02:00 PM | CHOW OUT ~ RANGE CHECK | HARTLAGERL |
| 11/24/2021 12:15:00 PM | RANGE CHECK FISHER | HARTLAGERL |
| 11/24/2021 12:23:00 PM | CHOW IN ~ RANGE CHECK | HARTLAGERL |
| 11/24/2021 12:45:00 PM | RANGE CHECK FISHER | HARTLAGERL |
| 11/24/2021 1:15:00 PM | RANGE CHECK FISHER | HARTLAGERL |
| 11/24/2021 1:45:00 PM | RANGE CHECK FISHER | HARTLAGERL |
| 11/24/2021 1:45:00 PM | END OF SHIFT | HARTLAGERL |
| 11/24/2021 2:02:00 PM | 2nd Shift C/O's B. Crank & H. Merritt, All Keys Checked, Closet Inventoried, Equipment checked, Past 72 Hours E-Log Reviewed, Keys 11 w/6, 1 PR24, 1 RCDD,1 | CRANKBL |

Exhibt K-2

| | | |
|---|---|---|
| | pair yellow cuffs, 1 Escape Hatch Key, 1 Narcan, 2 Nail Clippers | |
| 11/24/2021 2:15:00 PM | Range Check Officer H. Merritt | CRANKBL |
| 11/24/2021 2:30:00 PM | Range Check Officer H. Merritt | CRANKBL |
| 11/24/2021 3:00:00 PM | Range Check Officer H. Merritt | CRANKBL |
| 11/24/2021 3:16:00 PM | I/m ~~Redacted~~ to L6-6 Total Block Count now 62 | CRANKBL |
| 11/24/2021 3:30:00 PM | Count Time/Signal 22 | CRANKBL |
| 11/24/2021 3:30:00 PM | Range Check Officer H. Merritt | CRANKBL |
| 11/24/2021 3:35:00 PM | Good Count Of 61 Per CC1 | CRANKBL |
| 11/24/2021 3:50:00 PM | Count Clear/Signal 21 | CRANKBL |
| 11/24/2021 4:01:00 PM | Range Check Officer H. Merritt | CRANKBL |
| 11/24/2021 4:30:00 PM | Range Check C/O B. Crank | CRANKBL |
| 11/24/2021 4:58:00 PM | Range Check C/O B. Crank | CRANKBL |
| 11/24/2021 5:05:00 PM | Block out to Chow | CRANKBL |
| 11/24/2021 5:26:00 PM | Block Back From Chow | CRANKBL |
| 11/24/2021 5:27:00 PM | Range Check C/O B. Crank | CRANKBL |
| 11/24/2021 5:56:00 PM | Range Check C/O B. Crank | CRANKBL |
| 11/24/2021 6:25:00 PM | Range Check Officer H. Merritt | CRANKBL |
| 11/24/2021 6:29:00 PM | MEO Pass | CRANKBL |
| 11/24/2021 6:50:00 PM | LT. Bradley UAR | CRANKBL |
| 11/24/2021 6:54:00 PM | Range Check Officer H. Merritt | CRANKBL |
| 11/24/2021 7:00:00 PM | Range Check Officer H. Merritt | CRANKBL |
| 11/24/2021 7:27:00 PM | Range Check Officer H. Merritt | CRANKBL |
| 11/24/2021 7:59:00 PM | Range Check Officer H. Merritt @751 PM | CRANKBL |
| 11/24/2021 8:13:00 PM | Block Out To Library | CRANKBL |
| 11/24/2021 8:13:00 PM | Range Check C/O B. Crank | CRANKBL |
| 11/24/2021 8:41:00 PM | Range Check C/O B. Crank | CRANKBL |
| 11/24/2021 8:59:00 PM | Block Back from Library | CRANKBL |
| 11/24/2021 8:59:00 PM | Range Check C/O B. Crank | CRANKBL |
| 11/24/2021 9:15:00 PM | Range Check C/O B. Crank | CRANKBL |
| 11/24/2021 9:25:00 PM | Good Count of 62 Per CC1 | CRANKBL |
| 11/24/2021 9:45:00 PM | Range Check C/O B. Crank | CRANKBL |
| 11/24/2021 9:50:00 PM | ++++++++++End Of Shift++++++++++ | CRANKBL |
| 11/24/2021 10:04:00 PM | 3rd shift. 6 keys #11 plus 1 escape hatch key. Alarms and telephones checked. 1 cuff. 1 CDD. 1 PR-24. Past 72 hours reviewed. All doors, gates, bars, windows, common areas, and equipment checked. 2 nail clippers. 2 Radios. 2 Batteries. 1 Charger. 1 Narcan | MALONEAA |
| 11/24/2021 10:10:00 PM | Range Check Cooper | MALONEAA |
| 11/24/2021 10:16:00 PM | Count Good: 62 Lt Smith | MALONEAA |
| 11/24/2021 10:30:00 PM | Range Check Cooper | MALONEAA |
| 11/24/2021 10:50:00 PM | Range Check Cooper | MALONEAA |
| 11/24/2021 11:10:00 PM | Range Check Cooper | MALONEAA |
| 11/24/2021 11:30:00 PM | Range Check Cooper | MALONEAA |
| 11/24/2021 11:50:00 PM | Range Check Cooper | MALONEAA |

Exhibit K-3

| Date & Time | Log Book Entries | Officer |
|---|---|---|
| 11/25/2021 12:10:00 AM | Range Check Hetherington | MALONEAA |
| 11/25/2021 12:30:00 AM | Range Check Hetherington | MALONEAA |
| 11/25/2021 12:50:00 AM | Range Check Hetherington | MALONEAA |
| 11/25/2021 1:10:00 AM | Range Check Hetherington | MALONEAA |
| 11/25/2021 1:30:00 AM | Range Check Hetherington | MALONEAA |
| 11/25/2021 1:36:00 AM | Lt Osborne UAR | MALONEAA |
| 11/25/2021 1:50:00 AM | Range Check Hetherington | MALONEAA |
| 11/25/2021 2:10:00 AM | Range Check Malone | MALONEAA |
| 11/25/2021 2:14:00 AM | Count Good: 62 Lt. Smith | MALONEAA |
| 11/25/2021 2:30:00 AM | Range Check Malone | MALONEAA |
| 11/25/2021 2:50:00 AM | Range Check Malone | MALONEAA |
| 11/25/2021 3:10:00 AM | Range Check Malone | MALONEAA |
| 11/25/2021 3:30:00 AM | Range Check Malone | MALONEAA |
| 11/25/2021 3:51:00 AM | Range Check Malone | MALONEAA |
| 11/25/2021 4:10:00 AM | Range Check Cooper | MALONEAA |
| 11/25/2021 4:31:00 AM | Range Check Cooper | MALONEAA |
| 11/25/2021 4:32:00 AM | Over-ride cleared by Capt Daniel due to 911 | MALONEAA |
| 11/25/2021 4:38:00 AM | Checking Range Check times only for staggered intervals | OSBORNERJ |
| 11/25/2021 4:57:00 AM | Range Check Cooper late due to IDR | MALONEAA |
| 11/25/2021 5:15:00 AM | Range Check Cooper | MALONEAA |
| 11/25/2021 5:21:00 AM | Count Good: 59 Lt Broughton | MALONEAA |
| 11/25/2021 5:35:00 AM | Range Check Cooper | MALONEAA |
| 11/25/2021 5:45:00 AM | Range Check Cooper | MALONEAA |
| 11/25/2021 5:54:00 AM | ----End of Shift---- | MALONEAA |
| 11/25/2021 6:03:00 AM | 1st shift, Fisher and Hartlage, 5 + 1 keys, two nail clippers, flashlight, cuffs and pr24, narcan checked, log reviewed and commom areas checked. | FISHERM |
| 11/25/2021 6:08:00 AM | 2 push brooms, 2 straight brooms, 2 dust pans, 4 spray bottles, 2 mop handles, 2 mop buckets, 2 mop ringers, 4 wet floor signs, 1 plunger, 1 ice bucket, 2 toilet brush's, 4 scratch pads, 1 ice scoop, 2 shower pitchers and 8 mop heads-checked. | FISHERM |
| 11/25/2021 6:15:00 AM | Range check C/O Hartlage | FISHERM |
| 11/25/2021 6:43:00 AM | Range check C/O Hartlage | FISHERM |
| 11/25/2021 7:03:00 AM | Range check C/O Hartlage | FISHERM |
| 11/25/2021 7:27:00 AM | Chow in/ Range check C/O Hartlage | FISHERM |
| 11/25/2021 7:55:00 AM | Range check C/O Hartlage | FISHERM |
| 11/25/2021 8:23:00 AM | Range check C/O Hartlage | FISHERM |
| 11/25/2021 9:20:00 AM | Range check C/O Hartlage@8:52am | FISHERM |
| 11/25/2021 9:20:00 AM | Range check C/O Hartlage | FISHERM |
| 11/25/2021 9:47:00 AM | Range check C/O Hartlage | FISHERM |
| 11/25/2021 10:10:00 AM | RANGE CHECK FISHER | HARTLAGERL |
| 11/25/2021 10:30:00 AM | COUNT 57 | HARTLAGERL |
| 11/25/2021 10:46:00 AM | LT SETTY UAR | HARTLAGERL |
| 11/25/2021 11:00:00 AM | RANGE CHECK FISHER | HARTLAGERL |
| 11/25/2021 11:30:00 AM | RANGE CHECK FISHER | HARTLAGERL |
| 11/25/2021 12:00:00 PM | RANGE CHECK FISHER | HARTLAGERL |
| 11/25/2021 12:16:00 PM | CHOW OUT ~ RANGE CHECK | HARTLAGERL |
| 11/25/2021 12:31:00 PM | CHOW IN ~ RANGE CHECK | HARTLAGERL |

Exhibit K-4

| Date/Time | Description | Name |
|---|---|---|
| 11/25/2021 12:45:00 PM | RANGE CHECK FISHER | HARTLAGERL |
| 11/25/2021 1:10:00 PM | Lt. R. Broughton Reviewed Log If Range check is logged late need to explain why. Range checks need to be logged as they occur | BROUGHTONRD |
| 11/25/2021 1:15:00 PM | RANGE CHECK FISHER | HARTLAGERL |
| 11/25/2021 1:45:00 PM | RANGE CHECK FISHER | HARTLAGERL |
| 11/25/2021 1:45:00 PM | END OF SHIFT | HARTLAGERL |
| 11/25/2021 1:58:00 PM | 2nd Shift C/Os Maxie & Davis 6 keys #11 plus 1 escape hatch key. Alarms and telephones checked. 1 cuff. 1 CDD. 1 PR-24. Past 72 hours reviewed. All doors, gates, bars, windows, common areas, and equipment checked. 2 nail clippers. 2 Radios. 2 Batteries. 1 Charger. 1 Narcan | MAXIEJA |
| 11/25/2021 2:15:00 PM | Range Check C/O Davis | MAXIEJA |
| 11/25/2021 2:45:00 PM | Range Check C/O Davis | MAXIEJA |
| 11/25/2021 3:05:00 PM | Range Check C/O Davis | MAXIEJA |
| 11/25/2021 3:30:00 PM | Range Check C/O Davis – Count | MAXIEJA |
| 11/25/2021 3:34:00 PM | Good Count of 62 Per CC1 | MAXIEJA |
| 11/25/2021 3:59:00 PM | Range Check C/O Davis | MAXIEJA |
| 11/25/2021 4:29:00 PM | Range Check C/O Maxie | MAXIEJA |
| 11/25/2021 4:58:00 PM | Range Check C/O Maxie | MAXIEJA |
| 11/25/2021 5:27:00 PM | Range Check C/O Maxie | MAXIEJA |
| 11/25/2021 5:56:00 PM | Range Check C/O Maxie | MAXIEJA |
| 11/25/2021 6:06:00 PM | MED PASS | MAXIEJA |
| 11/25/2021 6:22:00 PM | Range Check C/O Davis | MAXIEJA |
| 11/25/2021 6:57:00 PM | Range Check C/O Davis – late due to loading REC | MAXIEJA |
| 11/25/2021 7:10:00 PM | Redacted          ) L6-14 to J2-38<br>Redacted             L6-18 to J2-62<br><br>Block Count now 60 | MAXIEJA |
| 11/25/2021 7:26:00 PM | Range Check C/O Davis | MAXIEJA |
| 11/25/2021 7:55:00 PM | Range Check C/O Davis – REC In | MAXIEJA |
| 11/25/2021 8:52:00 PM | Range Check C/O Maxie @8:25 | MAXIEJA |
| 11/25/2021 8:52:00 PM | Range Check C/O Maxie | MAXIEJA |
| 11/25/2021 9:15:00 PM | Range Check C/O Maxie | MAXIEJA |
| 11/25/2021 9:18:00 PM | Good count of 60 per CC1 | MAXIEJA |
| 11/25/2021 9:41:00 PM | LT. PRATER REVIEWED E-LOG | PRATERWR |
| 11/25/2021 9:45:00 PM | Range Check C/O Maxie | MAXIEJA |
| 11/25/2021 9:45:00 PM | -----End Of Shift----- | MAXIEJA |
| 11/25/2021 9:59:00 PM | 3rd shift. 6 keys #11 plus 1 escape hatch key. Alarms and telephones checked. 1 cuff. 1 CDD. 1 PR-24. Past 72 hours reviewed. All doors, gates, bars, windows, common areas, and equipment checked. 2 nail clippers. 2 Radios. 2 Batteries. 1 Charger. 1 Narcan | MALONEAA |
| 11/25/2021 10:10:00 PM | Range Check Crabtree | MALONEAA |
| 11/25/2021 10:15:00 PM | Count Good: 60 Lt Bradley | MALONEAA |
| 11/25/2021 10:30:00 PM | Range Check Crabtree | MALONEAA |
| 11/25/2021 10:50:00 PM | Range Check Crabtree | MALONEAA |
| 11/25/2021 11:00:00 PM | 11/25/2021 11:11:00 PM Range Check Crabtree 11:10am<br>Range Check Crabtree 11:10pm | MALONEAA |

Exhibit K5

| | | |
|---|---|---|
| 11/25/2021 11:32:00 PM | Range Check Crabtree 11:30pm | MALONEAA |
| 11/25/2021 11:50:00 PM | Range Check Crabtree | MALONEAA |
| 11/26/2021 12:10:00 AM | Range Check Hetherington | MALONEAA |
| 11/26/2021 12:19:00 AM | Count Good: 60 Lt Bradley | MALONEAA |
| 11/26/2021 12:30:00 AM | Range Check Hetherington | MALONEAA |
| 11/26/2021 12:50:00 AM | Range Check Hetherington | MALONEAA |
| 11/26/2021 1:10:00 AM | Range Check Hetherington | MALONEAA |
| 11/26/2021 1:30:00 AM | Range Check Hetherington | MALONEAA |
| 11/26/2021 1:39:00 AM | Lt Osborne UAR | MALONEAA |
| 11/26/2021 1:47:00 AM | Lt Bradley Reviewed eLog | BRADLEYPA |
| 11/26/2021 1:50:00 AM | Range Check Hetherington | MALONEAA |
| 11/26/2021 2:10:00 AM | Range Check Malone | MALONEAA |
| 11/26/2021 2:15:00 AM | Count Good: 60 Lt. Bradley | MALONEAA |
| 11/26/2021 2:30:00 AM | Range Check Malone | MALONEAA |
| 11/26/2021 2:50:00 AM | Range Check Malone | MALONEAA |
| 11/26/2021 3:10:00 AM | Range Check Malone | MALONEAA |
| 11/26/2021 3:30:00 AM | Range Check Malone | MALONEAA |
| 11/26/2021 3:50:00 AM | Range Check Malone | MALONEAA |
| 11/26/2021 4:10:00 AM | Range Check Crabtree | MALONEAA |
| 11/26/2021 4:30:00 AM | Range Check Crabtree | MALONEAA |
| 11/26/2021 4:57:00 AM | Range Check Crabtree late due to IDR | MALONEAA |
| 11/26/2021 5:17:00 AM | Range Check Crabtree | MALONEAA |
| 11/26/2021 5:21:00 AM | Count Good: 57 Lt Broughton | MALONEAA |
| 11/26/2021 5:36:00 AM | Range Check Crabtree | MALONEAA |
| 11/26/2021 5:48:00 AM | Range Check Crabtree | MALONEAA |
| 11/26/2021 5:51:00 AM | ----End of Shift---- | MALONEAA |
| 11/26/2021 6:03:00 AM | 1st shift, Fisher and Hartlage, 5 + 1 keys, two nail clippers, flashlight, cuffs and pr24, narcan checked, log reviewed and commom areas checked. | FISHERM |
| 11/26/2021 6:10:00 AM | 2 push brooms, 2 straight brooms, 2 dust pans, 4 spray bottles, 2 mop handles, 2 mop buckets, 2 mop ringers, 4 wet floor signs, 1 plunger, 1 ice bucket, 2 toilet brush's, 4 scratch pads, 1 ice scoop, 2 shower pitchers and 8 mop heads-checked. | FISHERM |
| 11/26/2021 6:14:00 AM | Range check C/O Hartlage | FISHERM |
| 11/26/2021 6:43:00 AM | Range check C/O Hartlage | FISHERM |
| 11/26/2021 7:08:00 AM | Range check C/O Hartlage | FISHERM |
| 11/26/2021 7:23:00 AM | Chow out/ Range check C/O Hartlage | FISHERM |
| 11/26/2021 7:49:00 AM | Chow in/ Range check C/O Hartlage | FISHERM |
| 11/26/2021 7:53:00 AM | Rec out, range check C/O Hartlage | FISHERM |
| 11/26/2021 8:23:00 AM | Range check C/O Hartlage | FISHERM |
| 11/26/2021 8:48:00 AM | Rec in, range check C/O Hartlage | FISHERM |
| 11/26/2021 9:18:00 AM | Library out, range check C/O Hartlage | FISHERM |
| 11/26/2021 9:47:00 AM | Lt. Williams UAR | FISHERM |
| 11/26/2021 9:49:00 AM | Range check C/O Hartlage | FISHERM |
| 11/26/2021 10:02:00 AM | RANGE CHECK FISHER | HARTLAGERL |
| 11/26/2021 10:16:00 AM | LIBRARY IN ~ RANGE CHECK | HARTLAGERL |
| 11/26/2021 10:30:00 AM | COUNT S3 | HARTLAGERL |
| 11/26/2021 10:58:00 AM | RANGE CHECK FISHER | HARTLAGERL |
| 11/26/2021 11:28:00 AM | RANGE CHECK FISHER | HARTLAGERL |
| 11/26/2021 11:33:00 AM | E - Log and Cell Shakedown Log reviewed. Unit Manager Nolan | NOLANBP |

Exhibit K-6

| | | |
|---|---|---|
| 11/26/2021 11:44:00 AM | CHOW OUT ~ RANGE CHECK | HARTLAGERL |
| 11/26/2021 12:11:00 PM | CHOW IN ~ RANGE CHECK | HARTLAGERL |
| 11/26/2021 12:40:00 PM | RANGE CHECK FISHER | HARTLAGERL |
| 11/26/2021 1:01:00 PM | RANGE CHECK FISHER | HARTLAGERL |
| 11/26/2021 1:24:00 PM | RANGE CHECK FISHER | HARTLAGERL |
| 11/26/2021 1:45:00 PM | RANGE CHECK FISHER | HARTLAGERL |
| 11/26/2021 1:45:00 PM | END OF SHIFT | HARTLAGERL |
| 11/26/2021 2:00:00 PM | 2nd shift, Kenyon and Bates, 5 + 1 keys, two nail clippers, flashlight, cuffs and pr24, narcan checked, log reviewed and commom areas checked. | KENYONDR |
| 11/26/2021 2:02:00 PM | 2 push brooms, 2 straight brooms, 2 dust pans, 4 spray bottles, 2 mop handles, 2 mop buckets, 2 mop ringers, 4 wet floor signs, 1 plunger, 1 ice bucket, 2 toilet brush's, 4 scratch pads, 1 ice scoop. | KENYONDR |
| 11/26/2021 2:08:00 PM | Range Check C/O Bates | KENYONDR |
| 11/26/2021 2:38:00 PM | Range Check C/O Bates | KENYONDR |
| 11/26/2021 3:08:00 PM | Range Check C/O Bates | KENYONDR |
| 11/26/2021 3:30:00 PM | Range Check C/O Bates / count | KENYONDR |
| 11/26/2021 3:35:00 PM | Count of (58) with 2 out. Total (60) PER CC1 | KENYONDR |
| 11/26/2021 4:00:00 PM | Range Check C/O Bates | KENYONDR |
| 11/26/2021 4:30:00 PM | Range Check C/O Kenyon | KENYONDR |
| 11/26/2021 4:44:00 PM | Start of Chow | KENYONDR |
| 11/26/2021 4:57:00 PM | Range Check C/O Bates | KENYONDR |
| 11/26/2021 5:07:00 PM | End Of Chow | KENYONDR |
| 11/26/2021 5:29:00 PM | Range check C/O Kenyon | KENYONDR |
| 11/26/2021 6:03:00 PM | Range Check C/O Kenyon | KENYONDR |
| 11/26/2021 6:08:00 PM | Range check C/O Kenyon 600pm late do to computer issues | KENYONDR |
| 11/26/2021 6:30:00 PM | Range Check C/O Bates | KENYONDR |
| 11/26/2021 6:58:00 PM | Med Pass | KENYONDR |
| 11/26/2021 7:11:00 PM | Range Check C/O Bates | KENYONDR |
| 11/26/2021 7:17:00 PM | UAR LT Hale entered @6:20 but did not save | KENYONDR |
| 11/26/2021 7:28:00 PM | Range Check C/O Bates | KENYONDR |
| 11/26/2021 7:30:00 PM | Lt. Hale Checking E-Log Range Checks | HALESA |
| 11/26/2021 7:58:00 PM | Range Check C/O Jackson | KENYONDR |
| 11/26/2021 8:28:00 PM | Range Check C/O Bates | KENYONDR |
| 11/26/2021 8:58:00 PM | Range Check C/O Bates | KENYONDR |
| 11/26/2021 9:16:00 PM | Range Check C/O Bates/ count | KENYONDR |
| 11/26/2021 9:20:00 PM | Good Count of (60) PER CC1 | KENYONDR |
| 11/26/2021 9:45:00 PM | Range Check C/O Bates | KENYONDR |
| 11/26/2021 10:04:00 PM | 3rd shift officers D. Cooper and Merriman | COOPERDS |
| 11/26/2021 10:05:00 PM | 5 + 1 keys, two nail clippers, flashlight, cuffs and pr24, narcan checked, log reviewed and commom areas checked. KENYONDR 11/26/2021 2:02:00 PM 2 push brooms, 2 straight brooms, 2 dust pans, 4 spray bottles, 2 mop handles, 2 mop buckets, 2 mop ringers, 4 wet floor signs, 1 plunger, | COOPERDS |

AGO Response to Discovery Request
000236

Exhibit K-7

| | 1 ice bucket, 2 toilet brush's, 4 scratch pads, 1 ice scoop. | |
|---|---|---|
| 11/26/2021 10:15:00 PM | Range check C/O Merriman | COOPERDS |
| 11/26/2021 10:18:00 PM | Good count of 60 per LT. Osborn | COOPERDS |
| 11/26/2021 10:35:00 PM | ~~11/26/2021 10:35:00 PM Range check c/o Preece~~ | |
| | void | COOPERDS |
| 11/26/2021 10:35:00 PM | Range check C/O Merriman | COOPERDS |
| 11/26/2021 10:55:00 PM | Range check C/O Merriman | COOPERDS |
| 11/26/2021 11:15:00 PM | Range check c/o Preece | COOPERDS |
| 11/26/2021 11:35:00 PM | Range check c/o Preece | COOPERDS |
| 11/26/2021 11:55:00 PM | Range check c/o Preece | COOPERDS |
| 11/27/2021 12:15:00 AM | Range Check C/O Cooper/count | COOPERDS |
| 11/27/2021 12:19:00 AM | Good count of 60 per CC1 | COOPERDS |
| 11/27/2021 12:35:00 AM | Range Check C/O Cooper | COOPERDS |
| 11/27/2021 12:55:00 AM | Range Check C/O Cooper | COOPERDS |
| 11/27/2021 1:15:00 AM | Range check C/O Merriman | COOPERDS |
| 11/27/2021 1:35:00 AM | Range check C/O Merriman | COOPERDS |
| 11/27/2021 1:47:00 AM | UAR by LT. Hale at 1:43 | COOPERDS |
| 11/27/2021 1:55:00 AM | Range check C/O Merriman | COOPERDS |
| 11/27/2021 2:15:00 AM | Range check c/o Preece | COOPERDS |
| 11/27/2021 2:18:00 AM | Good count of 60 per CC1 | COOPERDS |
| 11/27/2021 2:35:00 AM | Range check c/o Preece | COOPERDS |
| 11/27/2021 2:55:00 AM | Range check c/o Preece | COOPERDS |
| 11/27/2021 3:00:00 AM | Lt. Hale Checking E-Log Range Checks | HALESA |
| 11/27/2021 3:15:00 AM | Range Check C/O Cooper | COOPERDS |
| 11/27/2021 3:35:00 AM | Range Check C/O Cooper | COOPERDS |
| 11/27/2021 3:55:00 AM | Range Check C/O Cooper | COOPERDS |
| 11/27/2021 4:15:00 AM | Range check C/O Merriman | COOPERDS |
| 11/27/2021 4:43:00 AM | Range check C/O Merriman LATE DUE TO IDR | COOPERDS |
| 11/27/2021 5:03:00 AM | Range check C/O Merriman late entry @5:00 | COOPERDS |
| 11/27/2021 5:20:00 AM | Range check C/O Merriman | COOPERDS |
| 11/27/2021 5:23:00 AM | Good count of 59 per LT. Setty | COOPERDS |
| 11/27/2021 5:44:00 AM | Range check C/O Merriman late restroom break | COOPERDS |
| 11/27/2021 5:52:00 AM | *********END SHIFT********** | COOPERDS |
| 11/27/2021 6:01:00 AM | 1st shift, Fisher and Hartlage, 5 + 1 keys, two nail clippers, flashlight, cuffs and pr24, narcan checked, log reviewed and commom areas checked. | FISHERM |
| 11/27/2021 6:08:00 AM | 2 push brooms, 2 straight brooms, 2 dust pans, 4 spray bottles, 2 mop handles, 2 mop buckets, 2 mop ringers, 4 wet floor signs, 1 plunger, 1 ice bucket, 2 toilet brush's, 4 scratch pads, 1 ice scoop, 2 shower pitchers and 8 mop heads-checked. | FISHERM |
| 11/27/2021 6:14:00 AM | Range check C/O Hartlage | FISHERM |
| 11/27/2021 6:41:00 AM | Range check C/O Hartlage | FISHERM |
| 11/27/2021 7:08:00 AM | Chow out/ Range check C/O Hartlage | FISHERM |
| 11/27/2021 7:33:00 AM | Chow in/ Range check C/O Hartlage | FISHERM |
| 11/27/2021 8:02:00 AM | Range check C/O Hartlage | FISHERM |
| 11/27/2021 8:30:00 AM | Range check C/O Hartlage | FISHERM |
| 11/27/2021 8:58:00 AM | Range check C/O Hartlage | FISHERM |

Exhibit K-8

| | | |
|---|---|---|
| 11/27/2021 9:19:00 AM | Lt. Williams UAR | FISHERM |
| 11/27/2021 9:26:00 AM | Range check C/O Hartlage | FISHERM |
| 11/27/2021 9:49:00 AM | Range check C/O Hartlage | FISHERM |
| 11/27/2021 10:01:00 AM | RANGE CHECK FISHER | HARTLAGERL |
| 11/27/2021 10:30:00 AM | COUNT 57 | HARTLAGERL |
| 11/27/2021 11:00:00 AM | RANGE CHECK FISHER | HARTLAGERL |
| 11/27/2021 11:30:00 AM | CHOW OUT ~ RANGE CHECK | HARTLAGERL |
| 11/27/2021 12:00:00 PM | CHOW IN ~ RANGE CHECK | HARTLAGERL |
| 11/27/2021 12:18:00 PM | RANGE CHECK FISHER | HARTLAGERL |
| 11/27/2021 12:47:00 PM | RANGE CHECK FISHER | HARTLAGERL |
| 11/27/2021 1:17:00 PM | RANGE CHECK FISHER | HARTLAGERL |
| 11/27/2021 1:21:00 PM | Reviewed by LT. Eaches | EACHESJR |
| 11/27/2021 1:45:00 PM | RANGE CHECK FISHER | HARTLAGERL |
| 11/27/2021 1:45:00 PM | END OF SHIFT | HARTLAGERL |
| 11/27/2021 1:59:00 PM | ~~11/27/2021 1:59:00 PM 2nd Shift Officers H. Merritt & B. Crank Past 72 Hours of E-Log reviewed, Common areas shook down, equipment checked and in good condition, 1 P.R. 24, 1 set of cuffs, 1 Cut Down Device, 2 N/C, 1 Narcan, 2 Radios, 1 set of keys (Chit 11-6 Keys), 1 Escape Hatch Key, all seals are good~~ 2nd Shift Officers H. Merritt & B. Crank Past 72 Hours of E-Log reviewed, Common areas shook down, equipment checked and in good condition, 1 P.R. 24, 1 set of cuffs, 2 Cut Down Device, 2 N/C, 1 Narcan, 2 Radios, 1 set of keys (Chit 11-6 Keys), 1 Escape Hatch Key, all seals are good | HOWARDMJ |
| 11/27/2021 2:15:00 PM | Range Check Conducted by Officer B. Crank | HOWARDMJ |
| 11/27/2021 2:31:00 PM | Range Check Conducted by Officer B. Crank | HOWARDMJ |
| 11/27/2021 3:01:00 PM | Range Check Conducted by Officer B. Crank | HOWARDMJ |
| 11/27/2021 3:30:00 PM | Range Check Conducted by Officer B. Crank | HOWARDMJ |
| 11/27/2021 3:37:00 PM | Good Count of 58 with 2 out totaling 60 Per CCI | HOWARDMJ |
| 11/27/2021 4:01:00 PM | Range Check Conducted by Officer B. Crank @400 PM | HOWARDMJ |
| 11/27/2021 4:20:00 PM | Range Check Conducted by Officer B. Crank | HOWARDMJ |
| 11/27/2021 4:50:00 PM | Range Check conducted by Officer H. Merritt | HOWARDMJ |
| 11/27/2021 4:51:00 PM | Block out to Chow | HOWARDMJ |
| 11/27/2021 5:18:00 PM | Block back from Chow | HOWARDMJ |
| 11/27/2021 5:18:00 PM | Range Check conducted by Officer H. Merritt | HOWARDMJ |
| 11/27/2021 5:48:00 PM | Range Check conducted by Officer H. Merritt | HOWARDMJ |
| 11/27/2021 6:17:00 PM | Range Check Conducted by Officer B. Crank | HOWARDMJ |
| 11/27/2021 6:31:00 PM | Med Pass | HOWARDMJ |

Exhibit K-9

| | | |
|---|---|---|
| 11/27/2021 6:46:00 PM | Range Check Conducted by Officer B. Crank | HOWARDMJ |
| 11/27/2021 7:00:00 PM | Lt. Williams UAR | HOWARDMJ |
| 11/27/2021 7:05:00 PM | Block Out to Rec | HOWARDMJ |
| 11/27/2021 7:05:00 PM | Range Check Conducted by Officer B. Crank | HOWARDMJ |
| 11/27/2021 7:33:00 PM | Range Check Conducted by Officer B. Crank | HOWARDMJ |
| 11/27/2021 7:55:00 PM | Block Back From Rec | CRANKBL |
| 11/27/2021 7:55:00 PM | Range Check Officer H. Merritt | CRANKBL |
| 11/27/2021 8:11:00 PM | B. Williams with I/M Feaster 551-840 L6 54 out of block to J2 01 Block Count now 59 | CRANKBL |
| 11/27/2021 8:23:00 PM | Range Check Conducted by Officer B. Crank | HOWARDMJ |
| 11/27/2021 8:49:00 PM | Range Check conducted by Officer Wellman | HOWARDMJ |
| 11/27/2021 9:15:00 PM | Count Time | HOWARDMJ |
| 11/27/2021 9:15:00 PM | Range Check conducted by Officer H. Merritt | HOWARDMJ |
| 11/27/2021 9:17:00 PM | E-Log Checked by Lt. Brittany Williams | WILLIAMSBN |
| 11/27/2021 9:20:00 PM | Good Count of 59 Per CC1 | HOWARDMJ |
| 11/27/2021 9:32:00 PM | Count Clear | HOWARDMJ |
| 11/27/2021 9:45:00 PM | Range Check Conducted by Officer B. Crank | HOWARDMJ |
| 11/27/2021 9:51:00 PM | ~~~~End of Shift~~~~ | HOWARDMJ |
| 11/27/2021 9:56:00 PM | Start of Third Shift, Officer H. Merritt on Post | HOWARDMJ |
| 11/27/2021 9:56:00 PM | Past 72 Hours of E-Log reviewed, Common areas shook down, equipment checked and in good condition, 1 P.R. 24, 1 set of cuffs, 2 Cut Down Device, 2 N/C, 1 Narcan, 2 Radios, 1 set of keys (Chit 11-6 Keys), 1 Escape Hatch Key, all seals are good | HOWARDMJ |
| 11/27/2021 10:15:00 PM | Range Check conducted by Officer James | HOWARDMJ |
| 11/27/2021 10:17:00 PM | Good Count of 59 Per CC1 | HOWARDMJ |
| 11/27/2021 10:35:00 PM | Range Check conducted by Officer James | HOWARDMJ |
| 11/27/2021 10:55:00 PM | Range Check conducted by Officer James | HOWARDMJ |
| 11/27/2021 11:15:00 PM | Range Check conducted by Officer James | HOWARDMJ |
| 11/27/2021 11:35:00 PM | Range Check conducted by Officer James | HOWARDMJ |
| 11/27/2021 11:55:00 PM | Range Check conducted by Officer James | HOWARDMJ |
| 11/28/2021 12:15:00 AM | Range Check conducted by Officer H. Merritt | HOWARDMJ |
| 11/28/2021 12:20:00 AM | Count of 59 good per Lt. Prater | HOWARDMJ |
| 11/28/2021 12:35:00 AM | Range Check conducted by Officer H. Merritt | HOWARDMJ |
| 11/28/2021 12:55:00 AM | Range Check conducted by Officer H. Merritt | HOWARDMJ |
| 11/28/2021 1:15:00 AM | Range Check conducted by Officer H. Merritt | HOWARDMJ |

Exhibit K-10

| | | |
|---|---|---|
| 11/28/2021 1:35:00 AM | Range Check conducted by Officer H. Merritt | HOWARDMJ |
| 11/28/2021 1:58:00 AM | ~~11/28/2021 1:58:00 AM Range Check conducted by Officer H. Merritt @1:50AM~~<br>Range Check conducted by Officer H. Merritt @1:55AM | HOWARDMJ |
| 11/28/2021 2:15:00 AM | Range Check conducted by Officer Potts | HOWARDMJ |
| 11/28/2021 2:16:00 AM | Good Count of 59 Per CC1 | HOWARDMJ |
| 11/28/2021 2:26:00 AM | Lt. Williams UAR | HOWARDMJ |
| 11/28/2021 2:35:00 AM | Range Check conducted by Officer Potts | HOWARDMJ |
| 11/28/2021 2:55:00 AM | Range Check conducted by Officer Potts | HOWARDMJ |
| 11/28/2021 3:14:00 AM | Lt. Hale Checking E-Log Range Checks | HALESA |
| 11/28/2021 3:15:00 AM | Range Check conducted by Officer Potts | HOWARDMJ |
| 11/28/2021 3:35:00 AM | Range Check conducted by Officer Potts | HOWARDMJ |
| 11/28/2021 3:55:00 AM | Range Check conducted by Officer Potts | HOWARDMJ |
| 11/28/2021 4:15:00 AM | Range Check conducted by Officer James | HOWARDMJ |
| 11/28/2021 4:40:00 AM | Range Check conducted by Officer James Late due to RR Break | HOWARDMJ |
| 11/28/2021 5:00:00 AM | Range Check conducted by Officer James | HOWARDMJ |
| 11/28/2021 5:20:00 AM | Range Check conducted by Officer James | HOWARDMJ |
| 11/28/2021 5:23:00 AM | Good Count of 57 with 2 out totaling 59 Per CC1 | HOWARDMJ |
| 11/28/2021 5:49:00 AM | Range Check conducted by Officer James Late due to RR Break | HOWARDMJ |
| 11/28/2021 5:55:00 AM | ~~~~End of Shift~~~~ | HOWARDMJ |
| 11/28/2021 6:07:00 AM | Relieve 3rd Shift... 1st Shift c/o J.D. Yazell | YAZELLJD |
| 11/28/2021 6:08:00 AM | Past 72 hours of e-Log was reviewed, Equipment checked, Block Keys (11) with (6) keys; and Hatch (1) are sealed and in good condition. PR24 (1), Motorola base 2 radio, RCDD (1), Nail Clipper (2). Cuffs (1). Common Areas Checked and Secured. | YAZELLJD |
| 11/28/2021 6:08:00 AM | NARCAN (1) secured in Lock Box inside Booth. Common Are Checked, Spider Alarm checked. Security Device Issue Log, Employee Visit and Post Orders Records filled out. | YAZELLJD |
| 11/28/2021 6:09:00 AM | 1st Shift c/o Henson | YAZELLJD |
| 11/28/2021 6:15:00 AM | Range Check by c/o Henson | YAZELLJD |
| 11/28/2021 6:44:00 AM | Range Check by c/o Henson | YAZELLJD |
| 11/28/2021 7:13:00 AM | Block Out for Breakfast<br>Range Check by c/o Henson | YAZELLJD |
| 11/28/2021 7:41:00 AM | Block Return from Breakfast<br>Range Check by c/o Henson | YAZELLJD |
| 11/28/2021 8:08:00 AM | Lt. Cooper Checking 1st Shift E-LOG | COOPERAN |

AGO Response to Discovery Request<br>000240

| SUBJECT:<br>**Medical Services** | PAGE ___1___ OF ___18___ |
| | NUMBER: **68-MED-01** |
| RULE/CODE REFERENCE:<br>ORC 4723.43, ORC 4730, 5120.01 | SUPERSEDES:<br>68-MED-01 dated 06/1/2021 |
| RELATED ACA STANDARDS:<br>5-ACI-2A-03, 2C-12, 4A-01M, 4B-28M, 6A-01M,<br>5-ACI-6A-03 **thru** 6A-07, 6A-09, 6A-12M,<br>5-ACI- 6A-18M, 6A-20, 6A-22M, 6A-27, 6A-40,<br>5-ACI-6B-01M, 6B-02M, 6B-03M, 6B-11, 6B-12,<br>5-ACI-6C-01, 6C-03M, 6C-10, 6C-11, 6C-14M,<br>5-ACI-6C-15, 6D-01, 6D-04, 6D-06, 6D-08,<br>5-ACI-6D-09, 6D-10, 2-CO-4E-01 | EFFECTIVE DATE:<br>**March 14, 2022**<br><br>Exhibit L |
| | APPROVED:<br>*a.C. Smith* |

**Ohio** | **Department of Rehabilitation & Correction**

## I.   AUTHORITY

Ohio Revised Code 5120.01 authorizes the Director of the Department of Rehabilitation and Correction, as the executive head of the department, to direct the total operations and management of the department by establishing procedures as set forth in this policy.

## II.   PURPOSE

The purpose of this policy is to establish standard procedural guidelines for the delivery of medical services and the provision of unimpeded access to medical care for incarcerated individuals under the jurisdiction of the Ohio Department of Rehabilitation and Correction (ODRC).

## III.   APPLICABILITY

This policy applies to all persons employed by or under contract with the ODRC (excluding DPCS, CTA, and OPI staff) and to all incarcerated individuals confined to institutions within the ODRC.

## IV.   DEFINITIONS

The definitions for the below listed terms can be found at the top of the ODRC policies page on the ODRC Intranet at the following:

Definitions Link
- **Advanced Level Provider (ALP)**
- **Chief Medical Officer (CMO)**
- **Health Care**
- **Health Care Administrator (HCA)**
- **Intrasystem Transfer**
- **Medical Emergency**
- **State Medical Director**

| SUBJECT: **Medical Services** | PAGE __2__ OF __18__ |

## V. POLICY

It is the policy of the ODRC to provide medical services and continuity of care to incarcerated individuals. Continuity of care is provided from admission to transfer or discharge from the facility and shall include referral to community-based providers when indicated. These services are to be accessible to all incarcerated individuals, include an emphasis on disease prevention, and reflect a holistic approach in accordance with approved levels of care.

## VI. PROCEDURES

### A. Governance and Administration

1. Responsibilities of Medical Operations

    a. The State Medical Director shall serve as the responsible physician and the medical authority for the ODRC and the medical services programs. The State Medical Director is responsible for the overall supervision of medical services.

    b. Medical Operations shall assist institution medical departments in the coordination of institution medical services.

    c. With input from institution field staff, Medical Operations shall utilize a health care staffing analysis to identify the types of health care providers necessary to provide the determined scope of services and essential positions needed to perform the health services mission in each institution.

    d. Medical Operations shall provide operational and fiscal support for all ODRC institution medical service programs.

    e. The Office of Correctional Health Care (OCHC) shall coordinate all medical continuous quality improvement activities within ODRC institutions.

    f. The OCHC shall manage equipment requests for institution health services.

    g. The OCHC shall coordinate the credentialing process for all advanced level providers (ALPs) including all physicians, dentists, ophthalmologists, podiatrists, nurse practitioners, clinical nurse specialists, and physician assistants.

2. Institution Health Authority

    a. The health care administrator (HCA) shall serve as the institution health authority.

    b. Responsibilities of the institution health authority shall include, but not be limited to, the following:

        i. Decisions about the deployment of health resources and the day-to-day operations of the medical services program, and

| SUBJECT: **Medical Services** | PAGE ___3___ OF ___18___ |

ii. Development of a mission statement that defines the scope of medical services, and

iii. Development of mechanisms, including written agreements, when necessary, to ensure that the scope of services is provided and properly monitored, and

iv. Adhere to and ensure all medical staff comply with ODRC policy and protocol, and

v. Review health care policies and protocols on an annual basis, and

vi. Development of institution medical procedures, when necessary, to address needs not addressed in ODRC policies. Each institution procedure and program in the institution's health care delivery system shall be reviewed, revised, if necessary, and signed at least annually by the HCA, and

vii. Review of and input to the Medical Operations created institutional staffing plan at least annually to identify if the number and type of staff is adequate to provide the determined scope of services, and

viii. Establishment of systems for the coordination of care among multidisciplinary medical providers, and

ix. Development of an institutional Continuous Quality Improvement (CQI) program, and

x. Coordination with institution administration to ensure that there is adequate space made available for administrative, direct care, professional, and clerical staff. Such space shall include access to a conference area, a records storage area, a public lobby, and toilet facilities, and

xi. Equipment supplies, and materials necessary for health services are procured and maintained as determined by the HCA.

a) Institution HCAs shall follow the purchase procedures outlined in PM-01, DAS Purchasing Procedures, for supplies not provided through the Ohio Department of Mental Health supply system.

b) If the institution's medical budget is exhausted, yet additional equipment essential to the provision of quality medical care is needed, a Request to Purchase (DRC1918), an Equipment Justification (DRC5372), and a Budget Adjustment Request (DRC2303) for such equipment must be forwarded to Medical Operations.

xii. And all other duties as assigned by the OCHC.

c. The HCA shall be available to provide clinical and administrative supervision to institution medical staff 24 hours per day, 7 days per week. In the event the HCA is

| SUBJECT: **Medical Services** | PAGE___4___ OF __18__ |
| --- | --- |

not available to provide such supervision, the HCA shall arrange for back-up clinical and administrative supervision as follows:

    i. Designate the CQI coordinator to provide clinical and administrative supervision as acting HCA; or

    ii. Designate the assistant HCA or arrange with the appropriate institution deputy warden to provide administrative supervision of the institution medical staff as acting HCA and designate an experienced staff nurse to provide clinical guidance; or

    iii. Arrange with the HCA of a nearby ODRC institution for provision of clinical guidance and arrange with the appropriate institution deputy warden to provide administrative supervision of the institution medical staff.

3.    Responsibilities of the Chief Medical Officer (CMO)

   a. The CMO shall have responsibility for all matters involving clinical judgment and shall not be countermanded by non-clinicians. The CMO shall provide clinical leadership for the provision of medical services in conjunction with the HCA.

   b. Additional responsibilities of the CMO include, but are not limited to:

    i. Coordinating on-call physician coverage 24 hours per day, 7 days per week - provides and shares on-call responsibilities, and

    ii. Adhere to and ensure all medical staff complies with ODRC policy and protocol, and

    iii. Conducts peer review/monitoring on institutional ALP at least every six (6) months, which shall include a review of ten (10) patient records.
      a) The CMO shall maintain these confidential reviews.
      b) These reviews shall not replace the OCHC biennial peer reviews.

    iv. Clinical care of the incarcerated individual population, and

    v. Evaluation of incarcerated individuals for referral consultations, and

    vi. Participation in collegial review process, per ODRC Medical Protocol B-1, Consultation Referrals, and

    vii. Review and act upon the recommendations of the specialty consultants, which may include modification of the recommendation or development of an alternative plan of care. The rationale for modifications or alternative plans of care shall be documented in the electronic health record (EHR), and

    viii. Monthly review of outstanding consults with the HCA, per ODRC Policy 68-MED-14, Specialty Health Care Services, and

| SUBJECT: **Medical Services** | PAGE __5__ OF __18__ |
|---|---|

    ix. Review of all medical emergency transfers to outside hospitals on the next working day, with the HCA, and

    x. Review and approval of all medical restrictions, and

    xi. Provision of medical information/education to the health care and institutional staff, and

    xii. Provision of medical summaries or other written information, and

    xiii. Attendance and participation in institution and departmental meetings and committees, including the Pharmacy and Therapeutics committee, CQI committee, and quarterly administrative meetings, and

    xiv. Health Care policies and protocols review on an annual basis, and

    xv. All other duties as assigned by the OCHC.

4.    ODRC Medical Policy and Protocol

    a. Each policy, procedure, and program in the health care delivery system is reviewed at least annually by Medical Operations and revised, if necessary.

    b. Medical Operations shall develop, coordinate, and enforce system-wide medical service policies and protocols and shall provide direction related to health care issues.

    d. The State Medical Director shall be responsible for the review and revision of medical policies and protocols.

    e. The deputy director of Holistic Services shall be responsible for the review and revision of OCHC policies and protocols.

    f. Medical Operations shall be responsible for providing specific guidance and training/testing materials to all relevant field staff about substantive changes in medical policy or protocol.

       i. Each HCA shall ensure all institutional medical advanced level providers (ALP) and nurses receive OCHC-generated training and testing regarding new and revised medical/medical-related policies and protocols.

          a) Policy and protocol testing shall occur during the initial on-the-job-training period.
          b) Policy and protocol testing shall also occur upon new and updated policy and protocol releases; this testing shall be completed within thirty (30) days of the policy/protocol effective date.

       ii. Training and testing results shall be maintained and tracked through the CQI process.

SUBJECT: **Medical Services**  |  PAGE___6___ OF ___18___.

g. The institution HCA and the CMO are responsible for ensuring each policy and protocol is implemented in accordance with ODRC guidelines.

h. The managing officer/designee shall be responsible for reviewing and revising any institution post orders required to ensure compliance with medical policy and protocol.

5. Institution Medical Strategic Planning

a. As a part of the institution's medical program strategic planning process, each HCA and CMO shall develop measurable goals and objectives that shall be reviewed annually and updated as needed.

b. During the annual review, each HCA shall assess the achievement of established goals and objectives and document findings. Program changes shall be implemented, as necessary, in response to findings.

c. As detailed in ODRC Policy 08-MAU-01, Internal Management Audits, the internal management audit system shall be used to monitor compliance with department policies and established standards.

6. Institution Administrative Meetings and Reporting Requirements

a. Each institution HCA and CMO shall meet with and submit reports to the managing officer, appropriate deputy warden, and a security representative at least quarterly to address communicable disease and infection control issues/activities, issues pertinent to medical services and health environment; and shall develop and submit plans to address issues raised. Additionally, the HCA shall review with the managing officer and appropriate deputy warden any newly adopted or revised policies and protocols.

b. Each institution HCA shall prepare and submit electronic monthly reports that include, but are not limited to, the following:
   i. Referrals to specialists,
   ii. Prescriptions written,
   iii. Laboratory and x-rays completed,
   iv. Infirmary admissions,
   v. Off-site transports,
   vi. Transports to outside emergency departments,
   vii. Hospital admissions,
   viii. Serious injuries or illnesses, and/or
   ix. Deaths.

7. Credentials Review

a. The HCA shall verify the licensure status of each licensed or certified employee annually, as outlined in ODRC Medical Protocol K-2, Credentialing and License Verification. Verification of current credentials and job descriptions shall be maintained on file in each facility.

| SUBJECT: **Medical Services** | PAGE ___7___ OF ___18___ |

b. The centralized background unit shall conduct a background investigation on all contractors, as outlined in ODRC Policy 34-PRO-07, Background Investigations. The results of this investigation shall be maintained in the contractor's file.

**B.** **Incarcerated Individual Care and Treatment**

1. Vital signs (i.e., blood pressure, temperature, pulse, height, weight, and oxygen saturation levels) shall be completed on the patient and recorded for every medical encounter other than medication administration; specific vital signs appropriate to specific drug administration shall be completed as indicated by the drug parameters.

2. A complete medical, dental, and mental health screening shall be performed on each incarcerated individual, excluding intra-system transfers, at the time of the incarcerated individual's arrival at one of the ODRC's reception centers in accordance with ODRC Policy 52-RCP-06, Reception Intake Medical Screening.

3. Health appraisal data collection and recording shall include the following:

   a. A uniform process as defined by the OCHC.
   b. Health history and vital signs collected by health trained or qualified health care personnel.
   c. Collection of all other health appraisal data performed only by qualified health professionals.
   d. Review of results of the medical examination, tests, and identification of health-related problems is performed by an ALP.

4. Detoxification

   a. Detoxification of alcohol, opiates, hypnotics, other stimulants, and sedative hypnotic drugs is conducted only under medical supervision at the facility or in a hospital setting when conditions warrant.

      i. Detoxification procedures shall be implemented in accordance with ODRC Medical Protocol B-24, Medical Detoxification Guidelines.

      ii. A referral to the Bureau of Correctional Recovery Services department located at that institution shall be electronically generated.

   b. Incarcerated individuals experiencing severe, life-threatening intoxication (an overdose), or withdrawal are transferred under appropriate security conditions to a facility where specialized care is available.

      i. A referral to the Bureau of Correctional Recovery Services department located at that institution shall electronically generated.

5. Intra-System Transfer Procedures: Reference ODRC Medical Protocol B-12, Intra-System Transfer and Receiving Process for specific process details.

| SUBJECT: **Medical Services** | PAGE __8__ OF __18__ |
| --- | --- |

    a. Prior to any intra-system or interagency (i.e., ODRC to county jail or other correctional agency) transfer, a nursing assessment shall be completed on all incarcerated individuals to maintain the provision of continuity of care.

        i. The assessment shall include information about the patient's health condition, treatments, allergies, scheduled appointments, pertinent test results and prescribed medication.

        ii. The medical evaluation shall include a determination of the patient's suitability for travel, with particular attention given to communicable disease clearance.

    b. All prescribed essential medication shall be prepared in accordance with procedures outlined in ODRC Medical Protocol E-32, Preparation of Medication for Intra-System Transfers.

    c. Medical records shall be transferred with the patient and be handled in such a manner as to ensure confidentiality.

        i. Completed hard copy patient records shall be transported to the receiving institution.

        ii. Refer to ODRC Policy 07-ORD-11, Confidentiality of Medical, Mental Health, and Recovery Services Information, ODRC Medical Protocol E-32, Preparation of Medications for Intrasystem Transfer, and ODRC Policy 69-OCH-06, Electronic Health Record Utilization and Responsibilities for additional details.

    d. Upon arrival at a new institution, all incarcerated individuals shall be provided both oral and written instruction, in a language that is easily understood by each incarcerated individual, concerning access to medical care, the grievance process, copay requirements, and mental health services within the institution.

        i. Arrangements shall be made to provide this information to non-English speaking incarcerated individuals in a language they can understand.

        ii. When literacy or other communication problem exists, a staff member shall assist the incarcerated individuals in understanding the information.

    e. Receipt of orientation information given to patients shall be documented on the Medical Intake Signature Acknowledgement.

6. A registered nurse (RN) or ALP shall conduct a health screening on each patient upon arrival which includes, at a minimum, those items needed to complete the NSG-Nursing Intra-System Transfer Receiving Assessment within eight (8) hours of arrival at the receiving institution. Consistent with ODRC Policy 67-MNH-02, Mental Health Screening and Mental Health Classification, and ODRC Policy 52-RCP-06, Reception Intake Medical Screening, the initial mental health screening shall also be completed at this time.

| SUBJECT: **Medical Services** | PAGE___9___ OF ___18___ |

7. Medical Needs During Transport

   a. Correction officers shall not provide nurse-administered medications and medical treatments during transport of a patient.

   b. The patient shall be permitted to retain certain self-carried medications in their possession, such as asthma inhalers and nitro-glycerin tablets, in accordance with ODRC Policy 310-SEC-03, Incarcerated Individual Transportation, and ODRC Medical Protocol E-32, Preparation of Medication for Intra-System Transfers.

   c. Patients on oxygen maintenance therapies may be transported in ODRC vehicles to and from institutions/hospitals.

   d. If the patient has a medical condition that requires a modification to the restraint procedures or any other special accommodations or precautions during transport, medical staff shall collaborate with the chief security officer/managing officer.

   e. The chief security officer/designee shall ensure all special precautions are followed, including any required use of masks, gloves, or other protective equipment. Such notification should also be made any time during a patient's incarceration when the treating ALP diagnoses a medical condition requiring such accommodation.

 8. General Medical Services

   a. An ALP shall be on call 24-hours per day.

   b. Patients who have complaints about medical issues shall follow the procedures outlined in Administrative Rule 5120-9-31, Inmate Grievance Procedure.

9. Sick Call Services

   a. Incarcerated individuals shall be able to place requests for health services daily. Such requests shall be conveyed through readily available Health Service Request forms (DRC5373 or the electronic equivalent), which are triaged daily by medical staff, as outlined in ODRC Medical Protocol A-2.35, Nursing Sick Call Access.

   b. A priority system shall be used to schedule clinical services, which shall be available to patients in a clinical setting at least five (5) days a week, including nurses and ALP sick call.

   c. Clinical services shall be available to all incarcerated individuals in a clinical setting at least five (5) days a week by an ALP or other qualified healthcare professional.

   d. No member of the correctional staff shall disapprove an incarcerated individual's request for attendance at sick call.

   e. All Health Care encounters shall be conducted in a setting that respects patient privacy. Unless there is a known threat to the safety of healthcare staff, security staff shall maintain sound privacy by standing outside of the consultation area.

| SUBJECT: **Medical Services** | PAGE ___10___ OF ___18___ |
|---|---|

    f.   Licensed medical personnel are expected to practice within their respective scopes of practice at all times.

    g.   Staff medical resources shall be available through each medical services department.

10.   Restrictive Housing

    a.   Security staff shall immediately notify medical staff when an incarcerated individual is transferred to a restrictive housing unit. The institution medical staff must approve the transfer of an incarcerated individual housed in the infirmary to a restrictive housing unit.

    b.   Medical staff shall provide review and assessment of each incarcerated individuals housed in a restrictive housing unit and log it.

        i.   The Monthly Emergency Telephone Log (DRC5372) must be used, as outlined in ODRC Medical Protocol A-2.36, Nursing Telephone Triage.

        ii.   In the incidence of an in-person review of the incarcerated individual, a log of the institution's design must be utilized.

    c.   Unless medical attention is needed more frequently, each incarcerated individual in restrictive housing shall receive a daily visit from a nurse.

        i.   The visit ensures that incarcerated individuals have access to the health care system.

        ii.   The presence of the nurse in restrictive housing shall be announced and recorded in the correction officer's log.

        iii.   Nursing rounds and nurses sick call shall be conducted in each restrictive housing unit as outlined in ODRC Medical Protocol A-2.35, Nursing Sick Call Access.

    d.   Doctor's sick call shall be provided on a schedule that is determined by the HCA.

    e.   Medical appointments, diagnostic tests or other medical procedures shall not be cancelled or rescheduled because of restrictive housing unit admission without the approval of the CMO.

11.   Infirmary Care

All institutions shall provide access to infirmary care either on-site or via transport to another facility. Specific procedural guidelines for infirmary care are outlined in ODRC Policy 68-MED-21, Infirmary Care.

SUBJECT: **Medical Services**  PAGE___11___ OF ___18___



12. Chronic Disease Management

   a. When incarcerated individuals are diagnosed with a chronic illness, institution ALPs shall develop a treatment plan that addresses the monitoring of medications, laboratory testing, health record forms, the frequency of specialist consultations and other guidelines outlined in the appropriate chronic care clinic protocol.

   b. A patient who requires close medical supervision, including chronic disease and convalescent care, shall have a written individualized treatment plan developed that includes directions to medical and other personnel regarding their roles in the care and supervision of the patient, and that is approved by the appropriate ALP.

   c. Chronic disease management strategies are outlined in ODRC Policy 68-MED-19, Chronic Disease Management, and in the chronic care clinic medical protocols.

13. Medical Emergency Services

   a. Each institution shall have a plan that assures that emergency medical, mental health, and dental services are available 24-hours per day.

   b. All correctional and healthcare personnel shall be trained to respond to health-related emergencies within a 4-minute response time. The training program is conducted on an annual basis and includes instruction on the following:

      i. Recognition of signs and symptoms, and knowledge of action that is required in potential emergency situations; and
      ii. Administration of basic first aid; and
      iii. Certification in cardiopulmonary resuscitation (CPR) in accordance with the recommendations of the certifying health organization; and
      iv. Methods of obtaining medical/mental health staff assistance; and
      v. Signs and symptoms of mental illness, violent behavior, and acute chemical intoxication, and withdrawal; and
      vi. Procedures for patient transfers to appropriate medical facilities or health providers; and
      vii. Suicide intervention.

   c. Specific procedural guidelines for provision of emergency services and emergency response training are outlined in ODRC Policy 68-MED-20, Emergency Services, ODRC Medical Protocol B-8, Guidelines for Assessment and Processing of Medical Emergencies, and ODRC Medical Protocol B-32, CPR Standards for Health Care Staff.

14. Sexual Assault

   a. When an incarcerated individual reports or is suspected of being the victim of a sexual assault, he/she shall be referred, under appropriate security provisions, to a community facility for treatment and gathering of evidence

| SUBJECT: **Medical Services** | PAGE __12__ OF __18__ |

    b. Specific guidelines for the management of a suspected sexual assault are outlined in ODRC Policy 79-ISA-01, Prison Rape Elimination, and ODRC Medical Protocol B-11, Medical Care Guidelines for Sexual Conduct or Recent Sexual Abuse.

15. Pre-Release Guidelines

    a. The count office shall notify the medical department, in writing, of an incarcerated individual's expiration of sentence or pending placement for the following month. Immediate notification shall be given on those occasions when an incarcerated individual is ordered released on a same day basis.

    b. Prior to release, the incarcerated individual's medical record shall be reviewed, and a licensed nurse shall complete an electronic release medical summary for all incarcerated individuals who are released.

    c. The ALP shall order, as outlined in ODRC Medical Protocol E-25, Dispensing Medication for Releases and Transfers, prescribed medical and mental health medication(s) that shall be issued to the incarcerated individual upon release from an ODRC institution.

    d. If the patient is prescribed insulin, a Diabetic Going Home Kit shall be issued to the patient. If other injectable medication is prescribed, excluding all mental health injectable medications, the appropriate supplies shall be issued to the patient.

    e. If the patient meets eligibility criteria, a Narcan Going Home Kit shall be issued to the patient.

    f. Each institution health services department shall develop an institution specific procedure that promotes continuity of care after release. A list of referral sources shall be given to patients who require medical follow-up after release.

    g. The release medical summary and education regarding medical follow up care needs shall be provided to all incarcerated individuals prior to release from the institution. Incarcerated individuals shall be provided medications prior to release from the institution.

 **C. Health Care Services and Support**

1. Specialty Health Services

    a. The CMO shall determine if a patient needs specialized healthcare services not available within the institution.

    b. Patients who need specialized health care beyond the resources available in the institution, as determined by the responsible ALP, shall be transported under appropriate security provisions to a facility where such care is scheduled, on call or available 24-hours per day.

| SUBJECT: **Medical Services** | PAGE ___13___ OF ___18___ |
| --- | --- |

c. Each institution shall develop a written list of referral sources, to include emergency and routine care. This list shall be reviewed and updated annually by the HCA.

d. If the CMO determines medical services are needed that are beyond the scope provided by the medical department of the parent institution, he/she shall make the referral for patient transfer under appropriate security provisions to a facility where such care is available, as outlined in ODRC Policy 68-MED-13, Medical Classification.

e. Hospital inpatient and specialty health services are provided by community providers, as outlined in ODRC Policy 68-MED-14, Specialty Health Care Services.

2. Ancillary Services

a. Laboratory Services: The ODRC-contracted lab provides full service, high complexity laboratory testing for all institutions.

b. X-ray services are available either on-site, at the Franklin Medical Center (FMC), in community facilities contracted by ODRC, or at institutions with privatized medical services.

c. Dental services are available to every incarcerated individual as outlined in ODRC Policy 68-MED-12, Dental Services.

d. Pharmacy services are provided for each institution as outlined in ODRC Policy 68-MED-11, Pharmacy Services.

e. Exercise areas shall be available in each institution to meet the exercise and physical therapy requirements of individual patient treatment plans.

f. Medical and/or dental adaptive devices (i.e., eyeglasses, hearing aids, dentures, wheelchairs, or other prosthetic devices) shall be provided when medically necessary, as determined by the responsible health care practitioner and through the collegial review process, as outlined in ODRC Medical Protocol B-1, Consultation Referrals.

3. Medical Transportation

a. The safe and timely transportation of incarcerated individuals for emergency and routine medical, mental health, and specialty clinic appointments, both inside and outside the institution, is the joint responsibility of the managing officer/designee and the HCA.

b. Each institution shall provide for transportation that assures access to medical services that are only available outside of the institution in accordance with ODRC Policy 310-SEC-03, Inmate Transportation, and ODRC Policy 68-MED-20, Emergency Services. Decisions concerning transportation shall incorporate the following requirements:

| SUBJECT: **Medical Services** | PAGE 14 OF 18 |

    i.  Prioritization of medical need: Referrals to specialty consults shall be designated as routine or to be scheduled within a specific timeframe within the EHR and processed in accordance with ODRC Policy 68-MED-14, Specialty Health Care Services and ODRC Medical Protocol B-1, Consultation Referrals.

    ii.  The urgency of the medical need for ambulance versus standard transport as designated by the institutional ALP or other health care designee.

    iii.  Medical escort shall be used to accompany security staff if necessary. If medical escort is required, ambulance transport must be used. Institutional medical staff shall not act as the medical escort.

    iv.  The transfer of medical information shall be followed as outlined in ODRC Medical Protocol B-8, Guidelines for Assessment and Processing of Medical Emergencies, and ODRC Policy 68-MED-14, Specialty Health Care Services.

 **D.** **Health Promotion and Disease Prevention**

1. Each institution shall offer an ongoing program of health education and wellness information to all offenders.

2. Each institution shall also offer a holistic services fair annually for incarcerated individuals, which may include informational booths, speakers, and access to free health screenings.

    a.  Participation and attendance of all institutional holistic services areas, which includes education, medical, mental health, religious and recreational services, and recovery services, is mandatory.

    b.  Medical services shall coordinate the event.

    c.  Holistic services fair admission shall be extended to family and support persons of incarcerated individuals and community partners.

    d.  Notification of the holistic services fair shall be publicized in incarcerated individual common areas at least thirty (30) days prior to the holistic services fair.

    e.  A list of activities/booths offered during the holistic services fair shall be publicized.

    f.  Incarcerated individual participation shall be captured via individual signatures.

 3. Periodic Examinations

    a.  Every institution shall make periodic physical examinations available to all incarcerated individuals as outlined in ODRC Medical Protocol B-5, Health Examination Guidelines for Inmates.

    b.  Appropriate patient education regarding health maintenance and disease prevention shall be made available to incarcerated individuals during the physical examination.

4. Medical staff shall collaborate with other areas of the OHS to ensure the holistic needs of the incarcerated individuals at the institution are met.

Medical staff shall participate in a holistic family event at least quarterly.

a. Each quarter, a different service area under holistic services shall be responsible for coordinating the event.
b. The event shall be extended to family and support persons of incarcerated individuals and community partners, when applicable.

c. When medical services are not responsible for coordinating the quarterly event, it shall be an active participant in the event by providing materials, information, staff, and other needed items to ensure medical services is appropriately represented.

**E. Personnel and Training**

1. Institution Medical Staffing

a. A staffing plan for each institution shall be developed through Medical Operations from a staffing analysis that defines the scope of services to be provided and determines the essential positions needed to perform the medical services mission. The HCA shall review this staffing plan with Medical Operations at least annually to provide input in determining if the number and type of staff is adequate.

b. Adequate health care personnel shall be available within the institution for health assessments, medication administration, triaging of complaints and problems, chronic care, management of emergencies, and follow-up services.

c. Written job descriptions shall be prepared by the OCHC for qualified health care staff and approved by the HCA. These job descriptions are reviewed with each employee upon hire and annually at the time of the employee's performance evaluation.

d. The specific duties and responsibilities of health care staff shall be clearly defined and delineated.

e. Work assignments shall be developed in compliance with the licensee's scope of practice.

f. Nursing students, medical students, and interns delivering medical care in the institution shall work, commensurate with their level of training, under the direct supervision of a clinical instructor who is responsible to the HCA.

i. There shall be a written agreement between the ODRC, coordinated and approved through the OCHC prior to student/intern placement, and the training or educational facility, that covers the scope of work, length of the agreement, and any legal or liability issues.

     ii. Students or interns shall agree in writing to abide by all facility policies including those relating to the security and confidentiality of information.

     iii. For additional details, refer to ODRC Policy 38-CED-05, Internship Guidelines.

  g. Incarcerated workers are restricted to defined job duties within the health care area and shall work under the supervision of the custody staff. Incarcerated individuals shall <u>not</u> be used for the following:

     i. Performing direct patient care services, except under direct supervision by qualified staff as part of an apprenticeship program.
     ii. Any duties that allow direct or indirect access to confidential medical information.
     iii. Scheduling health care appointments.
     iv. Any activity that determines access of other incarcerated individuals to health care services.
     v. Handling or having access to surgical instruments, syringes, needles, medications, or health care records.

  h. Upon receiving appropriate training developed by the HCA and approved by the regional nurse administrator (RNA), incarcerated workers may perform familial duties commiserate with their level of training. These duties may include:

     i. Peer support and education.
     ii. End-of-Life Care activities, including service as a companion, letter writing, and reading.
     iii. Assist impaired incarcerated individuals on a one-to-one basis with basic life functions/activities of daily living, which may include but is not limited to:
       a) Assisting vision-impaired incarcerated individuals with communication facilitation, ambulatory guidance, spatial awareness, organization of personal property, etc.; or
       b) Assisting mobility-impaired incarcerated individuals with ambulatory guidance, wheelchair maneuvering, transportation of items, organization of personal property, etc.; or
       c) Assisting hearing-impaired incarcerated individuals with communication facilitation, spatial and auditory awareness, etc.; or
       d) Assisting speech-impaired incarcerated individuals with communication facilitation, etc.
     iv. Serving as a suicide companion or buddy if qualified and trained through a formal program that is part of a suicide-prevention plan.
     v. Optometric assistance, as part of ODRC's eyeglass fabrication processes, when directly supervised and in compliance with applicable tool control policies.
     vi. Denture fabrication, when directly supervised and in compliance with applicable tool control policies.

2. Continuing Education and Staff Development

  a. The HCA shall work with the institution training department and the security chief to ensure all health care personnel are training in the implementation of the institution's medical emergency plans.

| SUBJECT: **Medical Services** | PAGE 17 OF 18 |
|---|---|

   b. Health care personnel must participate in annual training drills of the medical services delivery aspects of the critical incident management plan.

   c. Medical staff is encouraged to take advantage of the various medical in-service training classes officered by the department. Staff development classes are regularly offered at the Corrections Training Academy (CTA). A schedule of these classes is available in the CTA catalog if class offerings.

 **F. Special Medical Considerations**

   1. Security of Medical and Dental Equipment

   a. Security of all medical and dental equipment and instruments is of paramount importance. Medical and dental staff shall conform to the procedures outlined in ODRC Policy 310-SEC-36, Tool Control, and to each institution's specific tool control procedures.

   b. All medical and dental staff shall adhere to the procedures outlined in ODRC Medical Protocol E-2, Pharmacy Administrative Operations.

   2. Second Opinions/Private Pay

   a. Incarcerated individuals do not have the option to receive a second opinion in medical matters. Likewise, a "private physician" is not permitted to treat an individual while incarcerated.

   b. Incarcerated individuals generally do not have the option to purchase or receive prescription medication or medically related items from outside sources. Certain medically indicated devices may be authorized on a case-by-case basis. Such exceptions may include, but are not limited to:

      i. Back or knee braces,
      ii. CPAP machines,
      iii. Nebulizer compressors,
      iv. Eyeglasses (note: ODRC does not provide contact lenses to incarcerated individuals unless medically indicated),
      v. Specialized wheelchairs, and
      vi. Other medically necessary equipment that meets security requirements, if authorized by the institution's chief of security, the HCA and CMO.

   c. Health care insurance programs in place prior to the incarcerated individual's incarceration may be accessed for medical services while the individual is incarcerated by the ODRC. Decisions about seeking reimbursement from third party payers shall rest with the OCHC and shall be considered on a case-by-case basis.

| SUBJECT: **Medical Services** | PAGE___18___ OF ___18___ |

**Referenced ODRC Medical Protocols:**

A-2.35   Nursing Sick Call Access
A-2.36   Nursing Telephone Triage
B-1      Consultation Referral
B-5      Health Examination Guidelines for Inmates
B-8      Guidelines for Assessment and Processing of Medical Emergencies
B-11     Medical Care Guidelines for Sexual Conduct or Recent Sexual Abuse
B-12     Intra-System Transfer and Receiving Process
B-24     Medical Detoxification Guidelines
B-32     CPR Standards for Health Care Staff
E-2      Pharmacy Administrative Operations
E-25     Dispensing Medication for Releases and Transfers
E-32     Preparation of Medication for Intra-System Transfers
K-2      Credentialing and License Verification

**Referenced ODRC Policies:**

07-ORD-11    Confidentiality of Medical, Mental Health, and Recovery Services Information
08-MAU-01    Internal Management Audits
34-PRO-07    Background Investigations
38-CED-05    Internship Guidelines
52-RCP-06    Reception Intake Medical Screening
67-MNH-02    Mental Health Screening and Mental Health Classification
68-MED-11    Pharmacy Services
68-MED-12    Dental Services
68-MED-13    Medical Classification
68-MED-14    Specialty Health Care Services
68-MED-19    Chronic Disease Management
68-MED-20    Emergency Services
68-MED-21    Infirmary Care
69-OCH-06    Electronic Health Record Utilization and Responsibilities
310-SEC-03   Incarcerated Individual Transportation
310-SEC-36   Tool Control

**Referenced Forms:**

| Request to Purchase | DRC1918 |
| Budget Adjustment Request | DRC2303 |
| Monthly Emergency Telephone Log | DRC5372 |
| Health Service Request | DRC5373 |



**DAVE YOST**

OHIO ATTORNEY GENERAL

Criminal Justice Section
Office 614-644-7233
Fax 855-665-2568

Appendix Letter 1

March 19, 2024

Terrance Feaster, #A551-840
Southern Ohio Correctional Facility
P.O. Box 45699
Lucasville, Ohio 45699

Re: *Feaster v. Chambers-Smith, et al.*
Case No. 1:22-CV-313

Dear Mr. Feaster:

In reviewing your latest motion to compel, it is apparent that you did not understand my cover letter for the responses to your request for the production of documents. The video footage and audio file [Bates Stamped 000351 – 000354, for identification purposes] are with SOCF staff (Sherri Bishop) and you need to kite Ms. Bishop to schedule a time to review the video footage and audio file. Ms. Bishop has the Statement that is to be completed and signed each time you view a video or listen to the audio.

Thank you and please let me know if you have any questions.

Sincerely,

DAVE YOST
Ohio Attorney General

*Andrew T. Gatti*

ANDREW T. GATTI
Assistant Attorney General
Criminal Justice Section

ATG

Ohio Attorney General's Office                    April 18th ,2024

(Atty.) Andrew T. Gatti                           Appendix Letter 2

Corrections litigation Unit

30 East Broad St., 23rd Fl.

Columbus, Oh 43215


**RE: FEASTER v. CHAMBERS-SMITH, et al.,**

   (case no. 1:22-cv-313)


Dear Mr. Gatti,


I have now reviewed viable video and audio evidence in the above cited case as of 4/11/2024, and I have
concluded that the evidence is much more aggravated than one can imagine. In the sense the most vital
and damaging video labeled (security video #666-21) was conveniently unavailable, (Hand held camera
footage RIMG-0469, and RIMG-0470), and (R.I.B. Audio of Case No. SOCF-21-003966), In this instance is
overwhelmingly favorable to me and further my Settlement Agreement Proposal dated 12/1/2023
stands firm. I will next move to fully brief this case as I have enough evidence to support my claims as
well as seek to verify my "Amended Complaint" (Doc #3) I believe a settlement is in the best interest of
the State and defendants at this time. Please understand there will be a forthcoming civil action
pursuant to 42 U.S.C. 1983 and in gaining a full understanding are you going to be representing
officers/employees/ or agents with the S.O.C.F.? If so please look forward to my complaint.


Respectfully,

Terrance J. Feaster, Pro Se'

#551840

(S.O.C.F.)

P.O. Box 45699

Lucasville, OH 45699

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION AT CINCINNATI

TERRANCE J. FEASTER,

    Plaintiff.

Case No. 1:22-cv-313

VS.

District Judge Michael R. Barrett

Magistrate Judge Karen L. Litkovitz

ANNETTE CHAMBERS-SMITH, et al.,

    Defendants.

STATE OF OHIO )

           ) SS.  **AFFIDAVIT**

COUNTY OF SCIOTO )

Affiant, Terrance J. Feaster, after being duly Cautioned and Sworn, States as follows:

1. I, Terrance J. Feaster, the Plaintiff in this Action am making this Affidavit in Support of Plaintiff's Motion for Summary Judgment on the grounds that the Pleadings, declarations, and exhibits expressed therein and attached with Memorandum hereto are true and Correct to the best of my Knowledge.

        FURTHER AFFIANT SAYETH NAUGHT

                _____

                  Terrance J. Feaster

Sworn to, or affirmed, and Subscribed in my presence this 2nd day of

May, 2024.

_____

Notary Public:

3/19/24

My Commission Expires;

SHERRI BISHOP
Notary Public, State of Ohio
Comm. Expires March 19, 2027

District Judge Michael R. Barrett                                        May 2nd, 2024

United States District Court For

The Southern District of Ohio

100 East Fifth St., RM. 103

Cincinnati, Oh 45202


RE: Plaintiff's Letter to Court


Dear Honorable Judge Michael R. Barrett,

I am writing you this instant letter as I believe Magistrate Judge Karen L. Litkovitz must be advised that she has received the wrong mail and this mail was not sent out in my name at all but a prisoner by the name of R. Shanklin. Judge Barrett Mr. Shanklin sent out a letter along with the declaration by myself and mention of attorney Edward Hamilton I learned this mistake as of court order dated 4/25/2023 I would hate to believe that this court is also acting as a deterrent alongside and aligned with the (S.OC.F.). It seems that there is either clear and substantial prejudice and judicial bias with this specific court or that there is clear and evident systemic racism as the Southern Ohio Correctional facility is indulging in undeniable corrupt acts like I've expressed all along. I would also point out that as dated 4/25/2024 I sent a letter addressed to this court more specifically to you and on that exact same date I receive a ruling denying all dispositive motions in the order entered 4/25/2024. I don't believe in coincidences as this has happened more than once and quite the contrary is a clear violation of U.S.C.S. Jud. Con. And Disab. Proc. 4(a)(1)(2)(B). I have attempted to request "Oral Arguments" and suggest the court allow me a chance to be heard on the merits of this instant case. I am currently awaiting printouts of grievances to file the forthcoming 42 U.S.C.S. 1983 Civil Action. I would also like to inquire on whether or not you received my letter attached with Plaintiff's Notice of Verification which I sent attached meant to be filed as well.

My inquiries are merely to acknowledge a fair and impartial litigation and that It is the S.O.C.F. committing these aggrieved acts and not the court. As well as I contend that missing video footage is cause for a motion to compel as I am not certain as to why this is unavailable. Motion to Compel Discovery has since been denied by Magistrate Judge Karen L. Litkovitz. I have sent O.A.G. Atty. Andrew Gatti a letter directly after review of the available evidence as I have attached to "Motion for Summary Judgment". Please help clarify these unanswered grievances. Thank you!

Sincerely and Respectfully,

Terrance J. Feaster

#551840

P.O. Box 45699

Lucasville, Oh 45699